# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MKS INSTRUMENTS, INC., and | ) | |
| APPLIED SCIENCE AND TECHNOLOGY, | ) | |
| INC., | ) | |
|        Plaintiffs, | ) | |
|    v. | ) | Civil Action No. 03-469 JJF |
| | ) | |
| ADVANCED ENERGY INDUSTRIES, INC., | ) | |
| | ) | |
|        Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER
AS TO ADVANCED ENERGY'S MOTION FOR CONTEMPT**

## I.     PROCEDURAL BACKGROUND TO THE MOTION

On July 1, 2004, Defendant Advanced Energy Industries, Inc. ("AE") filed its
Motion for Contempt and supporting brief (D.I. 195-196) against Plaintiffs MKS Instruments,
Inc. and Applied Science and Technology, Inc. (collectively "MKS"). The filing of AE's Motion
for Contempt arises from the filing by MKS of a Petition for Decree of a Temporary Injunction
that was filed in the Federal Republic of Germany on June 6, 2004 (the "German Injunction").
MKS filed the German Injunction in an effort to enjoin AE from selling AE's Xstream product in
Germany. AE contends that in filing the German Injunction, which MKS filed under seal, MKS
violated the terms of the Stipulated Protective Order (D.I. 28) that was entered in this action on
September 24, 2003.

AE alleges that MKS violated the Stipulated Protective Order by attaching the
Affidavit of an MKS expert, Dr. Herbert H. Sawin, to the German Injunction. According to AE,
the Sawin Affidavit (which was also filed under seal but not designated as confidential in this
action) relied upon confidential documents produced by AE to MKS pursuant to the Stipulated

Protective Order in this action.  The documents in question, some of which were specifically referenced in the text of Dr. Sawin's report, were listed in Appendix B to the Sawin Affidavit that was filed in connection with the German Injunction by MKS.  Although it is clear that MKS filed the German Injunction on June 6, 2004, the record is unclear as to the precise time at which AE became aware of the filing of that action.  However, the record does reflect that at least by June 17, 2004, it had requested MKS to withdraw the German Injunction and on June 18, 2004, in a conference with this Court, AE reported to the Court the circumstances of the German Injunction and the use of the Sawin Report.  AE subsequently filed its Motion for Contempt on July 1, 2004.  MKS did not file its Opposition to AE's Motion for Contempt until August 6, 2004, after the infringement trial in July 2004 had run its course.  (D.I. 269)  A week later, AE filed its Reply Brief in support of its Motion for Contempt.  (D.I. 275)  The Court took no action with respect to AE's Motion for Contempt until it issued its Memorandum Order this year on March 31, 2005.  Specifically, in paragraph 15 of the Court's March 31, 2005 Memorandum Order (D.I. 311), the Court stated:

> "(15)  Advanced Energy's Motion for Contempt (D.I. 195) –
> **DENIED** with leave to refile before the Special Master.  Procedure
> for briefing and disposition of the issue of contempt to be at the
> direction of the Special Master."

## II.   DOES THE RECORD REFLECT THAT MKS VIOLATED THE STIPULATED PROTECTIVE ORDER?

The analysis of the above question must necessarily begin with a review of the German Injunction which corresponds, in some respects, to a civil complaint for patent infringement in this Court.  Within the German Injunction there are several references either to the general analysis provided by Dr. Sawin, or more specifically to his report that was annexed as an exhibit to the German Injunction.  Several specific pages of the German Injunction refer to

Dr. Sawin's analysis or his report, i.e. pages 5, 6, 7, 10, and 11.  There is no question that the German court or patent authority would have been drawn, ineluctably, to a review of the Sawin expert report that was attached as an exhibit to the German Injunction.  The Sawin expert report consists of 34 pages of text with exhibits, including the above-referenced Appendix B which is a list of documents relied upon by Dr. Sawin in preparing his report.  This list includes patent filings, correspondence, pleadings, and deposition transcripts in this action, and, perhaps most significantly, for purposes of the present motion, a list of AE documents that were produced in this action with no indication of whether they had been designated by AE as confidential or not. The parties have since confirmed, at my request, that virtually all of the AE documents identified in Appendix B and virtually all the AE documents relied upon and specifically cited in the text of Dr. Sawin's report, were designated confidential or highly confidential by AE.  On page 2 of the Sawin expert report, there is a section entitled "Materials Relied Upon in Forming Opinions." Beneath that heading, Dr. Sawin stated:

> In preparation and as a basis for the opinions expressed in this report, I have considered documents and materials provided to me by counsel for MKS.  A complete listing of the documents and materials so provided are attached as Appendix B.  I have personally inspected the Xstream, AE Rapid-F and Rapid-O products, and have personally inspected an Astron product manufactured by MKS.

MKS correctly points out that a not insignificant portion of Dr. Sawin's expert report relies upon his physical examination of the Xstream product, as well as a review of the manual to that product, both of which were publicly available.  However, Dr. Sawin's expert report also indicated his reliance on a number of other confidential documents produced by AE to MKS pursuant to the Stipulated Protective Offer.  For example, his report states:

> I have personally reviewed AE materials, documentation, and testimony on the Xstream product, including drawings, circuit

3

> diagrams, user manuals, and presentations, as listed in Appendix
> B.  I have based part of my opinion on an analysis of several
> drawings, including the drawings of the physical topology of the
> Xstream unit such as document AE (CO) 23739, and the related
> documents, as well as document AE (CO) 023738 showing a
> circuit diagram of the Xstream Active Match Network (the
> "Xstream Circuit"), which Advanced Energy claims functions as
> an impedance matching network.

*See* Sawin Report at p. 21, ¶66.

Both of the AE documents referenced in the above quotation are listed in

Appendix B to Dr. Sawin's expert report as documents produced by AE and designated as

"highly confidential."  In paragraph 86 of the Sawin report, in analyzing the characteristics of the

Xstream product, he indicated his reliance upon document AE (CO) 026877-890.  For reasons

that are not entirely clear, this Bates range does not appear in Appendix B to his report as a

document provided to him by AE, although it surely must have been.[1]  Nevertheless, the parties

have confirmed that this document was designated as "confidential."

Based upon the above undisputed matters of record, the question then becomes,

did Dr. Sawin's reliance on those AE documents in rendering his expert opinion that was

submitted in support of the German Injunction constitute a violation of the Stipulated Protective

Order?  AE emphasizes in its Motion for Contempt that the use of such documents was in clear

violation of paragraph 2 of the Stipulated Protective Order which provides:

> Any information, documents or things designated as Confidential
> Information or Highly Confidential Information by a Disclosing
> Entity ***shall be used by the Receiving Party(ies) solely for the
> preparation and trial of this lawsuit***, settlement discussions and
> negotiations in connection with this lawsuit, or any form of
> alternative dispute resolution of this action, and for no other
> purpose.

---

[1]  The same is true for document AE (CO) 023734 which is not identified in Appendix B to his
report.

(emphasis added).

> Additionally, paragraph 6 of the Stipulated Protective Order, provides that:
>
> Information, documents and things identified as Confidential Information by a Disclosing Entity shall not be disclosed, given, shown, made available or communicated in any way, directly or indirectly, to anyone other than the following:
>
> *   *   *
>
> Confidential Information shall not be disclosed to any independent expert until that person has executed a copy of the Undertaking acknowledging that he or she has read a copy of this Stipulated Protective Order and agrees to be bound by its terms . . . .

As is customary in confidentiality orders in complex commercial litigation, the Stipulated Protective Order contains a provision by which one party can challenge the other party's designation of documents as protected or confidential material. *See* ¶12 of the Stipulated Protective Order. The record does not reflect that MKS challenged the confidentiality status of the documents produced by AE that were relied upon by Dr. Sawin in his expert report and which were disclosed in the German Injunction filed by MKS.

The essence of MKS's opposition to the Motion for Contempt is that the Sawin report was based solely on public information and that Dr. Sawin did not rely upon any confidential documents disclosed to MKS in this action by AE. This position is fallacious in view of the very specific references in Dr. Sawin's report to AE documents that were designated by AE as confidential in accordance with the Stipulated Protective Order.[2] However, MKS makes additional arguments. It points out that the Sawin expert report was never designated as confidential by MKS, even though Dr. Sawin clearly relied upon confidential information

---

[2] In this regard, MKS's reliance on ¶18 of the Stipulated Protective Order is misplaced. That section permits the use of protected material that has become public by one reason or another at the time of its use.

5

provided to MKS by AE, and apparently AE never contested MKS's failure to designate that report as confidential.  Indeed, based on the briefing and oral argument before me on May 26, 2005, it appears that the parties were rather cavalier in the manner in which they treated their expert reports, with none of them being designated as confidential.  MKS also argues that its initial German Injunction was denied, and it subsequently filed a second German patent action in which a Sawin expert report was used that made no reference to any information other than publicly available information concerning the AE infringing products.[3]  MKS also points out that the information contained in the Sawin expert report at issue was disclosed publicly in the trial of this action in July 2004, several weeks after it had been filed under seal as part of the German Injunction.  Finally, both parties acknowledge that they have no information or basis to believe that any of the confidential information contained in the documents attached to the Sawin expert report, upon which he relied as part of the German Injunction proceeding, were ever disclosed to the public by virtue of MKS's actions in that regard.

Based on my review of the record, I conclude that MKS violated the Stipulated Protective Order by using confidential documents in an unrelated action in contravention of paragraph 2 of the Stipulated Protective Order.

### III.   THE APPROPRIATE REMEDY FOR MKS'S CONTEMPT IN VIOLATING THE STIPULATED PROTECTIVE ORDER

In determining the appropriate sanction, if any, for MKS's contempt, I have broad discretion to issue an order that comports with the actions under review.  There are a number of factors which affect my decision below.

---

[3]  Ultimately, the German court or patent authorities found the AE products to have infringed the MKS '628 Patent.

First, there is the fact that the parties appear to have been unconcerned that their expert reports were not designated as confidential.  I cannot ignore the practice of the parties in exchanging and using their expert reports without an apparent concern as to whether they were designated confidential or not.  While I believe counsel for MKS had an obligation to comply with a court order governing the production and use of confidential documents, a factor in any decision on the Motion for Contempt must take into account the manner in which the parties, as a practical manner, adhered to the technical requirements of the Stipulated Protective Order.  Other facts that affect my decision are that, (a) the offending Sawin expert report was submitted to the German authorities under seal; (b) the parties acknowledge that the information contained in the Sawin expert report did not fall into the hands of the public nor cause injury to AE; and, (c) the very information that is the subject of the Motion for Contempt was eventually made public in the trial of this action in July 2004.  Accordingly, in rendering a decision on the Motion for Contempt, I have to balance the fact of MKS' violation of the Stipulated Protective Order against these other considerations.

In determining what, if any, sanction to impose on MKS or its counsel for violation of the Stipulated Protective Order, my decision should be instructed by the case law that the parties have submitted in connection with this Motion for Contempt.  One decision that has affinities to the present matter is *On Command Video Corp. v. Lodgenet Entertainment Corp.*, 976 F.Supp. 917 (N.D. 1997).  The protective order in that action had language that is virtually identical to that which is in paragraph 2 of the Stipulated Protective Order:

> Any information designated as Confidential Information **shall not be used** by the other party for any purpose other than in connection with preparation of the parties [sic] analysis of issues **presented in this litigation.**

*Id.* at 920 (emphasis added).  Like this action, the party in *On Command* had used confidential information in connection with and in support of the filing of a separate action than that in which the confidential documents had been produced.  *Id.* at 921.  Consistent with my reading of the language in paragraph 2 of the Stipulated Protective Order in this action, the Court in *On Command* held that a common sense, plain reading of the cognate paragraph in the protective order in that case led to the conclusion that confidential information could only be used in the pending litigation and not in some unrelated action.  *Id.* at 922.  In determining that the plaintiff had violated the protective order in *On Command*, the court applied the well-recognized standard that before determining that a party is in contempt of an order, the moving party must show by clear and convincing evidence that the order was violated.[4]  Based on the facts before it, including the fact that the plaintiff had violated the protective order by using the confidential material in a complaint that was filed under seal in a different action, the court decided not to award attorney's fees against the plaintiff because none of the confidential information at issue had been released to third parties.  *Id.* at 922-923.

Another action similar to this matter is reflected in the decision, *Horizon Unlimited, Inc. v. Richard Silva & SNA, Inc.*, C.A. No. 97-7430, 2000 U.S. Dist. LEXIS 7760 (E.D. Pa. June 7, 2000).  Like the present action, the party accused of violating a protective order had argued that it had not violated the protective order when it had not disseminated confidential documents produced to it and had simply disseminated its expert report, that was clearly based

---

[4]  The *On Command* case also applied a standard that in addition to showing by clear and convincing evidence that the court's order had been violated, the moving party would have to show that the violation was beyond "substantial compliance, and that the violation was not based on a good faith and reasonable interpretation of the [Protective Order]."  *Id.* at 922, *quoting Wolfard Glassblowing Co. v. Van Bragt*, 118 F.3d 1320 (9th Cir. 1997).  The Third Circuit has noted the application of such a standard by other Circuits, but has not endorsed it.  *See Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 149 (3d Cir. 1994).

upon confidential documents provided to that expert.  *Id.* at *3-5.  The circumstances of the disclosure of the expert report in *Horizon*, however, were much more egregious than here, because in *Horizon*, the expert report, based on confidential information, was placed on a website for public viewing.  *Id.* at *4-5.  Accordingly, sanctions were awarded against the party which had violated the protective order in that case.

Applying the above legal principles to the facts presented to me in this case, I conclude that MKS certainly committed a technical violation of paragraph 2 of the Stipulated Protective Order.  The expert report of Dr. Sawin, that was filed in support of the German Injunction, clearly relied upon confidential documents that had been produced to him by his counsel, which in turn came from AE.  There is no reasonable conclusion, after reviewing his report, than that his opinion relied upon confidential information based on a review of confidential AE documents.

In making my decision though, I must juxtapose against MKS's technical violation of the Stipulated Protective Order a number of mitigating considerations.  First, the German Injunction and its supporting documents, including Dr. Sawin's expert report, were filed under seal in Germany.  Secondly, when AE complained to MKS about the reference in Dr. Sawin's report to its confidential documents, MKS withdrew the report and submitted a report based solely on public information.  Third, the parties appear to have had a rather laissez-faire attitude about compliance with the Stipulated Protective Order with respect to their expert reports in that neither party placed its expert reports under seal, even though the reports relied upon their own or the opposing side's confidential information.  This is not to say that either side had an obligation to police the opposing party's compliance with the Stipulated Protective Order.  Nonetheless, while there may not have been an understanding among the parties in writing or

otherwise that their expert reports would be confidential, the practice in this regard appears to have been at least lax.  Finally, within a few weeks of the time that the German Injunction was filed, the confidential information at issue became part of the public record when it was published in the infringement trial in July 2004.[5]

      In conclusion, based upon the above factual record and the applicable law, I hold that AE's Motion for Contempt is denied to the extent that there will be no imposition of costs or other sanctions against MKS or its counsel.

      IT IS SO ORDERED this 27th day of June, 2005, for the reasons set forth above.


      /s/ John E. James_____
      John E. James
      Special Master


cc:    The Honorable Joseph J. Farnan, Jr.
      Dr. Peter T. Dalleo, Clerk of Court


687349/29015

---

[5]  *See Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc.*, C.A. Nos. 01-1544, 01-1591, 2002 U.S. App. LEXIS 19150 (Fed. Cir. Sept. 17, 2002) (the degree of punishment for contempt is a matter of the court's discretion and when confidential documents are used in violation of a protective order, otherwise become matters of public record apart from such use, there should be a logical relationship between the violation and the remedy for contempt).

# EXHIBIT B

**Patrick Finch**

---

**Recent Work History and Achievements:**

*Jan 2005 – Present:* NASA Ames Research Center, Moffett Field, CA
*Position:* Research Scientist
*Description:* I have worked on and am part of many projects in the Biospheric Sciences branch of NASA Ames Research Center (http://geo.arc.nasa.gov). These projects range from image processing and algorithm development for creating an Uninhabited Aerial Vehicle (UAV) based wildfire detection system to designing and implementing a Sensor Planning Service.

**My current projects are:**
- Developing an online NASA science flight tracking system based on the Google Maps API, PHP, and JavaScript.
- Hardware and Software design of a data acquisition system to acquire and process thermal and color imagery from (un)manned aircraft for the real time monitoring of oil pipelines using COTS hardware, C++ and CUDA C (for GPU utilization).
- Implementing various delay tolerant networking protocols for data and command/control use during long duration and/or over the horizon unmanned science flights.
- Researching methods for securing delay tolerant networks including but not limited to IPsec (an abstract of which is being submitted for inclusion in the 34th International Symposium on Remote Sensing of Environment).

**Past projects have included:**
- Hardware and Software development of data acquisition systems for various other NASA instrumentation   systems. Developing the software and processing pipeline on a Gumstix Linux computer to gather Imagery for       use in sun tracking.
- Creating the reference implementation of the Open Geospatial Consortium's version 3 Sensor Planning       Service (http://www.opengeospatial.org/pub/www/ows3/index.html).
- Selection and Optimization of an algorithm for use in real time aerial wildfire detection (http://geo.arc.nasa.gov/sge/WRAP).

**Publications:**
- Dunagan, S., B. Baldauf, P. Finch, L. Guild, E. Hochberg, B. Jaroux, L. Johnson, B. Lobitz, J. Ryan, S.          Sandor-Leahy, and J. Shepanski. 2009. Small Satellite and UAS Assets for Coral Reef and Algal Bloom Monitoring. Proceedings, 33rd International Symposium on Remote Sensing of the Environment,       May 5-9,          Stresa, Italy. Paper #332, 1-5.
- Dibner, P., P. Finch, and J. Zheng. 2005. Semantics and Architecture in the Development of a Sensor   Planning Service. AGU Fall Meeting, Dec. 5-9, San Francisco, CA.

**Honors:**
- NASA Group Achievement Award to Wildfire Research and Application Partnership, 2009
- NASA Group Achievement Award to Wildfire Research and Application Partnership, 2008
- NASA Group Achievement Award to Western States UAS Fire Mission Team, 2008
- NASA Group Achievement Award to Western States UAS Fire Mission Team, 2007*June 1999 – Jan 2005:* Monterey Network Center, Salinas, CA

***Position:*** Senior Network Engineer, Senior Unix Engineer, and Technical Support
***Description:*** I maintained and improved the heterogeneous infrastructure of a Monterey based ISP. During my time there I helped to improve our customer satisfaction by introducing and implementing new technologies (both COTS and custom designed in house). These technologies include: broadband wireless, creating web applications, building a clustered computer for spam and virus filtering, and improving our web and collocation services.

**Technical Knowledge in:**
- Software: Various programming languages including: Java, C, C++, PHP, Perl, Python, and certain  flavors of assembly
- Hardware: Digital and Analog electronics.


**Scholastic History and Achievements:**
- California State University at Monterey Bay (1996 – 2005): Double Major -Earth System Science and   Policy (ESSP) and Telecommunications, Multimedia and Applied Computing (TMAC) with a minor in              Mathematics.
- Designed and constructed, from board level components, an inexpensive instrument for measuring benthic micro-currents for my ESSP senior thesis.
- Designed and wrote the visualization software accompanying my instrument for my TMAC senior thesis.

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TUFF TORQ CORPORATION, and        )
KANZAKI KOKYUKOKI MFG. CO.,       )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )   Civil Action No. 93-414-SLR
                                  )
HYDRO-GEAR LIMITED                )
PARTNERSHIP, et al.,              )
                                  )
          Defendants.             )

## MEMORANDUM ORDER

### INTRODUCTION

Plaintiff Tuff Torq Corporation ("TTC") and intervenor plaintiff Kanzaki Kokyukoki Mfg. Co. ("Kanzaki") (collectively "plaintiffs") brought this action against defendants for infringement of U.S. Patent Nos. 4,932,209 and 5,146,748 owned by Kanzaki and licensed to TTC.  Currently before the Court two matters are pending: a discovery dispute concerning two sets of interrogatories served on Kanzaki by Hydro-Gear Limited Partnership ("HGLP") and a motion by HGLP for sanctions.

### BACKGROUND

#### Discovery Dispute

On November 9, 1993, the Court issued a scheduling order which states "[a]ll fact discovery in this case shall be initiated so that it will be completed on or before **May 2, 1994.**" (D.I. 42, ¶2)(emphasis in original).  On April 14, 1994, Kanzaki's motion to intervene was granted.  (D.I. 110)  On April 22, 1994, and April 29, 1994, HGLP served on Kanzaki its first

and second set of interrogatories.  Kanzaki argues it should not be required to answer said interrogatories because: 1) they were not timely served; 2) HGLP could have collected the requested information in a timely manner; and 3) HGLP has refrained from participating in discovery during the period allowed by the Court for fact discovery.  (D.I. 138 at 1)  HGLP argues that Kanzaki should be required to answer both sets of interrogatories because 1) HGLP will be prejudiced; 2) the answers will narrow the issues in the litigation; 3) no delay will result; and 4) Kanzaki's opposition is an attempt to impede discovery against itself. (D.I. 135 at 1)

### Motion for Sanctions

On December 3, 1993, the Court issued an order (the "Protective Order") which stated, <u>inter alia</u>, a particular process to be followed with respect to the disclosure of confidential documents to outside experts. (D.I. 52 at ¶7)  On April 15, 1994, TTC deposed Gary Harvey ("Harvey"), HGLP's financial controller.  Present in the deposition for the plaintiff was Terry Musika ("Musika")[1] who was a consultant to TTC's counsel, Mr. Edward Kessler ("Kessler") and Ms. Vicki Margolis ("Margolis").  (D.I. 126 at 3-4; D.I. 136 at 2-3)  Prior to this deposition Margolis gave certain confidential HGLP

---

1.  HGLP refers to Musika as "Musikas," however, the Court will, for the purposes of this motion, refer to Musika as he has identified himself in his affidavit.

2

documents to Musika.[2]  During the deposition, counsel for

defendants, Robert Browne ("Browne"), questioned the presence of

Musika.  After reminding Kessler of the terms of the Protective

Order and directly asking Kessler if Musika was an outside

expert, Kessler acknowledged that Musika was going to be

designated as TTC's damages expert and stated it was an

"oversight" on their part that they did not comply with the

Protective Order.  (Harvey Depo. at 84-86)  Browne acknowledged

that he was not lead counsel for defendants in this case and that

lead counsel, Donald Zarley ("Zarley"), would object to Musika's

possession of confidential documents; Browne did request,

however, that Musika not look further at any such documents.

(Id. at 85-86)

On April 18, 1994, Kessler notified Zarley that TTC

intended to designate Musika as its damages expert, to which

Browne responded both by objecting because of the violation of

the Protective Order and noting the insufficiency of said letter

as a designation of an expert.  (D.I. 136, Exhibits E, F)  On

April 21, 1994, Musika signed the acknowledgement form required

in the Protective Order.  (D.I. 136, Exhibit A)  The final

communication between the parties on this issue was on April 26,

1994, when Kessler informed Browne that the Protective Order had

---

2.  Musika asserts that he understood at the time he received the
documents that they were confidential and not to be shared.  He
further asserts that on the morning of April 15, 1994, he was
informed of his "specific obligation to maintain the
confidentiality of the information..." and orally agreed to be
bound by the Protective Order.  (D.I. 136, Exhibit A at ¶3)

now been complied with and that counsel had not allowed Musika to
look at any further confidential documents.  (D.I. 126, Exhibit
G)  On May 3, 1994, Musika was designated as plaintiffs' damages
expert and on May 12, 1994, HGLP filed this motion for sanctions
requesting that Musika be barred from testifying as TTC's damages
expert.  (D.I. 125)

**DISCUSSION**

### Discovery Dispute

While Kanzaki correctly points out that said
interrogatories were filed in a technically untimely manner, the
circumstances of this case compel the Court to order Kanzaki to
comply with the interrogatories.  Kanzaki was not joined as a
party in this litigation until April 14, 1994.  HGLP filed its
interrogatories in a rapid manner, just six and fifteen days
after joinder, respectively.  Kanzaki's position, carried to its
logical conclusion, would allow a party to fight joinder
throughout the pretrial period, only to accept joinder just
before the discovery deadline, and then be relieved from any
discovery obligations.  The Court cannot accept such a view.

Moreover, HGLP has established a particularized need
for this information.  The two plaintiffs have legally distinct
relationships to the patents in suit.  Kanzaki is the owner of
the patents at issue in this litigation, while TTC is a licensee.
HGLP has the right to receive information from both the licensee
and owner of the patents, as they are distinct entities.
Kanzaki's argument that such information could have been

4

retrieved previously through depositions of Kanzaki ignores the distinction between different forms of discovery.  Throughout this litigation TTC has had the opportunity to both depose defendants and to subject them to interrogatories.  HGLP should not be denied that same opportunity because Kanzaki joined this litigation just prior to the discovery deadline.

Therefore, Kanzaki is ordered to answer HGLP's first and second set of interrogatories.  Pursuant to Fed.R.Civ.P. 33(b)(3), Kanzaki will have until July 1, 1994 to answer both sets of interrogatories.

### Motion for Sanctions

HGLP's motion for sanctions is granted, however, the Court declines to grant the relief requested.

The Protective Order at issue requires that certain clear procedures be followed concerning the disclosure of confidential documents to outside experts.  First, before disclosing such documents to an outside expert, counsel must provide the expert with a copy of the Protective Order and have him sign a specific acknowledgement form, a copy of which must be retained by counsel.  Second, "the party wishing to make such a disclosure shall give at least ten days' [sic] advance notice **in writing** to opposing counsel, stating the name and address of the person to whom disclosure will be made, identifying with particularity the Documents and/or Material to be disclosed, and stating the purpose for such disclosure." (D.I. 52 at

¶7)(emphasis added).   The opposing counsel then has ten days to file a motion with the Court objecting to disclosure.

TTC violated the Protective Order both by giving Musika confidential documents without having him sign the acknowledgement form and by failing to provide defendants in advance with Musika's name, the particular documents to be disclosed, and the purpose for such disclosure.   Moreover, the record before the Court indicates that TTC still has yet to comply with the Protective Order as it has only identified Musika as an expert and given his address. (D.I. 136, Exhibit E) Plaintiff's assertion that it has been prejudiced by HGLP's delay in filing this motion ignores the fact that it has yet to indicate to defendants what documents it would like Musika to review as well as the purpose for said review.  (See D.I. 136, Exhibit E)  TTC's actions have effectively denied defendants the opportunity to both object to Musika as an expert, as well as limit the documents seen by Musika if he becomes an expert.

The Court is authorized to issue appropriate sanctions either by its inherent powers or by Fed.R.Civ.P. 37.  "'Courts of justice are...vested, by their very creation, with power to impose silence, respect and decorum, in their presence and submission to their lawful mandates.'"  Chambers v. Nasco, Inc., 111 S.Ct 2123, 2132, reh'g denied, 112 S.Ct 12 (1991) (quoting Anderson v. Dunn, 19 U.S. 204 (1821)).  Included in this inherent power is the power to punish parties for "disobedience to the

orders of the judiciary." <u>Id.</u> (<u>quoting</u> <u>Young v. United States ex</u>
<u>rel. Vuitton et Fils, S.A.</u>, 481 U.S. 787, 798 (1987)).

Rule 37 also serves as a possible source of authority
to issue sanctions for violations of discovery orders.

> **Failure to Comply with Order.**
>         **\* \* \***
> **Sanction by Court in Which Action is Pending.**
> If a party...fails to obey an order to
> provide or permit discovery...the court in
> which the action is pending may make such
> orders in regard to the failure **as are just**
> and among others the following...

Fed.R.Civ.P. 37(b)(2) (emphasis added).  Contrary to TTC's
position, sanctions are not only for the purpose of remedying a
harm felt by the moving party.  The purpose of sanctions is "not
merely to penalize those whose conduct may be deemed to warrant
such a sanction [dismissal], but to deter those who might be
tempted to such conduct in the absence of such a deterrent."
<u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639,
643, <u>reh'g denied</u>, 429 U.S. 874 (1976) (affirming the sanction of
dismissal for failure to <u>inter alia</u> timely respond to
interrogatories).

The propriety of sanctions is particularly apparent in
cases where a party disobeys a discovery order.

> The Court considers this [failure to comply
> with a discovery order] an extremely serious
> matter.  Not only does it jeopardize the
> confidentiality of sensitive commercial and
> financial information....It calls into
> question the integrity of the discovery
> process conducted under protective orders.
> In thousands of actions throughout the
> federal court system, millions of documents
> have been and are being produced in reliance
> on the binding force of protective

orders....An appropriate sanction must,
therefore, be imposed....

<u>Falstaff Brewing Corp., et al. v. Philip Morris, Inc.</u>, et al., 89
F.R.D. 133, 135 (N.D. Cal. 1981), <u>aff'd</u> <u>in</u> <u>part</u>, 702 F.2d 770
(1983).

The Court in this case regards TTC's behavior as
sanctionable.  Moreover, TTC's description of HGLP's delay in
bringing this motion as "inexcusable" and "unexplained" while
characterizing its own behavior as "unintentional" and a
"mistake" is quite peculiar given the gravity of its own
violative conduct.  (D.I. 136 at 6-8)  Such arguments both defy
TTC's statement that it has "taken full responsibility" (<u>Id</u>. at
8) for its actions, as well as reflect an ongoing "'callous
disregard' of its responsibilities."  <u>National Hockey League</u>, 427
U.S. at 643.

However, the Court declines to impose the sanction
requested by HGLP.  While the Court has broad discretion in
determining the appropriate sanction, sanctions must be awarded
with restraint and discretion.  <u>See</u> <u>Coleman v. American Red</u>
<u>Cross</u>, 145 F.R.D. 422, 427 (E.D. Mich. 1993), <u>aff'd</u> <u>in</u> <u>part</u>, No.
93-1130, 1994 WL 185927 (6th Cir. 1994).  "A primary aspect of
that discretion is the ability to fashion an appropriate remedy
for conduct which abuses judicial process."  <u>Chambers</u>, 111 S.Ct.
at 2132-33.

The sanction of precluding Musika from testifying is
not appropriate for the case at bar.  All the authority cited to
the Court by HGLP in support of such a sanction concerned

8

situations in which either the nonmoving party had blatantly and intentionally misled the other party and court or the moving party had suffered a severe prejudice.  HGLP has not established such a situation in the case at bar.  HGLP has offered the Court no evidence that it has been prejudiced by the early disclosure of information to Musika.  Essentially, instead of objecting to plaintiff's actions, it is in actuality challenging plaintiff's designation of Musika as an expert.  Moreover, were this challenge to occur in a traditional fashion, HGLP would be required to show "good cause" as to why Musika is not an appropriate expert to whom confidential documents may be disclosed.  (D.I. 52 at ¶7)

The Court finds that a more appropriate sanction is found in Rule 37 itself.  "In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure."  Fed.R.Civ.P. 37(b)(2).  The Court contemplates TTC's counsel paying costs and expenses incurred by HGLP in connection with filing its motion for sanctions. (D.I. 125)  <u>See</u> <u>Young Jewish Leadership Concepts v. 939 HK Corp.</u>, No.93-CV-2643, 1994 WL 161241 (E.D. Pa. 1994).

9

**CONCLUSION**

THEREFORE at Wilmington this 9th day of June 1994, IT IS ORDERED that:

1) Kanzaki answer HGLP's first and second sets of interrogatories (D.I. 113; 115) on or before July 1, 1994.

2) HGLP's motion for sanctions (D.I. 125) is granted in part and denied in part.

a) On or before June 22, 1994, HGLP shall file and serve an affidavit of costs and expenses related to its motion for sanctions.

b) On or before July 6, 1994, TTC's counsel may file their objections thereto.

_____
United States District Judge