1                        IN THE UNITED STATES DISTRICT COURT

2                        IN AND FOR THE DISTRICT OF DELAWARE

3                                      - - -

4
        MOBILEMEDIA IDEAS LLC,          :    CIVIL ACTION
5                                       :
                       Plaintiff,       :
6                                       :
            vs.                         :
7                                       :
        APPLE INC.,                     :
8                                       :
                       Defendant.       :    NO. 10-00258-SLR-MPT
9

10                                     - - -

11                                Wilmington, Delaware
                                  Friday, July 27, 2012
12                                9:40 o'clock, a.m.

13                                     - - -

14      BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

15                                     - - -

16      APPEARANCES:

17                  MORRIS, NICHOLS,  ARSHT & TUNNELL
                    BY:  JACK B. BLUMENFELD, ESQ.
18

19                        -and-

20

21
                                         Valerie J. Gunning
22                                       Official Court Reporter

23

24

25

1     APPEARANCES (Continued):

2
                  PROSKAUER ROSE LLP
3                 BY:   STEVEN M. BAUER, ESQ.,
                        JUSTIN J. DANIELS, ESQ.
4                       SAFRAZ W. ISHAMEL
                        JINNIE REED, ESQ.
5                       (Boston, Massachusetts)

6
                        Counsel for Plaintiff
7

8

9                 MORRIS JAMES LLP
                  BY:   RICHARD K. HERRMANN, ESQ.
10

11                        -and-

12
                  O'MELVENY & MYERS LLP
13                BY:   GEORGE RILEY, ESQ. and
                        LUANN L. SIMMONS, ESQ.
14                      (San Francisco, California)

15                        -and-

16                O'MELVENY & MYERS LLP.
                  BY:   JONATHAN CRAWFORD, ESQ.
17                      (Menlo Park, California)

18
                        Counsel for Defendant
19

20                        - - -

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom

 4    beginning at 9:40 a.m.)

 5

 6              THE COURT:  You may be seated.  And I apologize

 7    for being late.  There was a retirement breakfast for our

 8    Chief Probation Officer and you think that two hours is

 9    plenty of time and the Governor shows up unexpectedly and,

10    you know, letters from the Vice President.  We have all

11    sorts of things going on.  But in any event, I apologize

12    for running late, and I look forward to our getting

13    started.

14              Why don't we make some introductions and any

15    preliminary remarks you care to and then we'll get down to

16    business.  Mr. Blumenfeld?

17              MR. BLUMENFELD:  Thank you, your Honor.

18              Jack Blumenfeld for the plaintiff, MobileMedia

19    ideas, and with me at counsel table are Steve Bauer, Justin

20    Daniels, Safraz Ishmael, and behind them, Jinnie Reed, all

21    from the Proskauer firm.  And in the back, the general

22    counsel of MobileMedia is Tony Petrowskey.

23              THE COURT:  Hi.  Welcome all.  Thank you very

24    much.

25              Mr. Herrmann?
```

1          MR. HERRMANN:  Good morning, your Honor.

2          THE COURT:  Good morning.

3          MR. HERRMANN:  Your Honor, I'd like to introduce

4    George Riley from O'Melveny & Myers, and Mr. Myers will

5    introduce the rest of the Apple team.

6          THE COURT:  Okay.  Good enough.

7          MR. RILEY:  Good morning, your Honor.

8          THE COURT:  Good morning.

9          MR. RILEY:  I'd like to introduce first my

10   client from Apple, Ian Cunningham, from the in-house

11   counsel.  Wendy Annaherby, also from the in-house counsel.

12   And then my colleague from O'Melveny & Myers, Luann Simmons,

13   and my colleague from O'Melveny, John Crawford.

14         THE COURT:  Good morning.

15         MR. RILEY:  And across the bar, my colleague

16   Melody Drummond Hanson.

17         THE COURT:  Thank you very much.

18         I know you had submitted to me a proposed agenda

19   and I had added a little bit to that because there are a

20   couple outstanding matters that I thought could, I could use

21   some recent guidance on.  You all write, but somehow

22   sometimes I think it's easier to talk about what's happening

23   in the case.

24         So if you wouldn't mind starting with the motion

25   to dismiss.  And the cases as you read them all talk about

1    bundles of rights, and with the information we've gotten in

2    the record, it's really unclear to me how those bundles, how

3    that bundle of rights is really divided among the plaintiff

4    and its owners, basically.

5           So it would be helpful to me if I could have a

6    few words from plaintiff's counsel initially, and then I

7    will hear from a response from Apple in terms of whether, in

8    fact, MMI has retained a sufficient bundle of rights to be

9    able to be pursuing this patent litigation without joinder

10   of any of its owners.

11          MR. BAUER:  Thank you, your Honor.  Steve Bauer.

12          So your Honor, when we start with the bundle of

13   rights, and if I can just put on here the document.

14          There's a pure perfect patent assignment in this

15   case.  It starts with --

16          THE COURT:  And just because we're short of

17   time, I understand that all of these papers were exchanged

18   contemporaneously, so I'm going to assume for purposes of

19   this proceeding that there was a pure assignment.

20          MR. BAUER:  Okay.

21          THE COURT:  But then it seems as though with the

22   rest of the documents, things were taken back, and so that's

23   where I'm confused.

24          MR. BAUER:  Okay.  So we have the pure

25   assignment.  Nothing was taken back, so MobileMedia was

1    assigned all of the rights.  It granted back to its parents,

2    so it owns all of the rights, period.  The patents were

3    transferred, assigned.  MobileMedia has the sole and

4    exclusive right to collect royalties going forward, the sole

5    and exclusive right to litigate going forward, the sole and

6    exclusive right to license going forward.  In all of the

7    cases of outstanding, that's the primary issue, who has the

8    sole right.

9            The rights that were granted back were Sony and

10   Nokia retained nonexclusive licenses to their own

11   technology.  So Sony and Nokia have no rights to enforce the

12   patents at all, period.  They retain nonexclusive rights to

13   license.  They are shareholders, non-majority shareholders.

14   Both Sony and Nokia have two seats on the board.  They argue

15   as though Sony and Nokia are the same company and that

16   between the two of them, they have a majority, four seats,

17   but each of those are completely independent companies and

18   each of them have two seats on the board.

19           Those people are not decision-makers in this

20   technology under the contract.  Those people cannot be

21   people who have operating responsibility in this field.

22   Sony and Nokia, as shareholders, will retain, get, some

23   profits from this, if there's money to be paid out.

24           So they are acting, Sony and Nokia, under the

25   agreements, are nothing more than non-majority shareholders

1    in this entity called MobileMedia.  No different -- well,

2    it's a lot less than all of the cases in which there's a

3    holding company, which one person owns everything.  There's

4    a lot of case here where the parent creates a subsidiary and

5    puts all the patents in.  The Federal Circuit says in those

6    cases, those companies can't even join.  When they're the

7    shareholder and they control the board and control

8    everything, they can't join.

9               In this case, Sony and Nokia are only two seats

10   out of seven, minority shareholders, have a nonexclusive

11   license back.  They did retain any licenses they had granted

12   beforehand.  They retained the money benefit of those

13   licenses, so both Sony and Nokia have other licenses with

14   other companies.  Those licenses, those other licenses stay

15   with them.  But they have no right to enforce the patents

16   coming out of those licenses.  They have the right to income

17   coming from those other licenses.

18              So prospectively, when this assignment was made,

19   MobileMedia owns the patents.  There was one -- I'm trying

20   to remember all of the issues for your Honor.  There was one

21   issue about reversion that after some period of time it

22   would revert.  That provision no longer exists.  Not because

23   of this lawsuit, although the coincidence, the banks

24   required that to come out before they provided lines of

25   credit.  They wanted to know there was no reversion rights.

```
 1                    THE COURT:  And does that mean even though I'm

 2     supposed to be looking at the fact that the time suit was

 3     brought, I shouldn't look at that fact at the time?

 4                    MR. BAUER:  Your Honor, there are two types of

 5     issues of standing.  Constitutional standing is on that date

 6     of filing.  I can't imagine that there's any argument here

 7     we didn't have constitutional standing.  There was an

 8     assignment.  Legal title was granted.  We owned the patent.

 9     And, your Honor, there's not a single case, not a single --

10     we talk about 12 cases from the Federal Circuit.  Not a

11     single case in which there was an assignment in which the

12     Federal Circuit said the party with the assignment didn't

13     have the right to bring the case, not one.  So that's the

14     constitutional standing.

15                    The prudential standing goes to the issue of, is

16     there a risk of multiple litigation.  And prudential

17     standing is when it can be corrected.  They would like it to

18     be corrected by joining the parties.  We say it does not

19     need to be corrected.  So that issue of reversion is gone.

20                    There was also an issue that the company can

21     terminate in 2020, and what happens then.  Well, all that

22     happens under the agreement in 2020 is the parties, the

23     shareholders, the board, can decide what to do.  It's not an

24     automatic in 2020, everything goes back.  It's just, this is

25     like a venture fund or anything like that.  This has a
```

1    limited term.  In 2020, they've agreed to sit down and talk,

2    to see what will happen next.  All of these patents will

3    have been expired by then, so there's no risk to them of

4    multiple lawsuits or anything like that.

5              But there's nothing automatic.  That's what's

6    most important about this.  There's nothing -- there are no

7    rights that have been retained by Nokia or Sony that's

8    automatic.  They are acting as shareholders.  If they both

9    agree in 2020 to terminate and to reallocate the patents,

10   they're free to, but that's no different than any company

11   which owns a patent.  Right?  I mean, the patent gets

12   assigned, and when the patent gets assigned and the legal

13   title goes with it, the new owner has the right to enforce

14   the patent.

15             So what's most important, the parties, Nokia and

16   Sony, have no rights to enforce these patents at all.  They

17   don't control the litigation.  There's nothing in these

18   agreements, so there's a lot of negatives.  So I can't point

19   to where it is.  They don't approve litigation, Sony and

20   Nokia don't approve litigation.  Sony and Nokia don't

21   approve licenses.

22             There's discussion about, I think it's 18 things

23   that need to be unanimous.  None of those 18 things relate

24   to the litigation.  Those 18 things are things that relate

25   to the company, such as termination, transfer of assets, you

1    know, all the financial stuff, and that's all in the

2    agreement, which I can show you, here's the 18 things.  None

3    of them, they don't need unanimous consent to litigate, to

4    settle, or anything.

5            Other things they need two-thirds -- oh, not

6    two-thirds -- majority consent for other things that relate

7    to assets, but not to the settlements of these cases.

8    They're nothing more than shareholders.  They get money out

9    of this like any shareholder, but the thing to keep in mind

10   is there's nothing different about this than a patent

11   holding company, where there's a hundred-percent ownership

12   in a company.  The difference is, here you have three

13   entities that own it.

14            THE COURT:  And you have not mentioned a third

15   entity.

16            MR. BAUER:  They have not asked to join the

17   third entity, which is MPEG LA.

18            THE COURT:  All right.

19            MR. BAUER:  They're trying to get Sony and Nokia

20   into the case.

21            THE COURT:  All right.

22            MR. BAUER:  MPEG LA -- so they have not asked to

23   join MPEG LA.

24            THE COURT:  Okay.

25            MR. BAUER:  Which is their -- they have three of

1    the seven seats.  But, again, we come back, all of those

2    cases in which there's a -- you know, the Federal Circuit

3    says, a parent can't join the case.  A parent which owns all

4    the stock, gets all the benefits, controls the board, can

5    terminate the company on a moment's notice cannot join this

6    case, according to the Federal Circuit.  A sole shareholder

7    who owns the company can't join this case.  A nonexclusive

8    licensee can't join this case.  The Federal Circuit is so

9    clear about that.  And here what they're trying to do is get

10   two -- and those are the pure hundred-percent ownerships,

11   and here what you have is two companies that have minority

12   ownership, and I don't know if there's something else.

13   Again, I don't have -- well, let me just --

14              THE COURT:  Well, I think that's fine.

15              MR. BAUER:  But I think they pointed to seven

16   different things, but all of those things are the types of

17   things an owner would get, but not -- an owner of the

18   company would get, but what they don't get to do is manage

19   the litigation.

20              THE COURT:  All right.  Thank you very much.

21              Let's hear briefly from Apple.

22              MR. RILEY:  Thank you.

23              Your Honor, this motion is founded squarely on a

24   case involving an assignment, the Crown Die case, a 1923

25   Supreme Court case in which there was an assignment of

1    rights, and the United States Supreme Court said that wasn't

2    sufficient.  And that's what's going on here.  And I think

3    this is squarely presented by counsel's last representation

4    to the Court, that Nokia and Sony have nothing to do with

5    the litigation.  That is not true.

6            In the operating agreement, and I'm referring to

7    Bates stamp 0266 and 0267, it sets forth the rights of Sony

8    and Nokia that require unanimous approval by the board.

9    What counsel said was what the members don't get to do is

10   manage the litigation.

11           In that list of rights that the board has that

12   require unanimous approval is, quote, "Enter into contingent

13   fee arrangements with law firms or other service providers

14   engaged by or for purposes of providing services to the

15   company."

16           So Nokia or Sony can veto the selection of

17   counsel to bring contingent fee litigation.  That's not a

18   traditional role of the Board of Directors.  And, in fact,

19   that control even goes beyond that.

20           In Section -- in the same section of the

21   operating agreement, there's a provision that says, all

22   other matters require the majority approval of the board,

23   such as licensing.

24           Now, the transfer of a patent requires unanimous

25   approval of the board, but, for example, other actions

1    require majority.  But they carve out an exception, and that

2    exception is that Sony and Nokia together have the exclusive

3    authority to approve the services budget, and the services

4    budget is the budget for litigation and licensing.

5         So what we have here is very, very clear, is a

6    shell company that was created.  Nokia and Sony park their

7    patents there for three years.  Now, that provision has been

8    changed, but as the Court points out, we must look at

9    constitutional standing at the time the case was filed, and

10   when the case was filed, Sony and Nokia park their patents

11   for three years, and then they would get them back

12   automatically, unless MMI had reached certain benchmarks.

13   And that reversion right was critical to the Federal

14   Circuit's opinion in the Pro Pat case in which, again, it

15   was a parking situation.

16        Pro Pat wasn't a license.  Pro Pat purported to

17   grant something akin to co-ownership to the transferee.  But

18   the Federal Circuit said, no, they can get the patents back.

19   And in Pro Pat, there was a right to veto litigation

20   targets, and the Court said that right had to be exercised

21   in the reasonable discretion of the transferor, but still it

22   was control over the litigation.

23        Contrast that to our situation.  The operating

24   agreement specifically provides that Sony and Nokia owe

25   no fiduciary duties to MMI.  It expressly provides that

1    their company representatives on the board can act in the

2    interest of Sony and Nokia, not in the interest of MMI.

3               So in the pursuit of that interest, in approving

4    the litigation budget, in approving contingent fee

5    arrangements with counsel, they are acting as owners of the

6    patents.  They simply created this shell in order to try and

7    exercise that right and shield themselves from U.S.

8    discovery.

9               You have two foreign companies that create this

10   so that they could avoid counteractions as well as shield

11   themselves from discovery.  And in the Crown Die case, it's

12   exactly what the Supreme Court said.  It said, in the

13   language of the 1920s, this would give the patentee the

14   ability to get a third party to stir up litigation, and

15   that's exactly what has happened here.

16              So what they have is the ability to control

17   contingent fee litigation engagements, to control the budget

18   with regard to contingency fees, a majority vote with regard

19   to settlement, and a unanimous vote with regard to the

20   transfer of the patents.  I would submit those are all the

21   critical indicia of ownership.  While they have the form of

22   an assignment, in reality, Sony and Nokia continue to

23   exercise the critical rights of a patent owner, namely, the

24   right to exclude.  They just exercise those rights through

25   the shell corporation, MMI.

1           And I think it's critical to note that when they

2    park these patents for three years, the agreement

3    specifically said that there would be no cash contribution,

4    and for three years, there would be no -- the board was

5    prohibited from requiring cash contributions for three

6    years.  They were just parking those patents for three

7    years, and they would get them back until they recently

8    changed that provision.

9           So I think it's clear here, they don't have

10   standing, they did not have standing when they brought this

11   case.  They lacked constitutional standing, and therefore it

12   has to be dismissed.

13          THE COURT:  Thank you very much.

14          Final remarks.

15          MR. BAUER:  Thank you, your Honor.

16          So, your Honor, we've got to keep in mind what

17   the main issue is when we're talking about standing.  It's

18   the ability to sue more than one person.

19          The Crown case that they talked about, this 1920

20   Supreme Court case, they kept the right, the patentee

21   retains the right to make, use and sell, but gives to many

22   different individuals the right to sue.  That was that case.

23   That is not this case.

24          The Pro Patent case that they talk about, Pro

25   Pat case that they just talked about, that case was a

1    license case in which, right, it wasn't an assignment case.

2    So we've got to keep in mind -- my pages are sticking

3    together here.  I'm sorry.

4              Pro Pat.  In that case, the patent -- the

5    plaintiff didn't have legal title.  There's no question we

6    have legal title here.  So all of the cases, every case they

7    talk about, there was the patent owner, the person with

8    legal title, who then granted something called a license.

9    Now, I know it's not what you call it, right.  We have to

10   look at the agreement.  But every single case they talked

11   about, legal title was in one person and other rights were

12   given to another.  In this case, your Honor, you look at

13   this and as you started with the first question, there's no

14   question we own legal title.  All rights, title and interest

15   in the patents were assigned to MobileMedia, period.  And

16   then the only question is what other rights may have been

17   granted back.

18             Once all those rights were granted, what rights

19   might have been given back by the patent owner?  And the

20   only rights given back were nonexclusive licenses, ability

21   to get money.  No right to control.

22             One other thing I need to point out.  The

23   persons that are on the board who can't have operating

24   responsibility in any of this technology, the agreement

25   gives them fiduciary obligations to MobileMedia.  They're

1    shareholders.  They're board members.  They're independent

2    board members.  Sure, they work for Sony and Nokia, but

3    these agreements require them to be acting on behalf of the

4    party, because we've got to remember, Sony and Nokia aren't

5    one thing.  It's not a majority issue.  It's two totally

6    independent companies.  And we always come back to every

7    other case.  A sole shareholder does not have the authority.

8    He can't have it here.

9              THE COURT:  And the two issues about the veto

10   power over the contingency fee arrangements and the services

11   budget, you don't think those are issues that are -- that

12   are determinative of this issue?

13             MR. BAUER:  Your Honor, the board needs to

14   exclusively agree before -- the board needs to exclusively

15   agree before a law firm is retained that's going to take a

16   third of this.  That's the same thing as adding another

17   shareholder.

18             If you recall, MobileMedia's primary business is

19   enforcing these patents.  So its primary income is going to

20   be coming in through enforcement of these patents.  To

21   retain a contingency fee law firm that's going to get

22   30 percent, 40 percent, whatever, it's essentially the same

23   thing as bringing in a new member to the board.  That's the

24   one thing that the board needs to agree exclusively.  Before

25   you bring somebody in and offer them 30 percent of your

```
 1    profit, we need to agree on that.  And the services

 2    agreement, once the service company is retained, they can't

 3    fire them but for good cause.

 4              So the services company comes in.  It's an

 5    independent company.  There's MPEG, then there's Tagavin,

 6    and they come in and they manage it.  But it's not Sony or

 7    Nokia, and that's not run or controlled or anything by Sony

 8    or Nokia, which is what they keep trying to get back to.

 9    You have a third party coming in and running this company.

10    So -- okay?

11              THE COURT:  All right.  Let's move on to

12    the claim construction issue.  You might as well stand

13    there.

14              MR. BAUER:  Okay.

15              THE COURT:  Or were you not going to address

16    that issue?  The motion to strike.

17              MR. BAUER:  I would be, but it's their motion,

18    so --

19              THE COURT:  I know, but I have a question for

20    you.

21              MR. BAUER:  Oh, okay.  All right.

22              THE COURT:  So we're going to start and try to

23    keep on the schedule here.

24              I feel like I'm stuck between a rock and a hard

25    place because, on the one hand, I have an independent
```

1        obligation, according to the Federal Circuit, to construe

2        claims for purposes of a jury's determination of

3        infringement and invalidity.  And if, for some reason, I

4        thought a claim term needed construed because of the way the

5        parties were manipulating it and it turned out to be

6        dispositive, I would have to sua sponte bring it up.

7                So we've got, as I understand the situation, we

8        have the plaintiff after the close of expert discovery

9        deciding that they need to add to the record, tweak the

10       record, and so on the one hand, with as many patent cases as

11       we process here, I can't have parties independently saying,

12       we're going to ignore the schedule and we are not going to

13       give our opponent's experts the opportunity review claim

14       construction in the context of the infringement and

15       invalidity opinions that we've been hired to give.

16               That puts me in a difficult position because, on

17       the other hand, if these are terms that truly need -- that

18       are truly important in the resolution of the case, I can't

19       necessarily say, well, then we'll just give Apple's

20       construction by default.  The punishment is, Apple gets to

21       construe the claim.

22               So you've put me in a very difficult position

23       and I'm trying to figure out, trying to review all the

24       materials you've given me, whether any of these late

25       constructions that MMI has offered truly play a role or

 1    whether you've generated a lot of controversy for no

 2    particular reason.

 3            MR. BAUER:  So, your Honor, I thought we were

 4    going to argue next the Magistrate's objection to this

 5    motion.  Mr. Blumenfeld is going to do it.

 6            THE COURT:  That's the source code; right?

 7            MR. BAUER:  No, no.

 8            THE COURT:  Oh, oh, oh.

 9            MR. BAUER:  No.  They had their objection to her

10    order.

11            THE COURT:  Right.

12            MR. BAUER:  So that's why I'm still standing

13    here.  But as to your motion, your question, Mr. Blumenfeld

14    will address it because it's a local practice issue, and

15    we're deferring to his law firm for these kinds of issues.

16            THE COURT:  All right.

17            MR. BAUER:  I understand your question, but I

18    think Mr. Blumenfeld has been prepared to --

19            THE COURT:  All right.  Well, I will be

20    interested to hear, because I don't think it's often that at

21    least without prior discussion with opposing counsel, with

22    the Court, that we add terms for construction after expert

23    discovery is concluded.

24            So Mr. Blumenfeld?

25            MR. BLUMENFELD:  Right.  And, your Honor, just

1    to put in context what happened here, we had a scheduling

2    order, have a scheduling order that required the parties to

3    exchange terms for construction and the proposed

4    constructions last September.  The parties did that on the

5    same day.  That was the first time that the parties saw each

6    other's constructions, so that was the beginning of the

7    process, not the end of the process.

8              And what happened in that process is that we put

9    out 60 terms and 60 proposed constructions.  Apple put out a

10   hundred terms and a hundred proposed constructions, and that

11   was the first time that either of us saw the other -- in

12   fact, I think we pointed out in our brief, they said in

13   their paper that they were reserving the right to change

14   theirs to respond to ours, and that's the way the process

15   always works.

16             The order specifically provided that after that,

17   the parties would meet and confer.  They'd discuss.  They'd

18   try to narrow.  They'd try to work things out and that's

19   always what happens.  Six months later, we had a claim chart

20   that was presented to the Court, which had new terms that we

21   put in mainly on -- new constructions we put in mainly on

22   terms where Apple had put forth the construction and we

23   hadn't, because there were a lot of those.  There were 30

24   some of those.  And that always happens, that things move

25   forward.

```
 1              The way the schedule works, what's happening at

 2    the same time is that expert discovery is going on and then

 3    shortly after the claim construction chart is put in,

 4    briefing is going on.  And that's a big point here because

 5    the terms that are at issue, those have been briefed by both

 6    sides.

 7              And getting back to the point where your Honor

 8    started, these are legal issues.  And we think your Honor

 9    does -- if there's a dispute and plain meaning doesn't

10    apply, we think you do have to decide them, that, you know,

11    that you have under the Federal Circuit law, the '02 case,

12    other cases, the duty to decide them, and you can't just

13    say, well, I will take Apple's because the plaintiff said

14    plain meaning.

15              But we did have meet and confers with them

16    during the course of the next six months, and we did tell

17    them what our provisions were.  It wasn't like the night of

18    March whenever it was that we filed the claim construction,

19    saying that they saw our provisions for the first time.

20    What we were trying to do was respond to the things where we

21    hadn't put in a construction in the first instance, and it

22    was based on what had happened in part during expert

23    discovery.  No question about that.  But our experts

24    gave opinions and the opinions weren't based on nothing.

25    They were based on what had happened during the expert
```

1    discovery.

2            So we do think that you should construe them.

3    There's certainly nothing that required final constructions

4    before the claim construction order.

5            And as to the prejudice point, it's a little bit

6    hard to understand because both sides are standing here

7    today, and we don't know whether your Honor is going to

8    accept our constructions, their constructions, or whether

9    you're going to come up with a different construction, which

10   is not unusual.  And we're all going to have to adjust to

11   that when it happens, when we get the claim constructions,

12   and that's not unusual either, that the experts are seeing

13   the final claim constructions for the first time very close

14   to trial, and we just all have to adjust to that.

15           And that's where we are.  And I really don't

16   think it's different than a lot of other cases where people

17   are adjusting claim constructions, negotiating claim

18   constructions, putting in new constructions.  Perhaps the

19   difference here is that we have ten patents and so there

20   are, I think, 25 terms left that are at issue that have been

21   briefed as opposed to a smaller case where there's one

22   patent and there's maybe two or three terms, and so it isn't

23   becoming a big issue.  But I think that's the only

24   difference.

25           But I think this happens in virtually every

1    case, that we need to have these terms construed where

2    there's a dispute.  They've been briefed.  And that's the

3    way we think things ought to proceed.  And certainly we

4    thought we were following your scheduling order, which did

5    have steps after that initial chart, which would lead to the

6    final chart six months later.

7            THE COURT:  Well, either I -- and I have to say

8    that there's enough going on in my life that I can't keep

9    all of your facts in this rather large case at the forefront

10   of my mind.  But I thought the difference between most cases

11   and this case, aside from having aggressive lawyering on

12   both sides, is that the changes, the addition to the claim

13   construction came after expert discovery.  And because an

14   expert is confined to his or her report for opining in

15   trial, I guess that's where my concern is, the disconnect

16   between what defendant's experts can do at trial with this

17   new information that they weren't privy to during their

18   exercise.

19           MR. BLUMENFELD:  All right.  And on both sides,

20   the experts provided opinions, and they didn't provide the

21   opinions based on nothing.  I mean, even where we hadn't

22   proposed things in our initial chart, when our experts

23   provided opinions, they explained what they were doing.  We

24   put that into our answering brief on this motion.  And so

25   it's not -- it's not exactly the correct that they were just

1    doing it in the air.  They were doing it based on what's in

2    their report, and I think --

3                THE COURT:  I've lost you, Mr. Blumenfeld.  They

4    were -- I don't know what they were doing.  I understand

5    that your experts -- if I recall correctly -- well, you tell

6    me.  Did your expert have the benefit of this information

7    during their expert reporting and depositions?

8                MR. BLUMENFELD:  No, they did not.  We did not

9    give them a list which we then did not give the defendant

10   until later.

11               THE COURT:  Right.  So none of the experts?

12               MR. BLUMENFELD:  So none of the experts had the

13   specific words, but the way we came up with the words was

14   not just making them up after the expert reports.  It was

15   based on what had happened during expert discovery and

16   trying to respond to what Apple had done.  But as I said,

17   all of the experts are going to have to deal with claim

18   constructions that nobody has seen because --

19               THE COURT:  Because I have not given you --

20               MR. BLUMENFELD:  Because you have not done it

21   and that happens in every case.  And sometimes things come

22   out one way or the other way and sometimes they go down the

23   middle or some other direction that nobody anticipated.  But

24   that's because they're legal issues that your Honor has to

25   decide and they do lead to adjustments.  But as I said, all

1    of these terms have been argued by the parties.  They're

2    based, at least they're supposed to be based largely on

3    intrinsic evidence and something that your Honor needs to

4    decide so that we can deal with them at trial.

5                THE COURT:  All right.  Thank you.

6                MR. BLUMENFELD:  Thank you.

7                THE COURT:  Let's hear from counsel for Apple.

8                MS. SIMMONS:  Good morning, your Honor.  Luann

9    Simmons for Apple.

10               I'd like to first address the question that your

11   Honor asked at the beginning of this discussion, which is,

12   does any of this really make a difference, essentially.

13   And, in fact, the constructions that were proposed for the

14   most part that are new, proposed by MMI, actually do make a

15   difference.  Some of them are completely new and involve

16   constructions that could never have been anticipated by

17   Apple or its experts.  And, in fact, in one instance, a

18   material change was made to a construction that MMI did

19   offer in September.

20               MMI essentially had previously disclosed that a

21   structure be construed to include one, two, three elements,

22   and then in March, after expert reports had been served,

23   MMI inserted an "or," essentially rendering one of the

24   previously required structures no longer required.  So these

25   changes actually do make a difference.  And as your Honor

1    has noted, the real prejudice here is that these

2    constructions were not offered until after Apple's experts

3    had prepared and fully disclosed their opinions.

4            MMI had an opportunity to meet and confer, which

5    is what MMI is pointing to, the requirement in the -- in

6    your Honor's order to meet and confer.  We had plenty of

7    time to meet and confer about our proposed constructions

8    before opening expert reports.  Our proposed constructions

9    came in September of last year.  Opening reports did not

10   occur until four months later.  And in the cases that MMI

11   refers to where these kinds of tweaking things happen before

12   the final report, before the final claim construction

13   statement, it's always before expert discovery.

14           So the key here really is that Apple's experts

15   were not given an opportunity, as your Honor noted, to opine

16   on infringement issues and invalidity issues under MMI's

17   newly proposed constructions, and in some cases, changed

18   constructions.

19           And we think at this point the only appropriate

20   remedy is to strike their constructions.  Now, that does not

21   mean obviously that your Honor has to just wholesale adopt

22   Apple's constructions and your Honor will obviously decide

23   the appropriate construction.  But at that point, if a new

24   construction comes out of your Honor's decision, the parties

25   would be able to deal with how their experts would address

1    that at trial.  That's not what occurred here.

2              THE COURT:  Well, as I said, even if I believed

3    that under normal circumstances, in a normal discovery

4    dispute, striking a party's proposed information would be

5    appropriate, it's much harder in the claim construction

6    context, because I do have an independent obligation.  And

7    if, in fact, we're talking about claims -- I mean, I think

8    aside from the one you spoke about, I think some of these

9    were ordinary meaning, now we have a meaning.  They're the

10   most difficult because that's where the parties can really

11   confuse a jury, when they have different ordinary meaning

12   constructions, and my job is to make it easier.

13             So if striking isn't necessarily appropriate for

14   claim constructions, is there another remedy or something

15   that you would suggest the Court do to make sure that you,

16   your client, is not unduly prejudiced by the way this

17   exercise spun out?

18             MS. SIMMONS:  I don't know that there's a way at

19   this point in the proceedings to avoid some significant

20   prejudice.  We have fully briefed what we believe to be

21   dispositive issues based on some of the issues that are

22   raised by these new constructions.

23             Now, your Honor obviously, your Honor could

24   alleviate the prejudice that would be incurred upon Apple at

25   trial by allowing us the opportunity to submit supplemental

1    expert opinions based on the new constructions.  But at this

2    point, it's hard to imagine how we could remedy the

3    prejudice to Apple for purposes of deciding dispositive

4    motions.

5            THE COURT:  All right.  Thank you very much.

6            MS. SIMMONS:  Thank you, your Honor.

7            MR. BLUMENFELD:  Your Honor, I just want to

8    connect one thing, and that is, the statement, the claim

9    construction statement with all of the terms was filed on

10   March 23rd and expert discovery depositions didn't close

11   until six weeks later.  And the expert depositions were

12   going on during that period, so to the extent that there was

13   an issue raised by the new constructions, there was a

14   six-week window in there, and we raised with Apple this

15   issue and trying to extend that date.  It never happened,

16   but there was time in there.  It wasn't like we finished the

17   expert depositions and then we said, now we're going to

18   spring on you a whole bunch of new constructions.  That

19   didn't happen.

20           THE COURT:  Well, if, in fact, some of these new

21   constructions I found obligated to incorporate into the

22   matrix of all the information that I used to come to my, to

23   satisfy my legal obligations, then it strikes me that --

24   well, I'm not exactly sure how we incorporate -- how the

25   experts, who are supposed to testify about these, how they

1    become opine and share their revised opinions.  I mean, do

2    you have an opinion about that process, given the lateness

3    of the day and the fact that I won't be making a decision

4    tomorrow on all of this?

5              MR. BLUMENFELD:  No.  And I think that the

6    suggestion that Apple's counsel made that -- I think I said

7    it a little differently, and that is that experts are going

8    to have to adjust, as they always do.  When we see your

9    Honor's opinion, your Honor's claim construction ruling

10   isn't going to be any different here.  And if it turns out

11   that there are rulings that an expert has not opined on

12   either because it's something that nobody anticipated or

13   it's something that they can say they didn't fairly have an

14   opportunity to deal with, then I think we can, you know, we

15   can and should be able to deal with it at that time.

16             We're certainly not trying to play a got you

17   here that, oh, we gave you a late construction, you

18   didn't -- your expert didn't opine on it, the Court has

19   accepted it, and now you've got no defense.  That's not what

20   we're trying to do here.  But it's hard to answer that

21   question without knowing how the claim construction is going

22   to turn out.

23             THE COURT:  Well, and, unfortunately, as we were

24   trying to divine how many of these quote, unquote "new"

25   constructions played into summary judgment, it struck me

1    that not -- well, if they don't play into summary judgment,

2    that makes it all that much harder because we don't know how

3    it's going to play out at trial.

4              To the extent they were addressed in summary

5    judgment, I think we can address it.  Otherwise, it's very

6    difficult to address because we will have to talk about

7    how we try this case.  But to the extent that there are any

8    in the patents that go forward initially, that's going to be

9    a difficult question, and that's the more difficult

10   question.

11             MR. BLUMENFELD:  Understood.

12             THE COURT:  All right.  My last, the source code

13   and I'm not going to take a whole lot of time.  I've got a

14   report and recommendation and an objection to it.

15             And let me just go through my understanding of

16   the facts, and then my questions are addressed to Apple.

17             As I understand the record, MMI asked for source

18   code related to functionality, and Apple's response via

19   letter was, we intend to begin collecting and preparing for

20   inspection the Apple source code that relates to, and then

21   the accused functionality, certain categories of

22   functionality.

23             And I think the bottom line was that the only

24   source code that was voluntarily provided after all the

25   letters and e-mails was the iOS 4.3 source code.  And so as

1    I understand it, both the Magistrate Judge and MMI

2    concluded, and I think if that is the record, appropriately,

3    that that source code was representative, and now Apple is

4    saying, no, that can't be.  It's MMI's burden to prove

5    infringement and we're not obligated to provide source --

6    we're not obligated to provide the source code to help them

7    prove infringement.

8              And I guess -- well, first of all, source code

9    is such an elusive discovery matter because although it can

10   create lots of discovery disputes, I think in all my years

11   on the bench I've had maybe two cases where source code was

12   actually used at trial to prove infringement.

13             So I don't know how you all use it, but I just

14   want to make sure that this isn't a tempest in a teapot,

15   that the source code controversy, and I think I've been -- a

16   writ of mandamus has gone up on another source code issue,

17   and God bless them, I will invite the Federal Circuit

18   Judges down here to deal with you all at this level in the

19   pits.

20             But I want to understand what the practical

21   problem is and I'm fairly confident that we can work through

22   it, but the language that you all use in your written

23   submissions, quite frankly, turn me off, and so I need to

24   get to the practical issues.

25             So I need to hear from Apple what the real

1    problem is, not in legalese, but in terms of trying this

2    case fairly and efficiently, and we'll get to a solution.

3    Forget the legal objections.  Let's get to a solution.

4              MR. RILEY:  Thank you, your Honor.  And we do

5    want to get to a solution.

6              The practical problem, the real practical

7    problem is, this is effectively an evidentiary preclusion

8    sanction.  You know, we didn't violate any rules, we didn't

9    violate any order that says if they prove infringement with

10   regard to a version of our software, it applies to other

11   versions, soft of unbounded by whether it's an accused

12   product or not.  And with regard to some of these patents,

13   it may make a difference.  With regards to others, your

14   Honor, I will tell you it does not make a difference.

15             And the way that I -- and I've dealt with

16   this in many, many cases and I know your Honor has to with

17   regard to representative products and so forth.  The

18   appropriate way is through a stipulation and with regard to

19   the actual accused products that are in the case.  And I

20   could go through that list, Apple would be prepared to sit

21   down with the other side and say, look, we will agree that

22   the iOS 4.3 is representative of the iOS that runs on those

23   accused devices, but not iOS5, which we don't believe is in

24   the case, and which has not been subject to expert

25   discovery.

```
 1                And I think if we could get to that point, we
 2      could put these other legal issues aside, because they
 3      wouldn't be surprised, we wouldn't be arguing if a different
 4      iOS and the iPhone 3G.  They would not be surprised if we,
 5      in turn, wouldn't be penalized because they're trying to
 6      read this on an earlier version of the iOS.  And I think
 7      that's really the way to proceed rather than what is
 8      tantamount to an evidentiary preclusion where there has been
 9      no finding of bad faith or violation of court order.
10                THE COURT:  Well, to some extent, and I don't
11      know that we're going to have time to do this today because
12      I'm a morning person and I don't function well later in the
13      day, so it's no use keeping me longer because I won't be any
14      good anyway.  But we have, what, 14 patents still at issue
15      in this case?
16                MR. RILEY:  We have ten patents at issue.  They
17      deferred four.
18                THE COURT:  Oh, all right.  We have ten.  And
19      ten patents is too much to present to one jury.  So at some
20      point -- and I understand that -- well, there are two levels
21      of issues here.
22                Number one, at some point, and I'm fairly
23      confident plaintiff wants it to be after summary judgment,
24      we've got to decide what patents are going to go forward
25      first, because we're not going to try ten patents to one
```

1    jury.  On the other hand, I don't know -- I mean, I don't

2    know whether we can punt this issue or whether this issue

3    plays into the summary judgment briefing that I have before

4    me.  From our attempt to go through all the papers, it

5    didn't leap out at us that this was an issue that we needed

6    to address in the context of summary judgment, but if it is,

7    I should find that out.

8                    MR. RILEY:  No, your Honor.  The bases that we

9    moved on for summary judgment do not turn on this issue at

10   all.

11                   THE COURT:  All right.  So I guess the question

12   is whether I need to -- I don't know how I'm moving the case

13   forward by either affirming or not affirming Judge Thynge's

14   order because, quite frankly, I think the real issue is how

15   we practically get beyond that.  So I guess I'm just going

16   to let it sit for the moment.  But we will address the

17   source code issue after summary judgment, before trial, to

18   see if there really is an issue left to be addressed.  All

19   right?

20                   MR. RILEY:  Yes.  Thank you.

21                   THE COURT:  All right.  So I've gone through my

22   issues.  I've raised an issue that we will need to address,

23   and that's how we go forward to trial.  But am I correct

24   that at this point, since I've let this case go forward with

25   so many patents in the first instance, that I should go

1    ahead and finish up the summary judgment exercise before we

2    talk about how we go forward at trial?  I mean, everyone is

3    in agreement with that?

4              MR. RILEY:  Yes, your Honor.  We think that

5    would be very helpful in terms of shaping the trial from

6    this stage.

7              MR. BAUER:  And, your Honor, we agree.  As you

8    know, the last time we were here, we did agree to defer four

9    of the 14, and so I think now we have ten here that we need

10   to, you know, at some point we're going to decide which

11   ones.  There are some that are duplicates in terms of what

12   products and things like that.  But it's too early now to

13   say which ones we're going to --

14             THE COURT:  Okay.  All right.  You gave me an

15   agenda and I'm happy to -- I even have my computer ready for

16   note-taking.  I'm happy to go forward on claim construction

17   or however you all talked about going forward.

18             MR. BAUER:  So, your Honor, just one

19   housekeeping with the agenda you have.  We've shortened it

20   even more.

21             THE COURT:  Oh, okay.

22             MR. BAUER:  If I can just tell you the ones that

23   are not on, if you have the agenda letter.

24             THE COURT:  I've got this huge book.  I'm trying

25   to find the letter.  Is it in here?  Go ahead.

1          MR. BAUER:  Okay.  So at least on the Morris

2    Nichols letter which had the agenda, we have taken off from

3    argument, we're not withdrawing the issues, but taken off

4    from argument on Patent No. 5, which was the '068 patent,

5    Items 3, 4 and 5, which were the three -- well, I shouldn't

6    say -- input means, processing items and predetermined

7    operation key.  So all we have there are the first two

8    elements of that patent.

9          THE COURT:  All right.

10          MR. BAUER:  That's three elements.  And in terms

11    of the summary judgment motions, for the '075 patent, we are

12    not going to argue the issue about whether the GSM is

13    admissible prior art, although we will argue that it's not

14    anticipatory.

15          And we are not going to argue on the '231 patent

16    the issue about the Spring reference being anticipatory

17    prior art.

18          THE COURT:  All right.

19          MR. BAUER:  So that's five issues less.

20          THE COURT:  All right.

21          MR. BAUER:  And then, your Honor, as we

22    understand it, we have the order that is in the agenda.  As

23    I understand it, as plaintiff, we'll argue the claim

24    construction, each one, one at a time, and then they'll deal

25    with their response.  We each have our PowerPoints in the

1    right order and so we can back and forth.  And after the

2    claim construction, then we'll do the summary judgment

3    motions in the same way.

4              THE COURT:  All right.  My only concern is, and,

5    hopefully, you've worked out the timing, is that so often

6    claim construction always takes longer and summary judgment

7    is given a shorter shrift.  And it is helpful to me if

8    during the course of claim construction, you let me know

9    that, for instance, Apple's construction fits into their

10   summary judgment argument.  And, you know, perhaps it's less

11   than objective because of that.

12             MR. BAUER:  All right.  Your Honor, if I could

13   hand up our PowerPoint.  We have three copies.  I'm not sure

14   how many copies.

15             THE COURT:  At least two.  Thank you.

16             MR. BAUER:  And so, your Honor, for timing

17   purposes, I think we have 12 seconds a slide.  A lot of

18   these slides are just bookend slides and things like that,

19   just so that it stands on its own.  All right.

20             Okay.  Do I need to turn this on here?

21             All right.  So, your Honor, the first few slides

22   are really just to get us grounded, that there are ten

23   patents in the case, and we've just sort of linked them

24   together.  When I talk about some of them go to similar

25   subjects or something, the common colors are patents that

1   will relate to common themes, and so these are the ten

2   patents that are in the case.

3           And this is why I tell you can I can go through

4   these slides from quickly.  It's just a mnemonic so you'll

5   remember what patent is what.

6           So the '155 patent is an iPhone with positional

7   information.  It's talking about how you identify the

8   location.  The '828 patent, which is on the slide 4, is

9   displaying images based on the orientation of the device,

10  turning -- so this will help, because when you read these

11  patents, you've got to remember, these are patents that

12  Sony and Nokia did back in the early 1990s, and most people

13  would agree that those companies at that time were the

14  leading groundbreaking companies in this technology.

15          And so a lot of these patents are -- well, all

16  of these patents are long before we were thinking about

17  iPhones and iPads.  But the discussion of them, this is

18  where we're going.

19          So the words may be different back then.  They

20  weren't thinking about smart pads and things like that, but

21  displaying images is the '828.

22          The next patent, the '078, is a mobile phone

23  with a camera.  The '942 is audio storage and playback, you

24  know, how do you hook your iPhone to an iPad, that sort of

25  thing.  I mean to the laptop and get your music to it.

 1                 The '170 patent is about compressed audio

 2       coding.  That's probably the most technical of all the

 3       patents we talk about today.  By the way, your Honor, on

 4       that one, there's a tutorial.  It's the only one where

 5       there's a tutorial.  It's the one that has been put together

 6       by Apple.  It's the only time they go first on these claim

 7       constructions.  It is very technically complex, at least

 8       what's described in the patent.  It's coding and decoding

 9       and how you handle the signals.

10                 The '430 patent is play list.  The '075 patent.

11       Then we get into some of these that deal with how the phone

12       handles calls.  So the '075 is rejecting incoming calls, the

13       ability to reject the call as soon as you get it.  It's the

14       kind of thing that on your phone you don't even stop to

15       think about, but was back in the 1990s not something people

16       were able to do easily.  When the phone was ringing, be able

17       to push a button and not just stop the ringing, but to send

18       the message back to the system.  You can drop this call as

19       opposed to hanging onto it the whole time.

20                 So the '231 patent is silencing the ringer of

21       the phone when you need to, when you have that incoming

22       call.  So one is rejecting the call, the other is silencing

23       the ringer while you still have it.

24                 What we have as Patent No. 9, the '068 patent,

25       is controlling the connecting state of the call, merging

1    when you have two calls and being able to have the button

2    that merges those calls together.

3                And the tenth patent, the '394, is changeable

4    keys, the ability, as you see in this picture, to have

5    different keys on the same screen; right?  Way back when,

6    way back when, you had hard keys and it wasn't an easy thing

7    to do.  And this patent talks about changing keys.

8                So those are the ten patents we're going to be

9    talking about, and I hope that just sort of puts it in

10   context that we're not talking about just random patents and

11   they all do end up pointing to the iPhone.  Some go to the

12   iPad.  Some go to iPods, things like that.

13               All right.  And that's why I say I can get these

14   through in 12 seconds each and I've just gone through 14

15   slides.

16               THE COURT:  Yes.  I think you have made up for

17   it.

18               MR. BAUER:  Okay.  So, your Honor, now we can

19   talk about the '078 patent, and, again, we just use that

20   slide.  That's why that's a mnemonic.  This is the mobile

21   phone patent.

22               The first term we're here to talk about is a

23   means for claim.  Most of the claims we've submitted to

24   your Honor on the pleadings are the means for.  There are a

25   few that we picked that we're arguing, and I know your Honor

 1    is well aware of the issues on means for.  So on this slide

 2    16, here's the constructions that the parties are talking

 3    about.

 4             We have agreed to the function.  The function

 5    comes right out of the claim element.  So the claim was a

 6    means for transmitting information.  We've agreed it means

 7    to transmit a picture captured by the camera and processed

 8    by the processing unit.

 9             The issue now becomes what is the structure for

10    that means for transmitting, and we need to focus, your

11    Honor, on the element, this means for transmitting.  Right?

12    That's what we're talking about.  It's a means for

13    transmitting and it's a means for transmitting information

14    processed by the microprocessor to another location.

15             So what is the means that the patent shows you?

16    We've got the structure.  It's the telephone.  We talk about

17    the radiotelephone.  It's not a term you use anymore, but

18    radiotelephone.  But the patent also talks about cellular

19    mobile phone units, controllers, antennas, that sort of

20    thing.  And those come right out of the patent.

21             This is an instance where Apple's construction

22    talks about, and we put it in blue here, a GSM data

23    interface and a telefax modem, just two very specific

24    embodiments buried in the patent.  And when you ask how it

25    affects things, your Honor, if they get telefax modem,

1    there is no infringement.  Our phones do not have fax

2    machines built -- not our phones.  The accused phones don't

3    have fax machines built into them.  So that's why all of a

4    sudden we have, I think, telefax modem as an essential

5    element, and I will just show you very quickly why that does

6    not belong.

7             So slide 17 is just a claim, just to put it

8    in context so you can see where the claim comes from in

9    claim 1.  It's a means for transmitting that information.

10            So where is the structure that we talked about?

11   Your Honor, in the patent, column 3, line 37 to 65 -- and I

12   will just show you where each of these things comes from.

13   By the way, I need to mention, when the patent talks about

14   notebook computer, again, it's the dating.  The smart phones

15   back then were thought of as notebook computers, but the

16   patent tells you, this computer comprises a radiotelephone.

17   That's the first element we put in the claim.

18            The next line right beyond that.  It tells, you

19   a radiotelephone that is a cellular mobile phone unit 17.

20   That's the second element we put in the construction.

21            The same thing then goes on.  It's connected to

22   a phone controller for the data processing unit and

23   receiver/transmitter antenna.  We've added those elements.

24            By the way, it could simply be a cellular phone,

25   means for transmitting, but we're pulling all of the

1    elements out of the claim, all of the structure which the

2    Federal Circuit says we need to do, and we're showing you

3    right where that structure comes from.  This is the

4    structure for transmitting the information, for

5    transmitting.  It's the phone.

6            The last element is and/or a modem, and in the

7    same column it talks about in the case of a telephone set

8    operating in an analogue network, and there are some

9    networks that are analogue.  In the old days, they were all

10   analogue.  Now they're digital.  Here it's telling you in an

11   analogue network, a modem is preferably connected.  Not

12   required, but it's one more thing that you can attach to the

13   cellular phone unit.

14           Now, where does Apple's construction come from?

15   Why is it wrong?  Apple throws in this GSM data interface.

16   Well, in the patent, it is in the same column, right what we

17   were looking at after we talk about the phones and

18   everything.  Then it gives you -- Apple ignores the next

19   sentence, which is cellular mobile phone technology is based

20   on the standard cellular phone.  Right?  There's nothing

21   special about this.  It's phones.  And then it tells you

22   both data and speech.

23           Now, data is what we're talking about, right,

24   means for transmitting pictures, right.  We're talking about

25   data, not speech.  It tells you both data and speech can be

1    transmitted via the integrated cellular mobile phone unit,

2    the phone.  That phone unit, the sentence above says, might

3    have a modem, doesn't have to, but it's the phone.

4           Now, here's where Apple jumps in.  They say,

5    they pull out the data transmission properties are based on

6    an analogue modem and the GSM data interface, for instance,

7    the technology of both.

8           Now, the GSM issue, your Honor, there are two

9    major phone networks in the country, GSM and CDMA.  Right?

10   There's the Verizon network, there's the AT&T network.  The

11   GSM is one.  The other one is the other.  The fact that the

12   patent talks about the GSM one, for instance, the technology

13   being conventional, isn't a requirement of this claim.  It's

14   certainly not a requirement for the means for transmitting

15   image information.  The means for transmitting is the phone.

16   But Apple adds in this GSM data interface, and then they

17   add, where the patent talked about this analogue modem,

18   which is, what's a modem?  It's a thing that allows you to

19   transmit data.  Nothing about telefax, which is a special

20   modem.  It's a fax machine.

21          The patent tells you further in that same column

22   at the bottom, and now I'm on slide 23, the functions

23   include telephone services, which are based on the cellular

24   mobile phone, data transmission or speech transmission.

25   Right?  Data transmission over the phone.  Then it says, or

1   facsimile services, or electronic mail, or short message

2   services.  All of that stuff can be put into the functions

3   of this phone.

4            Apple just picks out telefax mode.  It's not

5   even listed there.  Now, there is one place in the patent

6   where it talks about a telefax modem, but there's just one

7   place, and there's just no reason to stick that in there

8   other than it's their noninfringement.  It's the one thing,

9   it's the one thing in all of that bottom of that column 3

10  that they say if we have that, we don't infringe.  And

11  there's just no reason to require that.

12           Now, the patent tells you, by the way, that this

13  data can go by other things besides modem.  So on column 8

14  at line 5 to 18 -- and this is on page 24 -- we distinguish.

15  Remember I was talking about the analogue GSM network?  This

16  patent is telling you it can be either.  Right?  We don't

17  care about the network.  The patent is telling you it's

18  about a phone.

19           So at column 8, line 15, it talks about when the

20  phone unit of the notebook computer is implemented as a

21  digital GSM.  It's the alternative.  The user can transmit

22  messages over this SMS, sort of like text messages, things

23  like that, which you can attach pictures to.

24           It tells you the message reading is read by a

25  data collection device such as a camera unit.  After the

1    message has been transmitted via phone to the GSM SMS.  So

2    it is telling you the picture can go by things by other

3    than.  Well, not by things other than telefax because

4    nothing says it has to go by telefax.  But it's giving you

5    by structure.  It can be done by e-mail.  It can be done by

6    GSM short message.

7              In fact, the next column, exhibit we have up

8    here, page, which comes out of page 25, this is a place that

9    bitmap images, the digital images can later be forwarded via

10   telefax or electronic mail services.  So there's nothing

11   that says this telefax isn't a key part.

12             And I just wrap up, your Honor, on this, just

13   reminding you, the Federal Circuit case says that for

14   means-plus-function, this is the first one, so it's the one

15   time I will put the case up.  That what you need to look at

16   is what was necessary to perform the claimed function.

17   What's necessary to perform the claimed function?  And you

18   don't incorporate unrecited limitations.

19             What's necessary to perform the function?  Means

20   for transmitting.  It's a cellular phone with an antenna,

21   with a modem, with other things.  That's the means for

22   transmitting.

23             And then there is one last slide, your Honor,

24   and it is when they wanted a telefax modem, they put in a

25   dependent claim.  Claim 2 talked about the means for

1   transmitting is a cellular mobile phone unit, period.

2   Claim 4, where the phone unit comprises includes a

3   telefax modem.  They now want to make that telefax

4   modem an essential component of this patent, which they

5   say without it, it does not work, and that's the issue,

6   your Honor.

7             THE COURT:  All right.  Thank you very much.

8             MS. SIMMONS:  Your Honor, may I approach to hand

9   you our binders?

10            THE COURT:  Sure.  Thank you very much.

11            MR. RILEY:  I'd like to begin by going directly

12  to the means-plus-function issues with regard to Slide No.

13  8.

14            So the issue that we're faced with and are

15  discussing today is the means for transmitting, but we

16  have to read that in the context of the entire claim

17  language.

18            If we could go, what we're looking at is a

19  portable cellular mobile phone.  So we're looking at the

20  phone and it comprises a means, comprises under D a

21  microprocessor, and then underneath that, the

22  microprocessors is coupled to the means for transmitting

23  image information processed by said microprocessor to

24  another location using a radio frequency channel.

25            So the issue here is the means coupled to the

1    microprocessor for transmitting an image, not text,

2    transmitting an image.  And so we have to look in the patent

3    for the structure that provides the transmission for the

4    image.  Not text messages, not SMS, but the image.

5              Let's go to the next slide.

6              So, again, the steps for construing

7    means-plus-function, and I don't believe there's a

8    disagreement except with regard to the third step.  We first

9    identify the function.  We must construe the words of the

10   function using ordinary claim construction principles.  And

11   then we have to identify the structure from the

12   specification that is clearly linked to the function.  And

13   this is where MMI goes off the track.  They don't identify

14   the structure that is clearly linked to the function.  They

15   identify a close to things, including a structure which is

16   not even in the embodiment which is being claimed, the

17   cellular phone unit.

18             Let's go to the next slide.

19             So, again, we've agreed on the function.  And

20   note the function, to transmit a picture, not text messages,

21   not SMS, but to transmit a picture captured by the camera

22   and processed by the processing unit to another location

23   using a radio frequency channel.

24             Now, we've seen the competing constructions, but

25   if we go to the next slide, I really want to focus on the

1    difference, and the difference is in MMI, they say it's

2    and/or a modem.  They make an alternative whereas as in

3    Apple's construction, which clearly links the function to a

4    structure that is disclosed, the modem is required.

5              So, again, let's turn to the actual figures.

6    Now, the only area in the patent where we have a diagram

7    that indicates this is Figure 3, and there it says, cellular

8    mobile telephone and modem.

9              So the patent directs our attention to the

10   structure of this modem.  And if we go to the next slide,

11   how is that modem described?  Well, again, the statute,

12   means-plus-function construction, is a creature of statute

13   and we will return to that in a moment.

14             It says, let's look at construing it to cover

15   the corresponding structure, material, or acts.  The only

16   description of that modem appears as a -- an analogue modem

17   and GSM data interface.  That's what transmits the picture

18   image as opposed to the transmission of text images.  It is

19   the only structure, only structure which is disclosed in the

20   specification.

21             So if we turn to the next slide, Slide No. 16,

22   this is the point I was alluding to earlier.  And this is

23   why careful review of the specification is required.  There

24   are other transmission modes that are disclosed, such as

25   SMS, but at this time, SMS only transmitted text.  The

1    development of attaching photos to text messages is a very

2    recent development.  It is not described at all.  In fact,

3    you can see the user can transmit SMS messages.  No

4    description at all about transmitting photos or images using

5    SMS.

6              And then they say, well, what about e-mail?

7    Well, it says, an electronic mail message is implemented in

8    the same way as SMS message, but the electronic mail message

9    may be longer.  No description at all about transmitting an

10   image or a photograph.

11             If we can go to the next slide.

12             Now, in counsel's argument, they pointed to this

13   language about possible telefax, electronic mail services

14   and so forth, but that is a reference to the digitizer pad

15   embodiment.  There are two embodiments in here, and, of

16   course, the claims we are asking the Court to construe are

17   limited to mobile telephones.

18             So it would be inappropriate, in fact, a

19   violation of the means-plus-function principles to look

20   to a different claim structure.  The claim structure here

21   is the telephone.  The camera unit in the mobile telephone,

22   and that is where we have to find meaning for this

23   structure.

24             Next slide.

25             Now, as we heard at the end of counsel's

1    arguments, they point to a dependent claim, and say, well,

2    look, if it's a dependent claim off of this independent

3    claim that requires a telefax modem, then it can't be

4    required in the independent claim.  The doctrine of claim

5    differentiation, which is a judicial doctrine.

6              The Courts have been very clear on this.  The

7    doctrine of claim differentiation, to use the Cour's words

8    in this opinion, cannot trump the statutory

9    means-plus-function construction.  And in this case, the

10   Court said, a means-plus-function term is not made

11   open-ended by the presence of another claim, in this case, a

12   dependent claim, specifically claiming the disclosed

13   structure, which underlies the means clause for an

14   equivalent of that structure.  Indeed, the doctrine of

15   claim differentiation cannot broaden claims beyond their

16   correct scope, determined in light of the specification

17   and the prosecution history and any relevant extrinsic

18   evidence.

19             THE COURT:  I do have a question, and if I could

20   interrupt before I forget it.

21             There have been many, many, many times when a

22   patent has issued in year X and is enforced in year Z and

23   the technology certainly has gone beyond, and you know that

24   the technology that the patent is being forced against

25   wasn't in the inventor's mind because no one had invented it

1    yet.

2              So when you tell me that I've got to restrict

3    the construction of this first term to what was known, that

4    is the telefax modem, I'm struggling to figure out whether

5    that is really appropriate or not and whether I really am

6    required to be so narrow as to limit the construction to an

7    embodiment that -- you know, maybe the only embodiment that

8    was physically known at the time.

9              MR. RILEY:  And I think that the reason that we

10   are directed toward the actual structure is that they

11   described this element in the means-plus-function language.

12   If they had described the claim differently, we would have a

13   different discussion, but if we can return at least to Slide

14   11, the statute is very clear, when you are using

15   means-plus-function language, you are limited to the

16   disclosed structure and its equivalents.

17             THE COURT:  Right.

18             MR. RILEY:  You can't just make a general

19   description.  You're limited to the structure which is

20   actually disclosed in the patent specification.  If you

21   choose to use that language, you are required by the law,

22   the construction is limited to the disclosed structure.

23             THE COURT:  Well, and you're telling me it has

24   to be a telefax modem as opposed to the more general

25   reference to a modem used in other parts.  That's what

1    confuses me.  I mean, it's not as if that's the only place

2    they refer to a modem.  That's where they refer to a

3    specific type of modem.

4              MR. RILEY:  But with regard to the transmission

5    of pictures, of images, the only description, the only

6    structure is a telefax modem.  There are other uses for

7    modems, but with regard to this claim, which, remember, is

8    limited to the camera on the mobile phone.  The means for

9    transmission of the images that's described, and the only

10   structure, is the telefax mode.

11             THE COURT:  All right.

12             MR. RILEY:  Thank you.

13             THE COURT:  Brief reply from plaintiff's counsel

14   to that and then we'll move on.

15             MR. BAUER:  I just need to jump back here, your

16   Honor.  So they put up claim 73.  The claim 1 does not talk

17   about the microprocessor coupled to the means for

18   transmitting.  That was something they showed you in claim

19   73.  This just says, the device for comprising a means for

20   transmitting.  What is the device?  It's a device for

21   personal communication.  And the only place where it's

22   talking about, right, it's a device for personal

23   communication, including a means for transmitting image

24   information.  All right?

25             So it's the phone.  That's what we're talking

1    about.  Here's the camera.  All right?  It's a device for

2    personal communication, data collection and data processing,

3    small, et cetera, a housing.  It has a bunch of things in

4    it.  It does not say anything up there about the phone.  And

5    then down here, the device for transmitting image

6    information, the device for personal communication.

7              The patent tells you on this column 3 at the

8    bottom -- sorry.  The functions related:  Telephone services

9    based on the phone, data transmission.  Data transmission as

10   opposed to speech transmission.  And then it says, fax

11   services, electronic mail.  The phone alone is enough.  And

12   your Honor asked the question, that's why for

13   means-plus-function, when the actual jury instruction, it's

14   and equivalents within the statute.

15             So you get what was disclosed, and equivalents.

16   We have that sometimes in our claim construction, but I

17   think it really becomes a jury instruction once you've

18   defined it.  And the patent simply says, the phone provides

19   data transmission, and then there are other things you can

20   do.

21             So, your Honor, do you have any other question

22   on that one?

23             THE COURT:  No.  I will just have to go back and

24   read claim 73 and 1.  Yes.  All right.

25             MR. BAUER:  All right.  And --

```
 1                    THE COURT:  We'll move on.

 2                    MR. BAUER:  Okay.  Thanks.

 3               So now the next one, your Honor, is camera

 4      unit.

 5               And by the way, your Honor, you had asked about

 6      the claim constructions earlier.  Some of these, where we

 7      didn't have any, we didn't -- as Mr. Blumenfeld said, what

 8      we did is we provided the meaning that the expert had used,

 9      but we provided it so that we had something.  This was

10      meant -- it wasn't meant to do anything other than provide a

11      clear setup for today's hearing.

12               So the expert would have said during his -- in

13      his report, says, I've been told to use ordinary

14      construction.  To me, ordinary construction means something.

15      And then coming in here today, rather than having a blank on

16      the left, we've said, here's what the ordinary construction

17      is.  And that's a lot of these issues that you were asking

18      about before.

19               So camera unit is one that we don't think needs

20      construction, but we've provided a construction to set the

21      framework for today.

22               Their definition, a complete image capturing

23      apparatus including at least optical components and

24      dedicated image processing.  Well, one thing to be pointed

25      out to your Honor, first, and this is not
```

1     means-plus-function.  This is defining camera unit.  A

2     complete apparatus, including at least some components.

3     Those are inconsistent.  You can't have the two.  Either

4     it's complete, in which case these are the things, or it's

5     an image capturing apparatus having at least these things.

6     But to say it's complete and then it's at least, they're

7     setting up their noninfringement defense here.

8              Now, here's why we don't use the definition,

9     your Honor.  The claim defines the camera unit.  They can't

10    be any clearer.  The claim says, a camera unit for obtaining

11    information comprising.  It tells you what's in it.  And,

12    your Honor, what we've shown you is with their construction,

13    all of their words just come right out of the claim.

14             So their proposal, forget about complete,

15    because we all know that when it says comprising, it means

16    at least.  But what is the camera?  They say, includes at

17    least optical components and an image sensor circuitry.  The

18    claim tells you that.  A camera for receiving image

19    information and optics.  It's there.

20             The next thing they put in, memory circuits.

21    The claim tells you the camera unit has at least one memory

22    unit, so it's right there.

23             The next element.  An interface to external

24    circuitry they add to the camera unit.  It's right in the

25    claim, an output coupled to said data processing units.  So

1    what they've defined as the camera unit is what the claim

2    defines as the camera unit.

3            And your Honor knows that what we do in these

4    trials is you take the definition, you plug it into the

5    claim, and you say, here's what it means.  What they are

6    doing is taking a camera unit, which has an optics and

7    memory and output, and they want to put in a camera unit

8    that includes optical components, image sensor circuitry,

9    and an interface to external circuitry, which includes a

10   camera with optics.  They are taking the language right out

11   of the claim.

12           Now, that's three of the elements they take

13   right out of the claim.  Now we get -- so we have two

14   problems with their construction.  One is the complete and

15   at least.  And then it's dedicated.  Where did dedicated

16   come from?  The rest of this comes right out of the claim.

17   Everything else, but not dedicated.  You don't see that word

18   in there.

19           It's the same thing in claim 73, by the way.

20   Camera unit comprises, and there's the optics and there's

21   the image sensor, which is the sensor circuitry, and then

22   there's a means for processing and storing a portion of the

23   image information, the image processing and memory.

24           There's nothing about it being dedicated.  That

25   means -- now, what's interesting is, I think they think

1    dedicated means exclusive, but they are not going that far

2    to say it.  But that's the problem.  If dedicated just means

3    you have memory and you are putting information into it,

4    picture, well, you've told the patent machine, put the

5    picture into that memory.  That's one thing.  But this is a

6    summary judgment issue.  They take the position dedicated

7    means exclusive.  That is the only thing it can be used for,

8    and there's nothing in that claim that requires -- we go

9    back to claim 1 or claim 73.  It's a camera unit comprising

10   open-ended, comprising at least one memory unit.

11            And, by the way, your Honor, that one memory

12   unit, if you look in the preamble, it's in -- the personal

13   communication device has one memory unit as well, at least.

14   The same memory unit that's in that whole thing is also used

15   in the camera unit, that you see the same.

16            So it's a device for personal communication,

17   including a housing and having a data processor, a display,

18   a number of peripheral, at least one memory unit.  A camera

19   comprising at least one memory unit for storing.  You know,

20   there's nothing about the only thing that memory can do is

21   camera photos.  So they're adding a word there that does not

22   belong.

23            So let's go back.  We don't think you need any

24   construction because the claim tells you what the camera

25   unit is in as clear language as you can.  But if you are

1    going to take the stuff out of the language of the claim, at

2    least take it out faithfully and not add a word that gives

3    you a noninfringement defense.

4              THE COURT:  All right.  Thank you.

5              MR. RILEY:  Your Honor, I would like to begin by

6    first addressing claim 1, if we could go to slide 6.  We did

7    not discuss claim 1, your Honor, because claims 1, 2, 3 and

8    8 have been finally rejected in the re-exam.  MMI, rather

9    than contesting rejection, has filed three separate requests

10   to amend or cancel those claims, and I understand that

11   yesterday, a re-exam certificate was issued, suggesting that

12   those claims have, in fact, been amended.  So we did not

13   think it was -- that it was appropriate to burden the Court

14   with regard to construing the claim that is going to go

15   away.

16              And with that, I'd like to turn to the camera

17   and turn to, first, the prosecution history and explain why

18   it's appropriate to include these elements into this camera.

19   And the reason is that in prosecuting this patent, the

20   applicant said, this is no ordinary camera.  It's really

21   something else.  It can do -- and, in fact, it is itself

22   novel.  The prosecution history requires a camera unit

23   capable of storing and executing complex software, such as

24   optical character recognition, OCR software.  This is slide

25   25.

1              So any camera unit that is capable of doing

2      something as complex as optical character recognition is

3      going to have the elements which are described in the

4      specification.

5              And if we could go to slide 23, which describes

6      what those elements are and why Apple's patent, claim

7      construction is correct.

8              As you can see, the camera unit, which is

9      defined in Figure 5, includes Box 23 is a microprocessor as

10     its own separate memory, a backup, optics.  This is the

11     camera which the applicants represented to the Patent Office

12     was, in effect, novel.  And so if the camera unit is not

13     defined to include those elements, then we aren't being

14     faithful to what was disclosed to the Patent Office and

15     described in the specification.

16             Thank you.

17             THE COURT:  All right.

18             MR. BAUER:  Your Honor, as to claim 1, we have

19     not seen what came from the Patent Office.  All we know

20     there was something posted last night saying the re-exam

21     will allow.  So based on what we expect claim 1, there will

22     be a new claim 1, will have been amended, but with the same

23     terms that are at issue here.  So the claim is not going

24     away.

25             All right.  The next term, your Honor, is means

1   for processing and for storing at least a portion.  This has

2   something to do with the camera and the memory.  It's the

3   same issue that they were trying to do with camera unit,

4   trying to make things dedicated and solely.  And if you look

5   at that same picture that they put up, which is on our slide

6   41, those are the elements that are within the claim on

7   camera unit, the microprocessor, the memory.  We saw all of

8   that.  But there's nothing in this image that says that's

9   the only thing they do, and there's nothing in this patent

10  that requires it be the only thing they do.

11          So the means for storing.  So first on the

12  function, there's a dispute, and you asked where does it

13  matter and where doesn't it matter, your Honor.  This is

14  one I don't know if it matters.  We took the function

15  right out of the claim.  That's what the Federal Circuit

16  tells you to do, take the function out of the claim.  So we

17  took it right out of the claim.  They have an alternative

18  proposal.

19          Now, I'm not quite sure that it has a

20  substantive difference, but I don't know why they want a

21  different proposal.  We're just, again, being faithful to

22  the law that says take the function from the claim, the

23  means-plus-function, but we have that dispute and they

24  will tell us why they think it's important to have it

25  different.

1           Structure for processing and the structure for

2      storing, which is in the claim.  Again, you look at their

3      definition, what's the big issue?  Now they want the

4      microprocessor dedicated for -- again, it's dedicated.  But

5      the only thing it does is process pictures, that it does not

6      do anything else.  And the same thing, the memory is

7      dedicated to storing.  It's the exact same issue, is it

8      dedicated?  And there's no reason in the claim.

9           Our structure is a processor to process the

10     image information.  That's what we have.  It's a means for

11     processing the image information.  We need a processor.  And

12     how do you do it?

13          Structure for storing, your Honor.  This is one

14     I do want to focus on because this might not come across

15     clearly in the pleadings, I mean in the papers.  The

16     structure for storing is not the memory, which is what they

17     want it to be.  It's the thing that puts it into memory.

18     Right?  It's a means for processing and it's a means for

19     storing.  How do you store information?  So our proposal is,

20     it's the controller for control and retrieval to the memory

21     unit.  It's not the memory itself.  And I will show you,

22     your Honor, why that's right.

23          So the next claim that we get to, if we look at

24     claim 8, we'll see when we talk claim 8, it's just a means

25     for storing.  And the parties have agreed it should be

1    construed the same way.  This is just a means for storing as

2    opposed to the other was a means for storing, process

3    storing.  But the parties agree, a means for storing is the

4    same.

5          And claim 8 makes it clear, the means for

6    storing the processed image information in a memory unit it

7    doesn't say the means for storing is the memory unit.  It is

8    processing the data and then the computer means the

9    processor to put it in memory.

10         And then the issue about whether it's exclusive

11   or not, your Honor.  This is a slide 41.  The image

12   processing -- all it tells you, the image processing unit

13   includes comprises a microprocessor and a number of memory

14   units.  It does not say anything about that's the only

15   thing.

16         You are not going to find anywhere in this

17   patent where it says these memory units are only used for

18   data processing or only used for images.  The only way they

19   get to it is by looking at a picture, a block diagram that

20   says, here's our camera unit.  And, therefore, they say

21   that's the only thing it can do and that's not right.  It's

22   nowhere in there.

23         And then this is another -- another slide, your

24   Honor, that just confirms the means for storing is how do

25   you put it into -- this is slide 42.  Camera unit.  This

1     comes from column 4, 48.  Camera unit 14 functions in the

2     following way.  And, by the way, this is why we know it's

3     not what's on that card.  It functions in the following way,

4     whether it is fixedly integrated in that computer or

5     connected to a card slot.

6              So that one figure they showed you is the card,

7     you know, that says, here's a card with all the stuff on the

8     card.  You know, you don't put a card into it.  But it tells

9     you it can be built in, and if it's built in, there's no

10    reason it be exclusive.  It's part of the system.  But what

11    does it tell you?  A picture of a document taken by the

12    camera through the optics is transferred to an image

13    processing unit and through its microprocessor to the memory

14    unit.

15             So it is the memory -- the processor is putting

16    it into memory.  They're different things.  And that's it,

17    your Honor.

18             THE COURT:  All right.  Thank you.

19             MR. RILEY:  If we could start at slide 26.

20    Again, here the dispute term is a means for processing and

21    for storing, but it is within the context of the camera

22    unit.  And I think this is a distinction that was obscured

23    by MMI's presentation because we've got a mobile phone that

24    itself has a microprocessor and then it has a camera unit,

25    and the camera unit comprises optics and an image sensor for

1    obtaining information.

2            And here's the key language, in means for

3    processing.  So the camera unit as a separate means for

4    processing and for storing at least a portion of the image.

5    And that's what Apple's proposed construction gets at, that

6    distinction between the microprocessor for the mobile phone

7    and the camera unit, which has its own means for processing.

8            THE COURT:  Well, it has a means for processing.

9    I don't see where it necessarily means it's a separate -- I

10   mean, it does not say a separate means or same means.  I

11   don't know how you get to the fact that it's dedicated as

12   opposed to shared or what you mean by that.  Perhaps you

13   need to explain that to me better.

14           MR. RILEY:  Certainly.  Because the only

15   structure that's disclosed shows separate processing units.

16   That's the only structure that's disclosed.

17           Again, Apple construed the function because we

18   were required to do and we tried to come up with a

19   construction of the function which was a bit simpler.  But

20   the key issue here, your Honor, is, as you've anticipated,

21   is, both MMI and Apple's constructions include a processor

22   and memory circuits.  So the dispute is, as you alluded to,

23   whether the processor and memory circuits of the camera unit

24   are general purpose or dedicated to processing and storing

25   pictures.  As you said, are they shared or are they

1    separate.

2              And then MMI adds to their definition this

3    concept of a memory controller, which is absent from Apple's

4    construction, and we believe is not disclosed in the

5    structure.

6              So, again, I think we go back to the entire

7    context of the claim in slide 31.  It identifies a

8    microprocessor, which we can call the CPU to this system.

9    So we've got a portable cellular phone comprising a

10   microprocessor wherein the camera unit comprises a means for

11   processing.  Again, making a textural distinction.  But we

12   don't have to just rely on that textural distinction.  We

13   can go to the actual diagram.

14             And slide 32 -- and, again, this is the only

15   structure that is disclosed.  In figure 3, you can see that

16   the mobile unit has a central processor.  Next to it is a

17   display controller and so forth.  And this central processor

18   is going to handle tasks like input, output.  You can see

19   there's a keyboard that's labeled there at 10.  There's an

20   infrared link.  It speaks to a display controller, which

21   then displays on the mobile unit.  So all of that is

22   contained and controlled by the CPU.

23             And then we look down to structure 14.  That's

24   the camera unit.  And in this discussion, the camera unit

25   can be integrated or it can be slid into a slide.  But it's

1    still a separate camera unit.  And that's what's discussed

2    in the patent.

3              And then if we go to the illustration, it shows

4    a separate microprocessor and its own separate memory,

5    backup battery, et cetera, in Figure 5.

6              So, clearly, the only structure for this means

7    for processing is a processor which is dedicated to the

8    camera unit.  There's nothing in this patent that teaches

9    sharing a central processing unit between the mobile phone

10   and the camera unit.  That's not described.  It's not

11   taught.  The only structure that is described is the one

12   that I'm showing on this slide 32.

13             So, again, given our requirement of linking the

14   means for processing and storing, the Apple construction

15   links it clearly to a dedicated processor and memory

16   circuits because that is, in fact, what is disclosed.

17             Now, the other thing that is wrong about their

18   construction is they require a memory controller in the

19   camera unit.  And as you can see from Figure 3, block 7, the

20   only memory controller is in the mobile unit.  It is not in

21   the camera unit.  There is nothing in this patent that

22   discloses a memory controller in a camera unit.

23             Thank you.

24             THE COURT:  And this is all on the assumption

25   that the camera unit is a separate card?

1          MR. RILEY:  Or integrated.  It can be either.

2    But it has to have a dedicated processor.

3          THE COURT:  So you are saying that if the camera

4    unit is integrated, even though that is not -- I don't think

5    -- my impression is that that isn't what Figure 5

6    illustrates, is it?

7          MR. RILEY:  Figure 5 is the only illustration we

8    have of any structure.

9          THE COURT:  Right.  But it's not of an

10   integrated camera unit.

11         MR. RILEY:  It could be, if we go back to it.

12   For example, your Honor, the display could easily be

13   integrated into the same system.  The mouse track ball, it's

14   hard to imagine that that would be separate from the system.

15   It would be right on the unit.

16         So my reading of this is that the camera unit is

17   integrated, but they say, alternatively, it could be slid

18   in.  Again, because all of these other, you know, the

19   infrared link, keyboard, mouse/ball, battery, display, those

20   are typically integrated into the same structure.

21         THE COURT:  And use the central processor?

22         MR. RILEY:  And use the central processor.  But

23   our camera unit as we see -- and, again, this is because of

24   what they were describing.  This is their invention.  Again,

25   it is a sophisticated camera that has the ability to do

1    things such as OCR.

2              When we go and look at the camera unit -- and,

3    again, they're touting this as part of their invention.

4    This is a novel camera that can run application software

5    that can do OCR.  It has a separate processor and separate

6    dedicated memory units.

7              THE COURT:  All right.  Thank you.

8              MR. BAUER:  So, your Honor, when you look at the

9    patent, what you'll see is that figure that's up there.

10   They could be integrated.  I mean, where the camera unit is,

11   just like the phone.  This isn't a separate thing, if the

12   box could be around the whole thing or not.  So that's why

13   it tells you, you know, what the patent says is, that the

14   camera card and camera unit conform to the block diagram.

15   That's all it tells you, it conforms to that block diagram.

16   It doesn't tell you that's the card.  That's just a block

17   diagram.  By example, camera card 15 consists of.

18             So as we talk about, it could be integrated or

19   it could be a separate card.  I think this figure applies in

20   both instances.  It's just, where do you draw the housing

21   around the whole thing, and then if it is all on the inside,

22   as we discussed, there's actually no requirement in anything

23   here that there be a single microprocessor for it.

24             All right.  So the last element, your Honor,

25   that we're here to talk about is application software, and

1      this one should go pretty fast.

2                 What is application software?  It's something

3      other than operating system software.  That's all.  Apple's

4      construction is -- it's a computer program.  Apple's

5      construction is programmed instructions that perform a

6      function.  That's all software.  That's just software.  But

7      this is application software.  It's something different.

8                 The patent tells, and the claim, you're

9      using application software.  Now, we know what applications

10     are.  That's a term we all use every day.  You know, Outlook

11     and Word and those things are application software as

12     opposed to Microsoft's or, on the iPhone, the iOS is an

13     operating system.  But it's not an application software.

14                Your Honor, this is a dictionary that they've

15     used.  The IEEE, everybody uses the IEEE standard dictionary

16     that tells you -- I mean, this is the standard dictionary

17     definition in these cases.  Application software is software

18     designed to fulfill specific needs, contrast system

19     software.  And the patent tells you, if you look at column 3

20     of the patent, the operating system and preferably at least

21     part of the application programs, the patent tells you

22     they're different.

23                There's no shortage of places.  We put on this

24     slide at least three.  The application program for the

25     camera has a business card handler.  There's a graphics

1    handler.  There are a number of accessories and

2    applications.  We all know applications are something

3    different than operating system.

4              And then that's all we say.  It's something

5    other than the operating system.  Their definition is

6    software.  There's no definition there.

7              THE COURT:  All right.  Let's hear from Apple.

8              MR. RILEY:  If we could go to Slide 37, please.

9              So, again, the term application software, and,

10   again, we're in a claim which is going to be amended or

11   changed or rejected.  The competing constructions are MMI

12   makes a distinction between operating system software and

13   applications.

14             THE COURT:  And I mean as unsophisticated

15   as I am, there is a difference, generally, in the art.

16   Right?

17             MR. RILEY:  There can be, if we're talking about

18   a desktop computer.  But at this time we were talking about

19   time mobile units, and we'll see from the specification that

20   that distinction is not as clear as we would hope it.

21             And, of course, the concept of operating system

22   has changed over time from DOS, which was a primitive

23   operating system, to the MAC OS.  The MAC OS contains

24   utilities, for example, text utilities, which before were

25   separate applications.  The concept of operations --

1   operating system has expanded over time.  And, in fact, in

2   this case, during the re-exam, which has been ongoing, at

3   least until yesterday, MMI made the same argument, your

4   Honor, in which they said regardless, one of ordinary skill

5   in the art, a personal communication device at the time the

6   invention was made would not interpret application software

7   to mean software distinct from operation system software.

8   That's what the PTO said, again, recognizing that this

9   patent -- this is slide 39, circa 1994, that on a mobile

10  unit, a small mobile unit, you wouldn't make the distinction

11  between operating system and application.  Today we

12  understand that distinction because we download apps to our

13  iPhone and we identify the iOS, but that concept and

14  distinction with regard to mobile units did not exist at the

15  time that this patent was filed.

16          And, in fact, if you look at the specification

17  where they rely on, it says the notebook computer, according

18  to this invention, comprises a number of facilities and/or

19  application programs.  But it then goes on to say, the

20  services used most frequently include functions related to

21  speech communications, telefax function, electronic mail,

22  paging, databank services and online information service

23  connections.

24          Well, today your operating system handles many

25  of these functions, such as online information services

 1    connection and databank services.

 2              So with regard to the time when this application

 3    was filed and the context in which we must read it, there

 4    really was a distinction between application software and

 5    operating system software.  We shouldn't import that

 6    distinction in hindsight.

 7              THE COURT:  All right.  Thank you very much.

 8              MR. RILEY:  Thank you.

 9              MR. BAUER:  So, your Honor, that was the

10    invention using application programs as opposed to operating

11    software.

12              This is a validity argument.  This is why they

13    are doing it.  They would rather have the broad just

14    definition of any software because then they can talk about

15    what people did before, and what this -- this quote that

16    they put up, the invention, according to the invention,

17    comprises a number of facilities or application programs by

18    which many of these possibilities happen.  This is the kind

19    of argument, your Honor, that, you know, Microsoft has made,

20    you know, when the whole thing about Windows and whether you

21    can integrate an application to the operating system.  And,

22    you know, that was the whole antitrust case way back when,

23    whether -- where you draw the line between an operating

24    system and an application software thing, and that was when

25    they were trying to integrate Internet Explorer into the

 1    operating system and then they said now it's part of the

 2    operating system.  The whole thing, its application

 3    programs, the IEEE tells you what they are.

 4                THE COURT:  At the time.

 5                MR. BAUER:  That IEEE is at the time.  And the

 6    thing they put up from the Patent Office, well, that's just

 7    what an Examiner said.  And, you know, that's not binding

 8    under anyone what the Examiner said.  What we have is the

 9    IEEE dictionary.  And clearly, clearly, the patent

10    distinguishes between the two.  So thank you.

11                THE COURT:  All right.  We've been at it for two

12    hours.  Let's take 15 minutes and then we'll go on.  Thank

13    you very much.

14                (Short recess taken.)

15                          -   -   -

16                (Proceedings resumed after the short recess.)

17                THE COURT:  All right.  You may be seated.

18                And, you know, I can't imagine we're going to

19    get through everything, even with the deletions in the time

20    that I can give you today.  So be thinking about whether we

21    need to come back for another morning of argument.

22                All right.  Where do we go now?

23                MR. RILEY:  Thank you, your Honor.  We're going

24    to begin with a tutorial on the '170 patent and then move

25    from that into claim construction.

1          THE COURT:  All right.

2          MR. RILEY:  We appreciate counsel affording us

3    an opportunity to do this.  This is the most technically

4    daunting of the patents.  Others deal with call forwarding

5    and things that we're used to.  This deals with image --

6    this deals with data compression.  Specifically, audio

7    compression.

8               Fortunately, there is only one asserted claim to

9    be construed here on slide 2, which is claim 49, the

10   apparatus for expanding a compressed digital signal.  And

11   MMI alleges infringement based on Apple's compliance with,

12   in the accused products with the MP3 standard.  And, again,

13   this is only with regard to decompression or expanding data

14   that has already been compressed.

15              So the technology tutorial, we're going to

16   cover just a little background on audio compression and

17   expansion, what it is, how it works, and then we're going to

18   go to the concept of time domain versus frequency domain.

19   The patent actually uses the phrase time axis versus

20   frequency axis.

21              Then we go to the concept of block floating or

22   bit shifting, and this is critical to Apple's invalidity

23   argument, the concept of bit shifting.  And then the idea of

24   adaptive bit allocation.

25              And after we cover the technology tutorial, MMI

1    will begin with the construction argument on the disputed

2    terms.

3            So to begin with, the concept of audio

4    compression and expansion.  Here I've simply illustrated at

5    the top, we have an audio input represented as sort of a

6    sine wave.  We are able to, using technology, compress that

7    signal into a series of bits, ones and zeros, transmitted,

8    say, over the Internet, and then at the other end, expand it

9    back into an audio, something we can listen to on our

10   stereo.

11           Now, there's the concept of lossless

12   compression.  Apple, for example, has a proprietary

13   technology which is called Apple lossless compression so

14   that it will compress it to about half the amount of storage

15   that's required, and then when it decompresses or expands

16   it, you lose virtually no information.  That's called

17   lossless compression.

18           Most compression technologies that we're

19   familiar with are actually lossy compression.  In lossy

20   compression, some information is lost.  Now, you get tighter

21   compression, you get a smaller file, but when you expand

22   it, it does not have the same fidelity, and the art and

23   science of lossy compression is doing it in a way that the

24   listener doesn't even perceive, even though not all the

25   notes are going to be represented when you come to the

1    expansion.

2              Well, this makes a lot of difference.  If we

3    look at a CD that contains uncompressed music, it's roughly

4    74 minutes of audio, and the CD standard was actually

5    pioneered by Sony, and the word is that they decided it

6    would be this size because they could fit Beethoven's Ninth

7    Symphony on it.  But we can compress Beethoven's Ninth

8    Symphony if we use the MP3 technology, we can compress that

9    down to one sixth of the space on the same CD disk.  But,

10   again, it's lossy compression, so that when it's expanded,

11   it's not quite the fidelity that Beethoven wanted us to

12   hear.

13             Now, this patent describes both the compression

14   process and the decompression process, and in order to

15   understand the expansion or decompression -- I will use

16   those terms interchangeably -- we have to understand the

17   front end.  How did we get it compressed and how are we

18   going to decompress it or expand it?

19             And so the patent claims an apparatus for

20   compressing as well as an apparatus for expanding.  The

21   claim at issue, claim 49, is only the apparatus for

22   expanding.  And the tutorial is going to go through some of

23   the concepts in both the compression and the expansion.

24             Well, the first is this concept of the time

25   domain versus frequency domain, and, again, the patent

1    refers to this as the time axis versus frequency axis.

2         Well, if we think about a sound wave, and here

3    I've shown a piano, and we're going to strike two notes, an

4    A below middle C and an A above middle C, and we're going to

5    strike them at the same time.  The A3, the one below middle

6    C, vibrates at 220 hertz.  The one above vibrates at 440

7    hertz, but we're playing one sound, hitting them at the same

8    time, and so we get a time domain signal that's a

9    combination of those sound waves that we can represent here

10   as a matter of time as well as the height or amplitude of

11   that signal.

12        Now, one way of expressing that signal, and this

13   is a way that sometimes it's done, is we could measure each

14   of these areas and represent that digitally and just send

15   the sound wave over that way.  That requires a lot of data

16   to represent all of those bits of information.

17        So what we can do alternatively is to translate

18   or transform that signal from the time domain shown on the

19   left to the frequency domain, and if we do that, we can

20   express that same wave with a lot less information, and

21   that's a way of compressing and one way of doing it, and

22   this is very common in the art, is discrete cosine

23   transform.

24        And what we do with a discrete cosine transform

25   is we take a particular block of that signal, and I've

1    highlighted it in yellow, and we transform it from an

2    expression in the time domain to an expression in the

3    frequency domain.  And our axes reflect, as I know, there

4    are two notes, 220 hertz, the A below middle C.  440 hertz,

5    the A above middle C.

6           And then we have this concept of the spectral

7    coefficient, which is a measure of the intensity of the

8    frequency.

9           So what we do by transforming from the time

10   domain to the frequency domain, we can express that -- that

11   wave, that sound wave, with less information, by going

12   through this -- this DC, the discrete cosine transform.  And

13   that's, in fact, a way that this works, and, again, it's

14   very common compression technology.

15          You can see the compression apparatus has DCT.

16   So we take our information, we run it through DCT, we

17   transform it from the time domain to the frequency domain.

18   We do some other processing.  We send it.  Well, when we

19   want to listen to it, we've got to reverse that, so we do an

20   inverse DCT, because what we've got is in the frequency

21   domain and we need to get back into the time domain so that

22   we can play it and listen to it.

23          So the expansion apparatus uses the concept of

24   inverse discrete cosine transform.

25          So, again, the compression transforms from the

1    time domain, or the time axis, into the frequency domain, or

2    the frequency axis.  And then expansion is just the reverse.

3    We take the frequency domain signal, use our inverse

4    discrete cosine transform, and get a time domain signal.

5            So with that in mind, we turn to two aspects

6    of the technology, which are important for claim

7    construction, the concept of block floating or bit shifting

8    and adaptive bit allocation.  And one way to think about

9    this is ways of processing the data in order to enhance our

10   compression.

11           Let's turn first to block floating.  If we

12   looked at our compression apparatus, before we get to the

13   DCT, there's a block that says block floating determination

14   processing.  So we're going to use block floating, we'll get

15   to that in a minute, and then we're going to do our

16   transform into the frequency, and then we are going to

17   release the block.

18           Similarly, on the expansion, we do the floating

19   determination processing to get it back in the form and then

20   we do the inverse and then we do the release.

21           So this concept of block floating appears on

22   both the compression side and on the expansion side.  So

23   what is it?  Well, the concept of block floating is a

24   concept that's part of digital mathematics.  Bits, of

25   course, are reflected as ones and zeros, but they can be

1   expressed as powers of two, as we've illustrated here on

2   slide 18.

3              The concept of block floating is that you shift

4   the binary data to the left in a process called

5   normalization.  So, for example, if we're going to shift

6   our data, and these are -- this represents data in the time

7   domain before we're going to do our transform, for example.

8   We shift it over two bits, which scales up the number.  So

9   32 becomes 128.  56 becomes 224.  27 becomes 108, and so

10  forth, because we're essentially multiplying by four.

11             So then you must ask, well, why do this?  Why

12  increase these values?  And the reason is that by getting

13  the most significant data in these rows over here

14  (indicating), our transform is more efficient.

15             So block floating reduces the complexity of the

16  transform.  The transform can operate on just the leftmost

17  bits of the input data, much like scaling any value.  You

18  might round up, for example.  It's easier to do the math.

19  And, again, because we want this to work efficiently and

20  that's part of what the patent claims, if we do this bit

21  shifting before we do the transform, we can have more

22  efficient transform.  That is that's all that is involved

23  here.

24             Well, you might ask yourself, well, but what

25  if the value runs all the way out to the leftmost bit

 1    space?  Well, bit shifting depends on the maximum value.

 2    And in this case, in this illustration, 56 is the maximum,

 3    which is shown here, because if you shift it over, then you

 4    can't shift when you have values that are beyond it.  So

 5    the amount that you can bit shift depends on the absolute

 6    value of the data.  And, again, that's discussed in the

 7    patent.

 8              So once you do the bit shifting, then after you

 9    do, in this case, on the expansion side, we're doing the

10    inverse, the IDCT, we have to tell the floating release, how

11    much did we shift it?  Did we shift it one bit?  Did we

12    shift it two?  Well, we shifted it two, so we need to get it

13    back into its non-shifted form, and that's what floating

14    release does.

15              So, again, floating determination, we do the bit

16    shift, then we perform either the discrete cosine transform

17    or the inverse discrete cosine transform.  Then, after we've

18    done that, we release it.  The bit shifting is released.

19    And then this line here (indicating) at the bottom says, the

20    shift amount equals two.  We need to know, did we shift one,

21    did we shift two?  How much did we shift?  Because we're

22    going back from, we've scaled it.  We've created a factor,

23    and now we need to get back to the original way in which it

24    was expressed or as close as we can to the original way it

25    was expressed.

1          And so that's the concept of block floating or

2     bit shifting.

3          The next concept is adaptive bit allocation.

4     And, again, to orient ourselves to both the compression and

5     expansion, you can see that adaptive bit allocation occurs

6     at the back end.  Before, when we're completing our

7     compression, we're going to do adaptive bit allocation.

8     Well, when we're expanding, we have to do adaptive bit

9     allocation decoding, so we're going to encode before we say

10    transmit it over the Internet.  Then, when we get it, we

11    want to listen to it, the first step is to decode the

12    adaptive bit allocation.  And then we do the floating and

13    then we'll do the IDCT.

14         Well, the concept of adaptive bit allocation is

15    actually fairly simple, and that is, this is another way of

16    compressing the data by, for example, rounding the numbers.

17    And that's the basic idea of quantization, is taking some

18    quantity, rounding it or scaling it.

19         And so, for example, again, we're in the time

20    domain, or in this case we're doing -- we're in the

21    frequency domain.  We have these coefficients, 32, 56, 27,

22    41.  We do adaptive bit allocation coding.  We round them.

23    We quantize them to 30, 50, 20, 40, and then, when we get to

24    the other side and expansion, we take those values and we

25    return them.  In this case, to 35, 55, 25, 45, because

1    that's -- for example, our protocol is to choose the

2    midpoint.

3              So the concept of adaptive bit allocation is

4    just another way to help us compress the data.  Rather than

5    expressing 32, we express 30.  It's easier.  And then when

6    we return by adaptive bit allocation decoding, we return it

7    to this non-quantized, which may not be exactly what the

8    original value was.

9              So that is our tech tutorial, unless there are

10   any questions the Court has.

11             THE COURT:  All right.

12             MR. RILEY:  Thank you.

13             THE COURT:  Thank you very much.

14             MR. BAUER:  All right.  So, your Honor, so this

15   is just on the first slide, is, again, just a mnemonic to

16   remember we're talking about compressed audio decoding, and

17   the first element we'll talk about is this adaptive bit

18   allocation.  It's a means-plus-function.  These, I think,

19   I'm going to go through very quickly.

20             First, on the function, we couldn't reach

21   agreement on that.  Again, we just took it right out of

22   the claim, our function just word for word from the claim.

23   They have a function that, whereas before I said I didn't

24   see anything wrong.  In this case, I don't even understand

25   it.  So I'm not quite sure why they have a different

1    function.  What they're trying to do, it sure isn't going to

2    help the jury understand this any better.  And so we just --

3    the function is what's in the claim.

4          The structure, again, I'm not quite sure where

5    the big disagreement is here, but, you know, they propose

6    adaptive bit allocation decoding 52.  They use the word

7    decoding.  I think they mean decoder, because that's what's

8    in the picture.  If you look at figure 14, figure 52 says

9    allocation decoding, but it's a decoder.

10          All we want to make clear, because I'm not quite

11    sure what they're going at is, for this structure -- and, by

12    the way, the arguments will be the same on the next one,

13    too, so it's going to be relatively quick there.  It's a

14    decoding means.

15          It can't -- I just want to be clear, it does not

16    have to be hardware.  So that's why I'm not sure when they

17    go to decoder, whether they think there's a hardware thing.

18    I'm just going to show your Honor why it can be both.

19          And so we just put in -- again, if you look,

20    it's not that far.  It's an adaptive bit allocation decoder,

21    but it's a circuit or a single processor which would

22    perform.  You know, it does not have to be dedicated.

23    Again, it's that issue of dedicated.  So the claim 49 just

24    has the decoding means.

25          From page 56, we just show you your Honor this

1    is where I say, and I think that they meant decoder because

2    at column 14, it says the adaptive bit allocation decoder

3    52.  It's that same thing.  And then it talks about that.

4    So there's one, no question that decoder 52.

5            On page 57, though, we show you the patent talks

6    about, you know, aspects, its embodiments.  We're trying to

7    just show your Honor it's not limited to one because it's

8    means-plus-function.

9            So a fifth aspect, the apparatus comprises

10   adaptive bit allocation decoding circuit.  That's the

11   language we put into our claim, decoding circuit, that

12   operates in response to auxiliary information.  That's the

13   last element we'll talk about later.

14           But slide 58, your Honor, it does not have to be

15   hardware.  It can be software as well.  So slide 58 and

16   slide 59 are both just coming out of the patent, column 8

17   and carrying on to column 9, where it shows you figure 3.

18   There's the decoding, bit allocation coding on the basis of

19   a loud noise, and then figure 5 is decoding.  So figure 3 is

20   the coding and then decoding.

21           What the patent tells you, it's the same

22   algorithym.  You're just doing it backwards.  So it does not

23   always repeat every word.  But what I wanted to show you is

24   on column 8, 62, figure 5 is a flow chart.  For explaining

25   the essential part of that expansion processing, that is the

1    decoding, right, expansion decoding.  So we have a flow

2    chart and then it goes through what a lot of -- the

3    processing steps.

4          And so the other column was the decoding, and it

5    goes through all the processing steps, and then figure 5 is

6    the expansion.

7          So that's all, your Honor.  It's circuit or

8    software.

9          THE COURT:  All right.  Thank you.

10         MR. RILEY:  Let's go to slide 28.

11         So, again, the phrase adaptive bit allocation

12    decoding means -- and, again, it has to be read within the

13    context of the claims, an adaptive bit allocation decoding

14    means operating in response to auxiliary information, a term

15    we'll get to in a moment, for inversely quantizing the

16    quantized spectral coefficients.

17         And, your Honor, we believe that we should

18    construe the function because it could be helpful to the

19    jury.  And, again, as we've seen through our tech tutorial,

20    adaptive bit allocation decoding expands data through

21    inverse quantization.  And so we had built into that

22    construction the converting quantize frequency coefficients

23    into non-quantized frequency coefficients, and instead MMI,

24    rather than construe it, just lists the language of the

25    function, which I believe is not helpful, particularly using

1     terms like spectral coefficients.  We tried to explain where

2     that was in this process of decompression.

3               Now, this is from the patent, and we tried to be

4     as faithful to the structure as possible.  The adaptive bit

5     allocation decoding 52, and 52 is the circuit.  It's

6     described as adaptive bit allocation decoding.

7               The critical dispute here, your Honor, is, MMI

8     says an adaptive bit allocation decoder circuit or digital

9     signal processor programmed as described and illustrated in

10    the patent.  So they add a new structure, digital signal

11    processor.  They add the concept of programming, as

12    described and illustrated in the patent.  And that is not

13    found anywhere in the patent.

14              The structure, as we have seen, is this adaptive

15    bit allocation decoding, which is block 52.  The description

16    and the only structure identified is shown here, where it

17    says, in figure 14, the input terminal -- that's the data

18    that's coming in for expansion -- the input terminal is

19    supplied with quantized spectral coefficients, so it's in

20    the frequency domain, obtained from the output terminal of

21    the compressor.

22              So we're going from the compressor.  At the end

23    of the compressor, we're coming into the decompressor.  The

24    quantized spectral coefficient is sent to the adaptive bit

25    allocation decoder 52, where the adaptive bit allocation

 1    applied by the adaptive bit allocation circuit in the

 2    compressor is reversed.

 3            There's no description of a signal processor,

 4    there's no programming of a signal processor.  The structure

 5    that is identified, the structure 52, nowhere does it

 6    describe the adaptive bit allocation decoding done in

 7    the claimed invention by the use of a digital signal

 8    processor.

 9            Thank you.

10            THE COURT:  All right.

11            MR. BAUER:  So I'm just going to move on to the

12    next one because I think I can overlap some of the same

13    arguments because the next issue is this block floating

14    means for ap plying this inverse.  And, again, it is the

15    same issues first on the function.  We've just taken it

16    right out of the claim, and, again, they've tried to

17    redefine it.

18            And I will notice, they told your Honor they

19    think it's clear to say non-quantized frequency coefficients

20    as opposed to spectral coefficients.  That's not going to

21    help the jury.  I don't know what mischief they're trying to

22    achieve by changing the words, but the experts are going to

23    explain this to the jury just fine, but words like

24    non-quantized frequency coefficients is no more clear

25    than spectral coefficients, and the experts will deal with

1    it.

2            Again, the same thing.  They've got that one

3    element, the processor 56, and we want it to be clear it's

4    the processor circuits, the digital signal processor.  Now,

5    the reason I'm jumping to this one, your Honor, even though

6    they both come from the same figure, there's that allocation

7    decoder 52 -- this is on slide 64 -- and there's the

8    floating determination processor 56 in the same figure.

9            So they're from the same figure.  They're side

10   by side.  This one makes it just crystal clear software.

11   The other one, I pointed to the code, the method -- not the

12   code, but the flow chart and the method, but this one just

13   really makes it clear that what we're talking about for both

14   of these is software.

15           So on page 64 of the slide, again, it gives you

16   one example, the resulting spectral coefficients are sent to

17   the block floating processing circuit.  That's hardware

18   circuit.  That's one embodiment.

19           But this is where it goes on in column 10 of the

20   patent, where it talks about this block floating, the same

21   block floating coefficient.  The number of steps, when

22   processing is carried out using a microprogram.  So this is

23   why it's making clear, it can be in a circuit or it could be

24   software.  Here it's talking about a microprogram.

25           On column 15, this is the next slide, 65, again,

1    talking about this block floating process in the compressor,

2    determining the size of the block of the coefficient in

3    response to the indexed, possible to reduce a quantity

4    subject to processing or the number of steps of a program.

5            So, you know, it's just -- and then column 10,

6    we talk some more about steps, the steps provide the

7    operation for determining the shift quantity.  And it has

8    this determining the shift quantity, a left shift is carried

9    out.  So it's column 6, page 67, column 10.  Again, there's

10   that figure with the bit -- the block -- right, figure 9.  A

11   flow chart for explaining the block floating operation.  All

12   right?  It's a flow chart and it tells you in the text,

13   figure 9 shows a software routine for processing each.

14           So it's much clearer, no question it's much

15   clearer that it's telling you that this is software, but

16   the reason I put them together is the two go side by side

17   when you look at that figure 14, and I think it's -- and

18   when you look at the allocation piece, it was also showing

19   you the code and the whole thing.  It's just -- it should be

20   clear from those two that what's going on in these two

21   things could be circuits or software.  Certainly, it's

22   much clearer on the block processing.  And that's all we

23   suggest is.

24           Oh, and then there's one other.  So when we talk

25   about it's done by the circuit or digital signal processor

1    as described in the patent to perform bit shifting, I think

2    that just describes what it's doing.

3              If you look at figure 9, we circled it on page

4    67.  It's showing that shift processing, and in column 10,

5    the steps provide the operation for determining the shift

6    quantity.  At the step, a left shift.  So it's a software or

7    hardware that does shift processing, and that's what the

8    patent tells you.  It's not just the decoder or not just the

9    thing.

10             THE COURT:  All right.  So you say either a

11   circuit -- I think you've said either a circuit or software,

12   and when you say "software," you're referring to your

13   structure digital signal processor program.

14             MR. BAUER:  Right.

15             THE COURT:  All right.

16             MR. BAUER:  That's right.  And so the program,

17   for example, on slide 67, the flow chart for explaining the

18   block floating operation, there's a program of some sort.

19   And then in the text, figure 9 shows a software routine for

20   processing each.

21             THE COURT:  All right.

22             MR. RILEY:  Our disagreement, of course, is with

23   regard to the programming of the digital signal processor.

24   That is not disclosed as a structure.  This flow chart is

25   very common to explain how circuits carry out the function.

1   This does not indicate or suggest or give a software

2   algorithym at all.

3           If we can go to slide 46, this is the

4   identification of the structure where it says the resulting

5   spectral coefficients are sent to the block floating

6   processing circuit 56, the circuit, where block floating

7   processing is applied to each block of spectral coefficients

8   in each frequency range.

9           Nothing about signal processing, no discussion

10  of how the program of a signal processor to carry out this

11  function.  This is a circuit that carries it out.  This is

12  the only disclosed structure in the specification.

13          The only reference to digital signal

14  processors -- and, again, this shows that if the patentee

15  wanted to use it, is in the background section and relates

16  entirely to a DSP program to do something else.  So if they

17  intended to identify a structure as a digital signal

18  processor, they did not do so.  The only discussion is in

19  the background section.  And the discussion of these steps

20  relates to the steps undertaken by the circuits, which we've

21  discussed.

22          Thank you.

23          THE COURT:  All right.

24          MR. BAUER:  So, your Honor, I'm just not sure.

25  I put back up slide 67, and Mr. Riley looked right at it.

1    The first sentence says figure 9 shows a software routine.

2    He says it doesn't say software.  I'm not sure what else he

3    was points go to.  Figure 9 shows a software routine, and it

4    is referring to the thing that is the block floating

5    operation in the figure.

6              The last one, your Honor, is auxiliary

7    information.  And auxiliary information is in claim 49.

8    That decoding, that allocation decoding, operates in

9    response to auxiliary information.

10             Now, your Honor, this was one of those terms

11   that you had asked us to -- this was one where we had added

12   there was no construction, and because we thought auxiliary

13   information -- I mean, we said, you don't mean auxiliary.

14   What does auxiliary mean?  It means additional supplemental

15   reserve.  It's something other than the main.

16             They came back with a claim that says, a

17   construction, allowable noise level for each frequency.

18   Well, that's one type of auxiliary information.  It's not

19   the only.

20             So, you know, we came in with a construction

21   that's -- you know, we provided a construction, but, your

22   Honor, honestly, we're perfectly happy with just auxiliary

23   means something other than the main thing.  It is the

24   ordinary definition.  Again, we were just trying to create

25   the framework for discussion.

1              And here's what the patent tells you on slide

2    72.  The apparatus comprises adaptive bit allocation

3    decoding circuit that operates in response to the auxiliary

4    information.  Right?  Auxiliary.  It's something other than

5    the main information.

6              Now, slide 73 is where they come up with their

7    definition, where it tells you on column 8 that the

8    allowable noise level for each critical band is transmitted

9    from the compressor as auxiliary information.  It's not

10   telling you it is the auxiliary information.  It's one

11   form.

12             If they wanted it to be the auxiliary

13   information, they would have just -- why even use the word

14   because it's in the claim, and if that's what it meant in

15   the claim, they would have just -- there's the claim.  I'm

16   sorry.  Well, let me come back.

17             Claim 51, which depends from 49, does use

18   auxiliary information, and in that one it says, includes the

19   allowable noise level.  So this is not a means-plus-function

20   where they say it doesn't count.  This is a claim

21   differentiation argument.

22             Claim 49 talks about auxiliary information, and

23   claim 51 says, the auxiliary information includes an

24   allowable noise.  They now want to define auxiliary

25   information as the allowable noise.  Now, if it's that

1    construction, first, 51 becomes meaningless.  Now it's the

2    allowable noise level includes the allowable noise level.

3    All right?  That's their construction.

4         But I just want to go back to when you look at

5    the claim itself, which on line 70, all it tells you is that

6    the decoding means operates in response to the auxiliary --

7    oh, I'm sorry.  It's in the preamble that I wanted to point

8    out.  The apparatus includes plural quantized spectral

9    coefficients, it includes something, and auxiliary

10   information.  It's making it clear it's plural quantize

11   spectral coefficients and something else, the ordinary

12   definition, and something else.  And then it tells you

13   to do the decoding means in response to that something

14   else.  And there's just no reason to limit that something

15   else to one example, which the patent gives you, but

16   not in a limiting sense.  It just tells you which one.

17   Okay?

18        MR. RILEY:  Let's go to slide 48, please.

19        Part of the alleged novelty of this invention

20   was this concept of auxiliary information, which include

21   noise levels.  That's actually pointed out in the very

22   discussion of the abstract.  So it's an important term, and

23   just to say that any information that the circuit acts in

24   response to doesn't capture what's described in the

25   specification.

1           Again, it says, an apparatus for expanding a

2    compressed digital signal including plural quantized

3    spectral coefficients and auxiliary information, and our

4    adaptive bit allocation decoding means operates in response

5    to this auxiliary information.

6           So what is it?  It's just not any information.

7    The fact that, again, late in the day, that MMI proposed a

8    construction, I think, indicates that auxiliary information

9    has no plain meaning.  It has to be construed in light of

10   the specification, other intrinsic evidence.

11          And if you look at the way in which you drop in

12   these constructions into the term, Apple's construction is

13   clearly the correct one.  Apple's proposed construction is,

14   operating in response to the allowable noise level for each

15   frequency band, for converting quantized frequency.  If you

16   apply MMI's proposed construction, you get something that is

17   incoherent.  Operating in response to a component of the

18   compressed digital signal in response to which the adaptive

19   bit allocation decoding means performs inverse quantization,

20   for inversely -- it just repeats what follows in the

21   limitation.

22          So we must give it some independent meaning, and

23   allow the noise level is the appropriate.  In fact, it's

24   what's supported by the spec.  The allowable noise level for

25   each critical band is transmitted from the compressor as

1    auxiliary information.  The auxiliary information

2    transmitted is a single allowable noise level for each

3    critical band.  Note that.  The auxiliary information

4    transmitted is a single allowable noise level for each

5    critical band.

6           Now, counsel raised the concept of claim

7    differentiation, looking at claim 51, but that is a proper

8    dependent claim because in claim 51, Subsection 3, it says,

9    the auxiliary information includes an allowable noise level

10   for each of the critical bands, and then it goes on to

11   further qualify that.  The allowable noise level for the

12   divided band being the allowable noise level for the lowest

13   frequency sub band.

14          So it says we have auxiliary information, which

15   properly construed is the allowable noise levels, and then

16   dependent claim 51 further qualifies that allowable noise

17   level by limiting and qualifying it to the lowest frequency

18   sub band.  So this satisfies claim differentiation and is

19   faithful to the specification.

20          Thank you.

21          THE COURT:  Thank you.

22          MR. BAUER:  Just very briefly on this.  So the

23   quote that he just gave you at the end, where he pointed to

24   the allowable noise level is transmitted as auxiliary

25   information, you've got to look at that in context.  The

1    paragraph right in front is talking about various

2    possibilities for one critical band are shown in figure 4.

3    So it is just giving you an example, and as it goes through

4    that example, in that example, the allowable noise level is

5    transmitted as auxiliary information.  That's an example.

6    We don't disagree with that.  But the claim itself -- I

7    pushed the wrong button.

8                    So that's all, your Honor.

9                    Yes.  Auxiliary information is one example.  The

10   claim says it includes it, it doesn't require it, and that's

11   all we're saying.  And, again, in terms of the construction,

12   we're perfectly fine with something that's not the main.

13   It's what claim 51 is, something beyond what's in that

14   thing.  That's what auxiliary means.

15                    All right.  We now get to go to the '075 patent,

16   your Honor, and this is the one about rejecting incoming

17   calls.  And there are just two terms we're going to talk

18   about.  One is rejection message.  And, your Honor, this is

19   one that we added, again, or changed one of those that you

20   asked about.

21                    And what you will see, what we did, again, to

22   the extent there was a change, nobody is surprised.  We just

23   made it as close to theirs as possible because we wanted to

24   frame the issue.  So our proposed construction is the same

25   as theirs, but they had proposed this word "single," and we

1    wanted to make clear that's where the dispute is.

2              So that's why we say we added something.  No

3    expert is going to be caught by surprise here.

4              So what is the dispute on rejection message?

5    They want it to be a single communication, this rejection

6    message, and we just say it's a communication to reject.  So

7    what are we talking about?  I thought we had it.  This isn't

8    the one we had?  This isn't the one of the picture back and

9    forth?  Okay.

10             This is one that had a summary judgment issue,

11   so we had a slide to put it in context.  But what's

12   happening, your Honor, and I will just -- is depending on

13   the network, when you want to reject your message, you push

14   your button.  All right?  This is an incoming call and you

15   don't want to hear it and you don't want them to hear the

16   ringing for the full minute, so you can push the button and

17   it just goes off to voice mail.  That is the rejection

18   message.

19             So some networks, when you push the button,

20   it sends a rejection message back to the base station that

21   says drop it.  Other networks, you push the button, it

22   sends a message saying reject it.  It sends you a message

23   back saying, are you sure?  Just electronically, not to

24   you.

25             Back to the phone saying, I got this.  The phone

1    sends another message saying, yes, reject it, because

2    otherwise they might be dropping calls you don't want to

3    drop.

4            So that's all we're talking about, but it's

5    their infringement case, because when some networks send a

6    message, then it's confirmed, and then another message.

7    That is why they want it to be single as opposed to two.

8            What does the claim say?  The claim doesn't say

9    that.  The claim, not means-plus-function, ordinary

10   language.  Transmitting a rejection message to the remote

11   transceiver in response to a determination that the incoming

12   call is to be rejected, the rejection message being.

13   So it's as easy as you can get.  What is a rejection

14   message?

15           The patent gives an example, and this is why

16   they come up with the single.  But the patent tells you,

17   provides this messaging sequence.  This is at slide 81.

18   This long messaging can be used in telecommunications

19   systems.  But here's what the patent tells you.  This

20   is one system in accordance with the IS-95 standard.  The

21   very next sentence, it will be apparent to those skilled

22   in the art that by substituting the corresponding protocol

23   and processes, the disclosed call rejection invention may be

24   implemented using different message sequencing.  It does not

25   require any one particular thing.  The whole idea here is

1    sending a rejection message to drop the call and not that it

2    be a single message as opposed to two.

3              Similarly, on slide 82, there's another example

4    and it says the same thing.  This messaging sequence 600 is

5    in accordance with the IS-95 standard.  It will be apparent

6    to those skilled in the art that other systems can be

7    similarly implemented using different messaging sequencing.

8    There's nothing special about it.  You read Apple's brief.

9    They sale you've got to read it as single because there's

10   the word "a" in the claim.  It says "a rejection message."

11   They say you have to read it as single.

12             I'm surprised they made that argument, your

13   Honor, because any patent lawyer knows, and we got the

14   Federal Circuit.  This isn't even -- this isn't even close.

15   The Federal Circuit says that "a" or "an" can mean one or

16   more.  One or more is described as a rule rather than a

17   presumption.

18             In patent language, when you say "a rejection

19   message," it does not mean single.  It's a rule it doesn't

20   mean single.  Apple argues that because they use the word

21   "a" in the claim, you've got to give it to single.  Let's go

22   back.  You can see the claim.

23             So transmitting from the mobile phone a

24   rejection message, and so Apple says in their brief, oh,

25   there's the word "a."  That means one.  And that might look

1    right in ordinary English, but the Federal Circuit says not

2    in patent language.  It's a rule, it is more than one.  You

3    don't get to do that.  The construction, that's the one

4    dispute.

5            MS. SIMMONS:  Your Honor, I think it would be

6    helpful to provide a little bit of background on the

7    claimed invention on the '075, so we would like to start

8    with that.

9            First, there are three claims that are asserted

10   from the '075 patent.  All of the claims, as counsel

11   mentioned, are directing -- directed to rejecting an

12   incoming call to a mobile phone.  The claims are very

13   specific about how this is to be done, though.  The claims

14   say that the mobile phone must send a rejection message to

15   the remote transceiver, and the remote transceiver is just

16   the cell tower or the base station.  And that message has a

17   very specific purpose as it is claimed in the invention.

18   And it, in fact, says it has a single information element

19   included within the message to fulfill this purpose, which

20   is to instruct the remote transceiver to immediately release

21   the incoming call.

22           As the patent originally issued, the invention

23   claimed rejecting both first and second incoming calls.  And

24   figure 2 and 4, which are shown on slide 6 next to each

25   other, show the method for rejecting a first incoming call

1    in figure 2, and for rejecting a second incoming call in

2    figure 4.  The process is an essentially the same, the only

3    distinction being that for rejecting a second incoming call,

4    as you might imagine, the phone is already on a call when it

5    receives the second call.

6           During the re-examination MMI narrowed the

7    claimed invention to only rejecting a second incoming

8    call, so that's the only process we're dealing with at this

9    point.

10          So let's look at it in a little bit of detail.

11   As is self-evident from the title, rejecting a second

12   incoming call, the phone is on a current call, and this is

13   shown on slide 8, when it receives an incoming second call.

14   This is just a call waiting call that comes in.

15          The phone claimed initially, I'm sorry, the

16   patent claimed an ability for the phone to automatically

17   reject an incoming call using a rejection list or a call

18   block list.  So that determination happens when the call

19   comes in.  The phone determines, is the phone number for

20   this call that I'm getting on my blocked call list?  And if

21   it is, the phone does not even alert the user that the call

22   came in, because the user has indicated by setting up this

23   rejection list, I don't even want to get these calls, and

24   the phone immediately sends the rejection message to the

25   base station.  And, again, the important thing about the

1    rejection message is that it tells the base station, you

2    need to immediately release this second incoming call.

3                Now, when the determination is made regarding

4    the rejection list or the blocked call list, if the phone

5    determines that the phone number for the second call is not

6    on this rejection list, then the phone will alert the user

7    of the second incoming call and will give the user the

8    opportunity to decide to do a manual rejection of the call,

9    is how it's referred to in the patent.

10               So the user can press a button, in some way

11   indicate to the phone that the user has decided to reject

12   the call.  The phone will then send the rejection message

13   that will instruct the base station to immediately release

14   the second call.

15               So turning to the disputed term that counsel

16   just addressed, the rejection message.

17               As we just discussed, the claim in claim 5

18   is representative, describes the method of receiving the

19   second incoming call, determining if it is to be rejected,

20   and then transmitting this very key element in this claimed

21   invention, this rejection message, whose sole purpose is to

22   instruct the wireless system that the call is to be

23   immediately released.

24               And as counsel mentioned, Apple proposed in

25   September of last year, pursuant to the Court's scheduling

1    order, that rejection message did need to be construed,

2    because it does not have a plain and ordinary meaning.  It's

3    a very specific concept and it's, in fact, the key part of

4    the invention.

5           So Apple construed rejection message to mean a

6    single communication, and this is just from the claim

7    language, sufficient to cause the base station to

8    immediately release the incoming call.

9           MMI initially proposed no construction.  And as

10   counsel had explained, in response to Apple's infringement

11   theories and contentions and specifically expert reports,

12   where our experts demonstrated that no such single

13   communication is sent by an iPhone to immediately release

14   the second incoming call, counsel then proposed a

15   construction which, while the words look very similar to

16   Apple's construction, there's a very material difference.

17   The word "single" is critical and so this is not just a

18   tweaking of Apple's construction.

19          And as counsel mentioned, both Apple's

20   construction and MMI's construction require that there be a

21   communication sufficient to cause the base station to

22   immediately release the call, but the key issue is that

23   under Apple's construction, this communication must occur

24   within the single message that is sent from the mobile

25   phone, whereas under MMI's construction, any number of

1    messages sent from the mobile phone and, in fact, apparently

2    any messages even sent from the base station can be included

3    in what is defined as the rejection message.

4         The claims are clear and disclose a single

5    communication that is sent from the mobile phone.  And it is

6    important that it is a single communication, because the

7    role of the rejection message, again, is to say to the base

8    station, you need to immediately release this call as

9    opposed to a situation where any number of messages could

10   be sent, which over time will cause the base station to

11   release the call.  That's not what was claimed.

12        And, yes, it is true, "a" doesn't generally mean

13   just one and only, but this -- but the Federal Circuit has

14   instructed that it can mean one and only if that's what the

15   claims and the specification require.

16        And when you look at the specification of this

17   patent, every embodiment, not just one embodiment, every

18   embodiment discloses a single communication that is sent

19   from the mobile phone.

20        And in figure 6 we've blown up the relevant

21   portion where the phone has detected user manual reject

22   input.  So that's what we talked about earlier, where the

23   user can manually reject the call.  The phone sends a single

24   rejection message across the communication channel, and upon

25   receipt of that message, when the message is received, as it

1    shows on slide 16, the call is released.

2              MMI's construction would include any number of

3    messages being sent over some period of time from the phone,

4    back from the base station, and ultimately the call being

5    released.  No message contains information sufficient to

6    cause the base station to release the call.  Other messages

7    are needed, but no claim or embodiment discloses the base

8    station waiting to receive additional information or to

9    receive information spread across multiple messages.  In

10   fact, the specification clearly states, as we've shown on

11   slide 17, that the base station releases the call when it

12   receives the message.

13             In support of their construction, MMI refers to

14   portions of the specification that address messages other

15   than the claimed rejection message.  Specifically, they, in

16   their initial briefing, as we've shown on slide 18, refer to

17   a portion of the specification that addresses a message that

18   is sent by the base station after it has received the

19   rejection message.  So that clearly can't be the rejection

20   message.

21             And then, as counsel addressed earlier, they've

22   referred to this figure 5, which illustrates the entire

23   messaging sequence that occurs between the mobile phone and

24   the base station, beginning with, there's an incoming call.

25   I'm alerting you.  How are we going to handle this, the

1     entire sequence?  That clearly can't be their claimed

2     rejection message.  And the fact that the specification

3     indicates the rather uninteresting point that the messaging

4     sequence disclosed on slide 19 and figure 5 from the patent

5     is illustrated in accordance with a particular standard, the

6     CDMA standard, and one of skill in the art could implement

7     this entire sequence using a different standard that in no

8     way indicates that the rejection message, the very

9     specifically claimed rejection message, can be anything

10    other than a single message.

11              THE COURT:  All right.

12              MS. SIMMONS:  Thank you.

13              MR. BAUER:  Your Honor, just so you can

14    visualize what we're talking about, this is the image.  This

15    will be slide 32 when we get to our summary judgment briefs,

16    for the record, but this is what we're talking about.

17              You click on the phone decline.  A message goes

18    to the station.  It sends a message back saying release, and

19    then it says, yes, please, and it releases.

20              So when they talk about a -- that number 4, the

21    release complete, that's a rejection message.  Two is a

22    rejection message.  Right?  What they want to do is say,

23    but it can't have any communication back and forth.  But

24    even under their definition, where it's a single

25    communication, the item number 4 would probably satisfy

1    that.  But we just don't think you need to limit it to one

2    because the patent tells you clearly it has to do with the

3    system you use.  You pick it based on this system.

4              All right.  And, by the way, your Honor, this

5    issue was one that was clearly delineated between the

6    experts.  They didn't catch -- well, it was after all the

7    expert discovery that we changed this.  This was the issue

8    with the experts, and so, you know, whether it could be a

9    single one or had to be.  You know, only a single one-way

10   message counted.

11             All right.  Then we talk about the one other

12   element here, the wireless system, immediately release the

13   incoming call.  And that goes hand in hand with that picture

14   I showed you.

15             What they want it to be is the instant you get

16   that signal first message, you immediately release it.

17   That's their contention.  The instant you get it, you

18   immediately release it.  And we say -- and, again, we have

19   tried to make clear just where the dispute is -- immediately

20   means before the whole phone call runs.  All right?  It's

21   not a -- and I will show you, your Honor.  Immediately

22   here isn't the computer sense that the instant you get a

23   message, drop it in microseconds.  Immediately here is

24   from the context of the viewpoint of the user, and the

25   context and viewpoint of the user is, I don't want this

1    call, push the button, make it disappear instead of going

2    through the whole call cycle.  You know, you don't have to

3    let it ring six tiles.  You drop it without waiting.  That's

4    immediately.  And, again, their construction is to have a

5    single message essentially.  You don't -- they want it to be

6    so fast, you don't have that handshake, do you want it to

7    drop or not.

8              So, your Honor, slide 87, here's where the claim

9    talks about it.  The wireless system is to immediately

10   release the incoming call.  All right?  And we go back.

11   What's the claim?  It's a method of rejecting an incoming

12   call.  It's a method of rejecting.  And all the elements,

13   this isn't a computer sequencing, it's receiving at the

14   phone a transmission, determining at the phone if the call

15   is to be rejected and transmitting from the phone a

16   rejection message.

17             All right.  This isn't about instantaneous or

18   sequencing.  And it's transmitting a rejection message that

19   the incoming call is to be rejected.  That rejection

20   message, including at least one information element,

21   indicating that the system is to immediately release it.

22   Now, immediately, I said refers to the user.

23             Slide 88, this is text from the patent.  The

24   first one is column 2, where it talks about present systems

25   do not allow mobile to refuse to accept calls, nor do they

1    provide mobile phone users with a rejection on demand

2    capability to immediately reject.  That's what "immediately"

3    means here, the rejection on demand.

4              Column 2 at line 65, we have another call out.

5    If the second call is not answered, the call alert to the

6    mobile phone user will continue for a time period to find

7    the ringing cycle.  Unless the mobile phone user answers the

8    call, there's currently no way to terminate it.  So that's

9    what we're trying to get at, how do you terminate it now

10   instead of waiting.  It's rejection on demand.

11             And column 4 talks about, you know, when you get

12   that rejection message, once the base station receives the

13   rejection message, the call is released.  It's not a matter

14   of timing.  It's when you get it, you reject it.

15             And that's really all there is to say, your

16   Honor.  Immediately is from the viewpoint of the user.  It's

17   rejection on demand, not the instant I get my first signal

18   from you, drop it right away.

19             THE COURT:  All right.

20             MS. SIMMONS:  Your Honor, as we explained with

21   respect to the claimed invention and the rejection message,

22   this concept of immediately release is all tied up in the

23   rejection message.  And the entire method that is disclosed

24   in this the patent isn't talking in the claim about the

25   user's perception.  The claims are talking about messages,

1    so this is about what messages are being sent between the

2    phone and the remote transceiver.

3              Apple's construction for immediately release,

4    which it disclosed in September of last year, is without

5    requiring any additional action by or communication from the

6    mobile phone.  This is consistent with the specification's

7    disclosures.  And, again, MMI did not propose a construction

8    until after expert reports.

9              MMI's construction after it received Apple's

10   noninfringement expert reports was to turn immediately into,

11   without waiting for the duration of the ringing cycle and

12   before completing a connection between the mobile phone and

13   remote transceiver.

14             I think there can be no argument that this is

15   the plain meaning of "immediately," so this is clearly a

16   construction that was offered after expert reports in an

17   attempt to deal with Apple's noninfringement opinions.

18             Under Apple's construction, true to the

19   specification, the base station must release the call upon

20   receipt of the message.  And counsel actually pointed to a

21   part of the specification that we will also point to.  Upon

22   receipt, when the remote transceiver receives the rejection

23   message, it must release the call.  Under MMI's

24   construction, by contrast, the release need not occur upon

25   receipt of the rejection message.

1          This is the same quote that counsel just put up

2     in support of MMI's construction, but, in fact, it clearly

3     shows that the specification requires that the base station

4     releases the incoming call upon receipt.  The base station

5     does not wait for additional messages to release the call.

6     Upon receipt, the call is released.

7          The plain meaning of immediately, in fact, also

8     supports Apple's construction, because immediately means

9     without intermediary, in direct connection or relation.

10    Nothing else needs to happen.  As soon as this message is

11    received, I will release the incoming call.

12         MMI's construction changes the word

13    "immediately" to mean two things.  Any time during the

14    ringing cycle and without completing a section between the

15    mobile phone and the base station.

16         Looking at this first part of the definition

17    that MMI proposes for the word "immediately," without

18    waiting for the duration of the ringing cycle.  This

19    construction, or this portion of their construction, assumes

20    that there is a ringing cycle and the base station is simply

21    not going to wait for it to complete the duration of the

22    ringing cycle before placing the call, but this conflicts

23    directly with the automatic call rejection embodiments that

24    we discussed in our overview of the '075 patent, where no

25    ringing cycle ever even begins.

1                The second portion of MMI's construction of what

2       the word "immediately" should mean includes, before

3       completing a connection between the mobile phone and the

4       remote transceiver.  So the mobile phone and the remote

5       transceiver are not yet connected.

6                Apple noted in its briefing that this conflicts

7       directly with the claim language itself, which requires that

8       said mobile phone is in communication with the first calling

9       station via the remote transceiver.  So the mobile phone is

10      already connected to the remote transceiver.

11               In reply, MMI argues that what they meant by

12      before completing a connection was before completing a

13      connection for a second call.  But this also conflicts with

14      what the patent discloses.  The specification describes the

15      fact that, as would have to occur under any

16      telecommunications standard for a phone call to be received,

17      the mobile phone has to be in communication with the base

18      station in order for the base station to even be able to

19      inform the mobile phone that there is an incoming call and

20      then teeter back from the mobile phone as to how the call

21      should be handled.

22               So there must be a connection, there must be a

23      ringing signal.  MMI's construction is simply not supported

24      by the specification.

25               MR. BAUER:  So under this sequence that's on

1    slide 32 from the summary judgment briefing, their proposal,

2    even under their proposal, the second, the release complete

3    is a single communication sufficient to cause, and a

4    disconnect is a single communication sufficient to cause.

5    This communication causes the disconnect.  Item No. 4 caused

6    the disconnect.  The fact that there's an intermediate

7    handshake doesn't change it.  We just don't think you need

8    the word "single."  It is a communication sufficient to

9    cause.

10            And the immediate that is item number 4, that

11   release complete causes the call to drop immediately, but,

12   again, we don't think you need to construe it.  How fast is

13   immediate?  It's during the call cycle.  It's on demand.

14   It's when the user wants it dropped.  And how fast does it

15   happen, whether it takes two signals back and forth or one,

16   it's all happening at the same time, or it's happening

17   quickly.

18            All right.  Your Honor, now we get to move on to

19   the '231 patent, and this one is about silencing the ringer

20   on the phone.

21            There are three terms, and this is going to be

22   very fast, I believe.

23            The first one is an alert sound generator for

24   generating the alert sound.  Then there's going to be the

25   control means for controlling that generator and then

1    changing the volume and stopping the sound.

2           So just looking back at slide 92, what we're

3    talking about, the sound, right, incoming call, your phone

4    beeps.  There's an alert.  You have an incoming call.  On

5    the iPhone, you push the button on the top, the call stops.

6    It just silences it.  So that's what we're talking about,

7    just turning off the beeping in your pocket while you are

8    sitting there in a meeting, silencing the ringer.  And

9    what you will see is the arguments they make are

10   interesting.

11          So what is the alert sound generator that's in

12   the claim?  This is one, your Honor, we added to give you

13   its ordinary meaning.  What is an alert sound generator?

14   Our view was it's the generator capable of generating an

15   alert sound.  They turned it into a means-plus-function

16   limitation and so we've provided the definition of what's

17   the ordinary meaning.  Nothing extraordinary.  And by the

18   way, Ms. Simmons pointed out the other one was the ordinary

19   meaning, too, we're proposing.

20          We're proposing, just trying do get the words

21   down.  What's the sound generator?  It's the generator

22   capable of generating an alert sound.  That's the ordinary

23   meaning.

24          Now, they have means-plus-function.  There's

25   no means-plus-function in this claim.  Everybody, you

1    know, as a general rule, you've got to have that word

2    "means" in there or something to make it

3    means-plus-function.  There are some exceptions.  This

4    isn't it.  We have a generator for generating an alert

5    sound.  That's what we propose.

6              Page 95 shows the claim in context.  It's

7    an alert sound generator.  This is just a Federal Circuit

8    case.  Claim terms reciting sufficient structure are not

9    means-plus-function.  And, by the way, when you look at

10   the structure, ours just provides as much structure as

11   theirs.  Their structures is generator.  So it's not like

12   they're saying you need more.  They are not saying we need a

13   battery and a computer and a microprocessor.  Their

14   structure is the same.  So why do they want it as a

15   means-plus-function?

16             And what does the patent tell you?  It's just

17   ordinary meaning.  Slide 97 from column 2, it just tells you

18   that the CPU to text the call with the alert on/off

19   controller 12 makes an alert sound generator generate an

20   alert sound.  Figure 2 shows you a box.  That's the alert

21   sound generator.  It tells you it's a box, figure 2 is a

22   block diagram showing you the equipment.  So the generator

23   is the generator of the sound.

24             And their expert -- the only reason I get to

25   deal with this is because they make the argument about

1    means-plus-function.  I thought it would be easy, it's a

2    generator.  But their own expert talks about, what do you

3    understand that generator to be?  And he says, it's a

4    mechanism for creating the sound from a transducer, which is

5    a microphone or a speaker.  In other words, the speaker and

6    the signal that need to be generated to provide the

7    transducer.  It's just -- it's the thing that generates the

8    sound.

9            MS. SIMMONS:  Your Honor, in the interests of

10   time, I will try to get through this one quickly so that we

11   can focus on some of the other claim terms and other

12   patents.  But what Mr. Bauer just said actually highlights

13   the reason this term should be construed as

14   means-plus-function even though it does not have the magic

15   language, which is that, according to their construction and

16   according to the limitation itself, what that means is a

17   thing that generates the sound.  We have no idea what that

18   thing is, how it generates the sound.  This claim actually

19   does require construction and does require a

20   means-plus-function construction.

21           The claim limitation is defined in purely

22   functional terms, alert sound generator, a thing that

23   generates a sound.  It's defined purely in terms of what it

24   does.  Therefore, it does require means-plus-function

25   construction.

1          And Mr. Bauer alluded or referenced Dr.

2     Balakrishnan, Apple's expert, referring to this claim

3     limitation as a mechanism for generating sound, but the

4     Federal Circuit has clearly held that mechanism is

5     essentially the same as saying means.

6          So, in fact, what Dr. Balakrishnan said was,

7     this is a limitation that is only described in terms of what

8     it does.  I don't actually know what the structure is.  It's

9     not defined by the language itself.

10         So we think the rest is set forth in our papers.

11     Again, in the interests of moving along, I will submit on

12     that.

13         THE COURT:  All right.  Thank you.

14         MS. SIMMONS:  Thank you.

15         MR. BAUER:  So I don't need anything else on

16     that one, your Honor.

17         The control means for controlling.  In this

18     case, on slide 102, we do agree that the function is what

19     the claim says, controlling the alert sound generator.

20     Their proposed structure is just the word "controller."

21     And, again, I just don't know when they say just

22     "controller," the number 12, what it is that they're

23     targeting.  I mean, the patent talks about controller 12

24     within the patent, but I think when you look at the patent,

25     you'll see it's the combination of the CPU and this

1    controller that turns on and off the sound generator.

2            So the claim says a control means for

3    controlling said alert sound generator.  That's in the

4    claim.  The patent at figure 2 shows that alert on/off

5    controller, element 12, at page 104 and corresponding text

6    at column 2 tells you when a call is given to this portable

7    phone from another party, the CPU 7 detects the call, and it

8    performs control to turn the on off controller.  That's why

9    what the patent is telling you is, the CPU controls the

10   controller to make the sound generator.  So that's why we

11   put the CPU into the claim element as what's the controller.

12   We say it's the CPU and the on/off controller because the

13   two go hand in hand.

14           Page 105, again, it tells you, CPU 7 performs

15   control to turn off the alert on/off controller to stop the

16   generation of the sound.  And so then, page 106, this is

17   what we talked about, associated programming.  In our

18   proposal it's the CPU and the sound generator program.  Just

19   because it's means-plus-function, we're just showing you

20   that there is more to it than just a box because we know

21   that if it's only a box, you might have a problem.  So on

22   page 106, it tells you what's going on inside that box, so

23   that is just our proposal, your Honor.

24           THE COURT:  All right.  Thank you.

25           MS. SIMMONS:  Your Honor, the control means, as

1    counsel mentioned, is a means-plus-function limitation whose

2    purpose is to control the alert sound generator.

3            The parties agree on the function, as counsel

4    mentioned.  Apple's construction for the structure is the

5    only disclosed structure in the specification, and MMI's

6    construction, by contrast, doesn't help the jury to

7    understand what this structure actually is by including just

8    a rearrangement of some of the claim language.

9            By indicating that this is a CPU and an

10   associated alert sound controller, that seems to just be

11   restating that it's a controller whose function it is to

12   control the alert sound generator, which will not help the

13   jury understand this claim limitation.

14           Again, the claim, as was shown on slide 18,

15   controller 12 is the only structure that is disclosed in the

16   specification for controlling the alert sound generator.

17   And the alert sound generator and its controller are

18   separate from the CPU, contrary to MMI's proposed

19   construction, which includes the CPU in the construction.

20   Instead, what the specification discloses is that the CPU is

21   responsible for detecting that there's an incoming call and

22   then alerting essentially the alert sound -- the control

23   means.  The control means then takes over from there and

24   takes over control of the alert sound generator.

25           Including a general purpose CPU without a

1   disclosed algorithym in the construction is improper under

2   the Federal Circuit's case law, and there is no disclosed

3   algorithym in the specification for how this general purpose

4   CPU isn't -- can affect control of the alert sound

5   generator.

6            Can we go to slide 22, please.

7            And MMI's addition, as I mentioned earlier, of

8   alert sound controller in the construction, or the proposed

9   structure for control means, is simply a restatement of the

10  function of the control means and does not help to define or

11  identify what the appropriate structure is.

12           And recall the structure must be linked back to

13  what is disclosed in the specification.  And it can't be

14  just a restatement of the function.  It has to be what is

15  actually disclosed in the specification as the structure for

16  performing this function.

17           Apple's construction is the only construction

18  that identifies and is true to the one structure disclosed

19  in the specification for performing this function.

20           Thank you.

21           THE COURT:  All right.

22           MR. BAUER:  We are moving fast now, your Honor.

23           So I just want to point out, the concern is with

24  what they're saying, and if I -- the claim says, control

25  means for controlling the alert sound generator.  Right?

1    That's what the claim says, control means.  They equate it

2    with the thing in the patent that says on/off controller.

3    Now, that's certainly part of the control means.  We don't

4    disagree.  But it's not the only thing.

5         When you read the text, the text says that the

6    thing that -- it's the CPU and the on/off controller turn on

7    the sound generator.  So that's why we say it's the control

8    means is those two things.  There is nothing in the patent

9    that says the on/off controller 12 is the control means of

10   this patent.  It's part of the control means, no question

11   about it, but when they -- when they want the claim

12   limitation to be limited only to that, they ignore the whole

13   system here.

14        THE COURT:  And what about the suggestion that

15   absent an algorithym, it is improper to reference the

16   general purpose computer and incorporate that into your

17   structure?

18        MR. BAUER:  So, your Honor, the algorithym

19   doesn't have to be at the level of source code; right?  It

20   doesn't have to be the computer.  That's why I put up slide

21   106.  It's telling you what to do.

22        If the call comes in, the operation shifts to a

23   state in which the alert sound is generated to inform the

24   user.  In the case where the user wishes to respond, I think

25   there is algorithym telling you what to do with that CPU.

1    When the incoming call comes in, the user depresses the key

2    to shift the state to stop the alert sound, and then the

3    state shifts to the State ST4.  I think there's an

4    algorithym there and that's why I put it up before.

5                THE COURT:  All right.  Thank you.

6                MR. BAUER:  All right.  Now, the last one,

7    your Honor, is the change of volume and stop the sound and

8    this -- I don't know what to say on this one.

9                What does it mean?  So these are terms that

10   we didn't think you needed a construction and we did

11   because change the volume of the sound, we thought

12   everybody would know what that means.  And so what's the

13   construction we proposed?  Change the volume of the

14   generated sound.  We just want to make sure we get it

15   right.  Stop the sound, we said stop the sound.  There's no

16   special construction.

17               Apple's proposal is just to change the word,

18   change the volume to change the degree of loudness.  Well,

19   what does that mean?  Those words aren't in the patent.

20   That is sure not helping the volume.  Change the volume the

21   jury is going to understand.  And Apple's construction to

22   mute the sound.  Stop the sound means to mute?

23               In ordinary English, you might say mute it, but

24   this is a summary judgment issue.  They're going to say they

25   don't mute it, they turn off the signal.  They distinguish

1    between the signal that makes the sound and the sound.

2          And so you'll see in their summary judgment

3    motion, what they say is, when they want to stop the sound,

4    they stop the electronics that generate it as opposed to

5    muting means the electronics are still there, but you've

6    turned off the speaker, so to speak, and so that's what

7    they're trying to get at.  Stop the sound means stop the

8    sound however you do it.  That's all.  Change the volume.

9    And the patent, the claim talks about stopping -- the

10   generator stops the sound.  That's all it says.  It's

11   nothing about muting in the claim.

12         The controller stops the generation of the alert

13   sound, and then we talk about volume on slide 113.  We all

14   know what -- you affect the volume, and I don't know where

15   they're going at with change the loudness or why you need

16   that.

17         THE COURT:  All right.

18         MS. SIMMONS:  Looking at the claim language to

19   see where this language actually comes in, these specific

20   limitations is important because it's describing something

21   very specific.

22         The claim language describes a situation where

23   there's an incoming call and the alert sound generator

24   generates an alert sound.  So you have a sound that is being

25   generated.  The control means is then going to control that

1     alert sound generator, and one of the ways in which it will

2     control it is that if the user pushes a button, then the

3     control means will control the alert sound generator to

4     change the volume of the generated sound.

5              And the reason that to change the volume, which

6     certainly does appear like a phrase that we could all

7     understand, the reason it does need construction is because

8     MMI, in fact, is construing to change or applying their

9     construction of to change a volume to include, to stop

10    generation of the sound.  Not an operation to change a

11    volume of a sound that is being generated, but to stop

12    generation.  That's not what the claim language says.

13             Then there's this issue of the dependent claim,

14    claim 2.  And the numbers seem off on the claim language, or

15    the claim numbers, as we've illustrated claim 2 on slide 25.

16    The reason is that during re-examination, claim 1 was

17    canceled and its limitations were imported into claim 12.

18    So it looks a little odd, but claim 2 does depend from claim

19    12, as that claim issued in re-exam.

20             Claim 12, therefore, is a dependent claim from

21    claim 12, and claim -- I'm sorry.  Claim 2 is a dependent

22    claim from claim 12, and it claims further -- this is a

23    limitation on how the volume shall be changed.  It claims,

24    stopping the sound.

25             Apple's constructions are true to that claim

1    limitation and how it is disclosed in the specification and

2    in the claim language itself.  Change the degree of

3    loudness, which is simply a way of defining what volume is

4    of the alert sound that is being generated.  And that's

5    really the important part.

6            The same with stop the sound, which, again, is a

7    dependent claim, so therefore it can't expand the scope of

8    the independent claim.  It must be a kind of change in the

9    volume.  The important part is these are operations that are

10   being done to change the characteristic of a sound that is

11   being generated.  These are not operations to stop the

12   sound, stop generation.

13           THE COURT:  Doesn't that stop the sound?

14           MS. SIMMONS:  And I agree.  We deposed the

15   prosecuting attorneys and we understand that this

16   specification and these claims were translated, and we --

17   there are several places in the specification that your

18   Honor may have noticed where there's some odd language

19   that's used.

20           THE COURT:  Not unusual, especially in software

21   patents.

22           MS. SIMMONS:  Exactly.  So these are some

23   translation issues.  But stop the sound, the only way that

24   that can be construed in a way that allows the dependent

25   claim to be valid and to not expand the scope from the

1    independent claim is that it has to be a subset of changing

2    the volume, muting.

3            So the specification describes an operation

4    to change the volume.  It gives one example.  You can

5    reduce the volume of the generated sound, but, again, the

6    important thing is the sound continues to be generated, and

7    this is just an operation to effect a characteristic of the

8    sound.

9            THE COURT:  So you are really focused on the

10   word "generating."

11           MS. SIMMONS:  Yes.  And the claim language is

12   as well.  It's to change a volume of the generated alert

13   sound.  It is not to stop the generation of the alerted

14   sound, which is that could have been claimed.  And there is

15   an embodiment in the specification that describes stopping

16   the generation of the sound, but that is contrasted with the

17   embodiments that describe changing a volume of the generated

18   sound.  There is still a sound, and we are changing a

19   characteristic of the sound.

20           THE COURT:  All right.  Well, I certainly

21   understand your argument.

22           MS. SIMMONS:  All right.  Thank you, your

23   Honor.

24           MR. BAUER:  So I just want to make sure that

25   the -- I think their position is that when it says to change

1    a volume of the sound, and your phone rings and you push the

2    button so it goes to zero, you didn't change the volume.  To

3    them, there still has to be some sound.  Going to zero, this

4    is what the issue is.  Going to zero is not changing the

5    volume.  This is their issue.

6              THE COURT:  All right.  They're saying -- you

7    are saying going to zero changes the volume.

8              MR. BAUER:  Is the ultimate change of volume.

9              THE COURT:  Right.  And they are saying, it

10   isn't changing the volume because the signal has stopped.

11             MR. BAUER:  No.  There are two separate issues.

12             THE COURT:  Two separate issues?

13             MR. BAUER:  Two separate issues.

14             THE COURT:  But I don't know what the difference

15   is between stopping the generation.  I thought counsel was

16   focused on the generation of the volume, and as long as

17   it's --

18             MR. BAUER:  Yes.  So I think there are two

19   separate issues.  I think one is going to zero is not

20   changing the volume, because it's not the degree -- it's

21   zero.  The ultimate change, music to nothing, it didn't

22   change the volume.  You stopped it.  One way or the other,

23   you stopped it or you muted it.  But their view is stopping

24   or muting is not changing the volume.  Changing the volume

25   is going from 10 to 9 to 8 to 7, and then when you get down

1    to one, but when you go to zero, you've stopped it.

2              THE COURT:  Is that the case?  I just want to

3    make sure that I do understand.  Going to zero isn't a

4    change, it's stopping?

5              MS. SIMMONS:  No, your Honor.  We completely

6    agree that if you effect an operation that will take the

7    volume from some level to zero, that is a change in volume.

8    The issue is whether something completely different in

9    operation to cease the generation of the signal itself, is

10   that a change in volume.  And, more precisely, is that an

11   operation to change a volume?  It is not.  It is an

12   operation to completely cease generation of the signal

13   altogether.

14             MR. BAUER:  So then the issue, your Honor, is,

15   they're confusing the signal from the sound.  Right?  A

16   sound comes out of a speaker.  They are talking about the

17   signal going into the speaker.

18             So it seems the way I understand it, as long as

19   there's a signal going into the speaker, you haven't --

20   right.  This is talking about changing the volume of the

21   generated sound, not the generated signal.  There's an

22   electric signal that goes into the speaker and then there's

23   a sound that comes out.

24             And so --

25             THE COURT:  Well, I mean, I'm getting the

1    impression this is like a rheostat if I'm looking at

2    electricity.

3                   MR. BAUER:  Right.

4                   THE COURT:  A rheostat, you turn it up, you turn

5    it down, but you have that -- and it can look like there's

6    no light, but you still have to click it off to stop the

7    signal.

8                   So if that is a correct analogy, I don't know

9    where that puts me, but that --

10                   MR. BAUER:  But I think their view would be you

11   have to unplug it, so there would be no electricity rather

12   than turn it off.  So as opposed to seeing nothing, that

13   there's -- they're getting into the -- I think that's where

14   they are at, your Honor.  We'll see it in the summary

15   judgment motion.

16                   THE COURT:  Okay.

17                   MR. BAUER:  Whether we get to the summary

18   judgment motion.

19                   THE COURT:  All right.

20                   MR. BAUER:  But the fact is, changing the volume

21   is changing the volume.  Stopping the sound is stopping the

22   sound.  And that's what the claim talks about, right,

23   changing the volume or stopping the sound.

24                   The sound has nothing to do with the electrical

25   signals.  That's what we're saying.  Nothing to do with the

1    electronics.  It's what do you hear.  And do you hear sound

2    or do you hear the volume change?  We say it's all about

3    what you hear, and I think what you'll hear from them is

4    it's about the electronics.  Okay?

5                 THE COURT:  All right.

6                 MR. BAUER:  All right.  Now we get to the

7    '068.  Your Honor, it's two very quick terms, I think.  This

8    is about controlling the connecting state of the calls.

9    When you get two incoming calls, how do you deal with that?

10   And the first term is incoming call.

11              What is an incoming call on your phone?  Again,

12   this is one that we had no -- we just say ordinary

13   construction and we provided the words, what is the ordinary

14   construction?  It's a ringing or newly received call.  The

15   incoming call, when it rings, but here's the distinction

16   between, they say the incoming call is the call when it's

17   ringing, but the instant you accept it, it's no longer an

18   incoming call.  That's where the distinction becomes.

19              So that's why we say it's a ringing or newly

20   received call.  And it's in the context of the invention,

21   which is talking about you're on the phone with the first

22   call, in comes a second call, and you've got to make a

23   decision.  So the patent is talking about the incoming call

24   being that second call.

25              So it's the ringing second call or the newly

1    received call.  But that's the distinction.  And that's what

2    we think -- again, we thought was ordinary meaning.  When

3    the phone is ringing, you say, I have an incoming call.  You

4    pick it up and you say "hi."  And you don't think it stopped

5    being an incoming call the minute you picked it off the

6    hook.  They want it to be the call that is requesting the

7    connection, but not yet connected.

8            All right.  Let me show you why I think we're

9    right.  So the claim talks about this control means.  This

10   is on page 119.  The control means for controlling

11   displaying of the processing items available to the user

12   relative to a present call.

13           So this is where it's distinguishing.  It's a

14   present call and an incoming call.  That's what we're

15   distinguishing between.  All right.  It's not the signalling

16   or the telephone network or anything.  There's a present

17   call and an incoming call, one or the other, and in

18   controlling the present call and the incoming call into

19   respective connecting states corresponding to what you

20   pick.

21           So you're on the call.  In comes another call.

22   You make a decision.  You can merge it, put it on hold, one

23   of those things.  All right.

24           So that's what the claim seems to be saying to

25   you, right, relative to a present call and incoming call.

1          The patent talks about if the arrival of

2     incoming call would be displayed on the -- the user can

3     operate the control screen.  So it's talking about that

4     arriving incoming call.

5          Now, page 121 is an interesting quote because

6     this puts it in context exactly what we suggest, your Honor.

7     Page 121 talks about in step SP8, it is detected whether the

8     disconnect, in which the incoming call is disconnected and

9     the call is continued.

10          Well, if the incoming call is disconnected, it

11     had been connected.  Right?  So that's -- so it's giving you

12     the choice.  These calls come in and sometimes you merge

13     them, sometimes you reject them.  But whether the disconnect

14     in which the incoming call is disconnected and the call with

15     the present call is continued, is selected or not.

16          The patent also shows you -- this is column 7.

17     It's an example of what happens on the telephone screen.

18     And here in the lower part of the screen, the telephone

19     number of the incoming call received showing that the

20     call is in the tripartite.  Tripartite means three-way

21     phone call.  Also, the lower part, call duration of the

22     tripartite call is displayed.

23          In this instance it's showing you the incoming

24     call.  At least in this instance you've got two phone

25     numbers have been connected for a second, at least, at least

1   in the way they're defining incoming call.

2          This is column 1.  In a portable telephone

3   apparatus, if a call incoming from the third party is

4   received, the call in progress and the call newly received

5   can be call controlled.

6          So the call is -- it's the newly received call

7   as much as the ringing call.  That's all we say, your Honor.

8   And that's all.  It's when it's coming in.  It's not forever

9   the incoming call, but certainly while you're making that

10  decision, because you've got to keep it in the context of

11  what the claim is telling you, and the claim is

12  distinguishing the incoming call and doing things with the

13  second call.  Okay?

14         THE COURT:  All right.  Thank you.

15         MS. SIMMONS:  Your Honor, I would like to just

16  pick up on one of the last comments counsel just made, which

17  brings us to one of the issues with MMI's construction with

18  incoming call, which is, it's not forever, counsel said.

19  It's unclear at what point an incoming call does become a

20  connected call under MMI's construction, and, in fact, MMI's

21  own expert, as we will show you, was unable to tell us when

22  that might happen and instead said it's subjective, which

23  clearly does not give us a defined boundary for what this

24  limitation is supposed to mean.

25         But let's start by looking at briefly what the

1      '068 patent means because this will help to understand what

2      the limitation means.

3              We have five asserted claims, all of which are

4      directed at controlling calls.  And as we illustrated on

5      slide 5, we've pulled out figure 9 from the patent.  The

6      patent describes this process of controlling calls by

7      displaying processing items on the mobile phone screen.  And

8      the patent will allow the user to scroll through these

9      options, these processing items, and then select one of the

10     items by stopping the scrolling while one of the items is

11     highlighted and then determining that that is the item you

12     want by pushing in on, for instance, a jog dial.

13             Now, can see in figure 9 various processing

14     items are displayed.  You're on an incoming call in the top

15     box on figure 9 with phone number, it looks like 03 and a

16     lot of ones.  Then there's a call incoming, so we have an

17     incoming call.  And the patent discloses that various

18     processing items will be displayed for handling that

19     incoming call which has a phone number 06222.

20             The first option is activate, which is to

21     connect the call.  And it is true that the second processing

22     item that is shown in the patent has the word "disconnect."

23     Again, we have some language irregularities in this

24     specification and these claims as noted before due to, we

25     assume some translation errors.  But this message actually,

1    this processing item may not actually be a translation

2    error.

3            Disconnect, the '068 patent specifically refers

4    to the GSM specification and indicates that it's describing

5    a method that's implemented using the GSM specification, and

6    disconnect is the message that is sent under the GSM

7    specification to reject or decline an incoming call.

8            See the fact that it uses the word "disconnect"

9    does not mean that the call has already been connected,

10   which is illustrated by the fact that there is a processing

11   item to connect the call.  This is an incoming call, has not

12   yet been connected.  It's ringing, a ringing call.  And as

13   you continue to control down, the display will switch to

14   options processing items available to the current call, the

15   connected call.

16           Looking at the claim limitation, as counsel

17   noted, the limitation requires in claim 1, requires that the

18   processing items that are displayed are processing items

19   relative to two different kinds of calls, an incoming call

20   and a present call.  They cannot mean the same thing.

21           Under Apple's construction, incoming call means

22   a call that essentially is ringing.  On this point, both

23   sides seem to agree that a ringing call is one form of an

24   incoming call.  We say it's the only form of incoming call.

25   But a ringing call is, as Apple has proposed, a call that is

1    requesting a connection with the communication terminal but

2    has not yet been connected.

3              MMI adds to their construction, not only it is

4    it a ringing call, but it's a call that is newly received.

5    It expands the scope of an incoming call to include

6    connected calls.  And the parties have agreed under their

7    agreed construction that present call -- you recall the

8    claim language specifically differentiates, as counsel

9    acknowledges, between a present call and an incoming call.

10   Well, the parties have agreed that a present call is a call

11   that is connected.  An incoming call cannot also be a call

12   that is connected.  It is a call that is ringing.  It's

13   requesting a connection.

14             This specification differentiates in multiple

15   places between an incoming call and various

16   characterizations of connected calls, such as a

17   predetermined call, or a call in progress, or an embodiment

18   in which two calls exist already.  However, a separate

19   embodiment discloses displaying processing items when

20   there's an incoming call.  This is to draw a contrast

21   between incoming calls and calls that are already rejected.

22   I'm sorry.  Already connected.

23             Could we switch to slide 15, please.

24             THE COURT:  I have to say, if I were just

25   looking at this language, it strikes me that my common sense

1    approach to this would be that an incoming call -- if I'm on

2    the phone and there's an incoming call, that it doesn't

3    change its character just because I pick up and I say,

4    sorry.  I'm on the phone with someone else.  I'm

5    disconnecting you.  I mean, you are making this

6    temporal division when I think most of us in the real

7    world would still consider that the incoming call, not the

8    present call.

9            MS. SIMMONS:  Understood.  The patent

10   specification, however, does draw a clear distinction, as

11   does the claim language, between a call that is connected

12   and an incoming call.  And part of that has to do with the

13   fact that the invention originally claimed an embodiment in

14   which the processing items that we talked about earlier are

15   displayed automatically on receipt, or as the incoming call

16   is coming in.  It was described as a trigger.

17           So I'm on my phone and I'm talking on the phone.

18   An incoming call is requesting a communication, a

19   connection, it's ringing, and these processing items will be

20   triggered and displayed automatically, which is generally

21   what happens with phones today.

22           When I get a call, my phone immediately will

23   display some call control options for me.  That was what was

24   claimed in the patent originally.  During prosecution, the

25   patentee had to limit the claims to only claim an embodiment

1    in which the processing items are displayed when the user

2    pushes a button.

3           There was a distinct difference drawn between an

4    incoming call, which is used as a trigger, to notify the

5    known, I've got a call that's requesting a connection.  The

6    phone says, I'm going to help the user out by displaying

7    these processing items so that the user can easily decide

8    what to do with the call.  And then the specification goes

9    on to describe different kinds of processing items that can

10   be displayed once two calls are connected.  It's no longer

11   an incoming call.  It's two connected calls now.

12          THE COURT:  That's why I love software patents.

13   All right.

14          MS. SIMMONS:  And one of the other issues, as I

15   alluded to earlier, was MMI's construction that the incoming

16   call include newly received calls is that their expert

17   described -- we tried to get an understanding of what newly

18   received call means.  MMI's expert testified that newly

19   received call is a, quote, "recently received call."  But

20   when asked, what does that mean, when does a call stop being

21   recently received and now become a present call or a

22   connected call, the expert was unable to identify when that

23   transition occurs, because it does not make sense.  The call

24   is requesting a connection.  It's ringing.  It's incoming.

25   And once it's connected, it's a connected call, a present

1    call.

2              The expert said recently a suggested perception

3    of distance and time.  A subjective definition doesn't

4    provide us for any boundaries of what is or is not included

5    within this scope of this claim limitation, and that's

6    another reason why MMI's construction is not appropriate.

7              THE COURT:  All right.

8              MR. BAUER:  I think your Honor is right.  This

9    isn't a patent about the detailed software and the computer

10   code and what signal is going where, the claims

11   distinguishing between the connected call and the present

12   call and the incoming call.  It's the sequential thing.

13   It's not a software clock cycle, did it accept it instantly

14   or what.  It's all about the incoming call.

15             You could, your Honor, use it, refer to it as

16   the second call instead of the first call.  And if newly

17   received isn't clear to the jury, it's an incoming call to

18   which something needs to be done, and to -- you know, it's

19   clearly -- and as the expert said, we all know what newly

20   received means.  At some point, it's no longer newly

21   received.

22             The last claim element, your Honor.  List and

23   listing.  Again, this was one that we didn't have an

24   original proposal.  Theirs is a series, Apple's is a series

25   of processing items displayed one after the other.  And so,

1    you know, I don't know.  One after the other.  We have it

2    processing items grouped together or grouping processing

3    items together, the list.

4              The claim talks about a control means.  This is

5    on page 127.  A means to display a list of processing items.

6    And that list of processing items are things like merge the

7    call, reject, speaker.  You know, those things that you see

8    on the front page of your phone.  That's your list of

9    processing items.

10             The argument I believe is a noninfringement

11   argument that because they do it side -- well, I can go back

12   to the picture.  I believe what the argument is, that the

13   argument is because they are grouped three by two, that's

14   not a list.  That a list has to be one above the other.

15             Your Honor, that might be one way, but let me

16   just show you the patent clearly says the other way.  So

17   what is a list?  Just right out of the dictionary, what's a

18   list?  A series of words or numerals.  Some dictionaries

19   might say otherwise, but what does the patent say?  This

20   should end it.  Then I'm done.

21             On page 129, the patent says, in this case, as

22   in the call control screen, a list in which processing for

23   each calls are arranged in a matrix is displayed just as in

24   the other.  The patent tells you the list can be a matrix.

25   They say a list can't be a matrix.  And that's all I want

1    to point out.  The patent tells you in its language.  And,

2    you know, we keep hearing that it's a translation issue.

3    Well, those are the words in the patent.  A list is a

4    matrix --

5                    THE COURT:  All right.

6                    MR. BAUER:  -- in this case.

7                    MS. SIMMONS:  Looking at the claim language,

8    again, claim 7 and 8 require that the processing items be

9    displayed in a list, or claims 23 require listing the

10   processing items.  And as counsel noted, the key dispute

11   here is whether a list can or cannot include a matrix.

12   And, in fact, this is really an infringement analysis that

13   MMI is trying to impose with their tardy construction of

14   "grouped."  MMI wants to change "list" to mean "grouped."

15   And that would include any grouping of items regardless of

16   order.

17                   Apple's construction reflects that a list is a

18   specific way of ordering the display of items.  In fact, the

19   patent specification does describe different embodiments,

20   embodiments in which the processing items are displayed as a

21   list, which the specification describes as from the second

22   to fourth lines of the screen, i.e., from the top to

23   downward.  This is what we've shown on slide 22.  It's a

24   list, top to bottom.

25                   The specification clearly differentiates between

1    a list and a matrix.  There are embodiments that are

2    described as, the former embodiment describes a list.  Now

3    we're going to talk about an embodiment that describes a

4    matrix, a table.

5              THE COURT:  So you're saying that, to some

6    extent, the patentees have been their own lexicographers?

7              MS. SIMMONS:  Well, I don't even know that I

8    would say that it requires going that far.  I think that the

9    understanding of a list and a matrix are that there are two

10   different things and the patent discloses it that way.  In

11   fact, the patentee explains the reasons for having a list

12   versus a matrix and what the benefits of the one are and

13   what the benefits of the other are.

14             So specifically the patentee described that when

15   you have a list of options displayed for, say, two connected

16   calls, I have to scroll down through several screens to get

17   to all of the processing items, because they're displayed as

18   the specification described, top to down.

19             Now, I might want instead as another embodiment

20   to display the processing items for both calls, both of the

21   connected calls as an example, side by side, and then maybe

22   I can get, if not all, more of the processing items for both

23   calls on the same screen.

24             So it even describes a reason why you would do

25   an embodiment with a list as opposed to an embodiment with a

1   matrix.

2            And Apple's construction is also just consistent

3   with the plain meaning of the word "list," which is a series

4   of processing items displayed one after the other.

5            MMI does not cite support in the specification

6   or the claims for changing the word "list" to mean "group."

7   Instead, MMI cites only to a dictionary definition, the

8   definition of which supports Apple's construction.  MMI

9   points to the etymology from this dictionary definition,

10  which is not a proper source for us to look to in order to

11  determine what the proper meaning of list should be in the

12  context of these claims.

13           THE COURT:  This is why patent litigation is so

14  much fun.  I mean, you really are talking about discrete

15  words with a mantel of science perhaps, but all generated by

16  business disputes.  So the truth is what the Federal Circuit

17  finds, and I mean it's amazing how we have these disputes

18  over words that most of us wouldn't think were worthy of

19  dispute.  But there it is.  Thank you very much.

20           MS. SIMMONS:  Thank you, your Honor.

21           MR. BAUER:  So, your Honor, all I can say, it's

22  just the one slide she didn't put up is the one where it

23  says a list can be arranged in a matrix.  And so when we

24  talk about lexicographer, you know, the rule says you have

25  to be clear if you are trying to redefine things.  I don't

1    know if they defined it here or not, but, clearly, they

2    believed a list could include a matrix and didn't have to be

3    one above the other as opposed to the side, although I think

4    both is a list, but that's all.

5            Your Honor, that is our claim construction

6    presentation.

7            THE COURT:  All right.  So this is the question.

8    I really have a 2:00 o'clock deadline I have to meet, and so

9    the question is whether we come back or whether there are

10   just some highlights.  And I'm happy to come back because --

11   well, because we didn't get as far as we wanted to get.  But

12   I know it's an expensive proposition.  So what is the

13   feeling among counsel here?

14           MR. RILEY:  Your Honor, there's no way we can

15   get through some very important motions today, and so if it

16   would assist the Court, we would be glad to come back.

17           MR. BAUER:  Your Honor, they're almost all their

18   motions.  I can see we don't need to argue any of them, but

19   they are theirs.  Ours are more evidentiary-type motions,

20   which, you know, we could do those in the 20 minutes.  They

21   go hand in hand with their motions, though.  If they want to

22   argue their substance, we can just do them together.

23           THE COURT:  Well, I guess the question is when

24   it would be most convenient for you to come back, sooner

25   rather than later, because we've got a lot of work to do to

1      get something out before the pretrial conference.  And you

2      all may have busier schedules than I do at this point

3      because my trials have kind of disappeared.

4                 MR. RILEY:  We certainly could meet, come up

5      with a date.  I'm sure we could do it within the next couple

6      of weeks.

7                 THE COURT:  All right.  All right.  Well, why

8      don't we do that.  I do think the case is dense enough that

9      I think it would be helpful to complete the oral argument,

10     and I apologize for being late, although maybe with

11     another -- well, I gave you more time, so I don't think we

12     could have gotten in it done regardless of how we did it.

13                MR. BAUER:  Your Honor, we did pretty well for

14     the number of slides.

15                THE COURT:  I congratulate you all for being

16     very efficient, and, as always, very interesting and

17     articulate, and I appreciate it.

18                MR. BAUER:  Your Honor, do you know your

19     schedule or should we just deal with your clerk?

20                THE COURT:  Well, I mean, next week I have most

21     of Wednesday and Thursday, and then I have an oral argument

22     in another patent case on Friday.

23                The following week, which is the week of the

24     6th, I have the Monday, Tuesday and Wednesday, and then

25     I am out of the office for a few days.  So the 6th, 7th and

1    8th.

2              And the following week, I have Thursday, the

3    16th.  And morning would be better for me because I do have

4    a few scattered proceedings in the afternoon.

5              MR. RILEY:  Very good.

6              MR. BAUER:  We'll talk, your Honor.  Thank you.

7              THE COURT:  All right.  Thank you very much,

8    counsel.  Always a pleasure.

9              (Court recessed at 1:45 p.m.)

10                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25