```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4

     MOBILEMEDIA IDEAS LLC,          :   CIVIL ACTION
5                                    :
                    Plaintiff,       :
6                                    :
          vs.                        :
7                                    :
     APPLE INC.,                     :
8                                    :
                    Defendant.   :   NO. 10-00258-SLR-MPT
9

10                             - - -

11                              Wilmington, Delaware
                                Monday, July 30, 2012
12                              10:00 o'clock, a.m.
                                ***Telephone conference
13                             - - -

14
     BEFORE:  HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE
15                             - - -

16
     APPEARANCES:
17
                    MORRIS, NICHOLS,  ARSHT & TUNNELL
18                  BY:  RODGER D. SMITH,  II, ESQ. and
                         JACK B. BLUMENFELD, ESQ.
19

20                         -and-

21

22
                                        Valerie J. Gunning
23                                      Official Court Reporter

24

25
```

```
1    APPEARANCES (Continued):

2
                PROSKAUER ROSE LLP
3               BY:  JUSTIN J. DANIELS, ESQ.
                     (Boston, Massachusetts)
4

5                    Counsel for Plaintiff

6

7
                MORRIS JAMES LLP
8               BY:  RICHARD K. HERRMANN, ESQ. and
                     MARY B. MATTERER, ESQ.
9

10                   -and-

11
                O'MELVENY & MYERS LLP
12              BY:  LUANN L. SIMMONS, ESQ.
                     (San Francisco, California)
13

14                   Counsel for Defendant

15
                         -  -  -
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (REPORTER'S NOTE:  The following telephone

 4     conference was held in chambers, beginning at 10:00 a.m.)

 5

 6              THE COURT:  Good morning, counsel.  This is

 7     Judge Thynge for the issue, discovery issue that has been

 8     raised by Apple against MobileMedia.

 9              Before we begin, I'm going to get introductions

10     from counsel as to who is on the line, and I will also

11     remind you that Val Gunning is the Court Reporter who is

12     taking down this proceeding.

13              So who is on the line on behalf of MMI?

14              MR. SMITH:  Good morning, your Honor.  Rodger

15     Smith at Morris Nichols along with my partner, Jack

16     Blumenfeld, and also Justin Daniels from Proskauer.

17              MR. DANIELS:  Good morning, your Honor.

18              THE COURT:  Good morning to all of you.

19              And who is on the line on behalf of Apple?

20              MR. HERRMANN:  Good morning, your Honor.  It's

21     Richard Herrmann, and I have my partner Mary Matterer with

22     me as well as Luann Simmons from O'Melveny & Myers.

23              THE COURT:  Good morning to all of you.

24              Understanding that this is Apple's motion, I

25     will have Apple speak first.  And I'm assuming, Luann,
```

1    you'll be talking on behalf of Apple?

2              MS. SIMMONS:  Yes, your Honor.  Thank you.

3              THE COURT:  Why don't you begin.

4              MS. SIMMONS:  Thank you, your Honor.

5              I would like to start by just noting, as we set

6    forth in our letter, that the sensitivity of Apple's source

7    code simply cannot be overstated.  I won't beat the dead

8    horse on that, but it truly is the most sensitive thing that

9    Apple has, and because of that, we go to great lengths to

10   limit the number of printed copies or electronic copies that

11   can be made in order to try to limit the risk of

12   unauthorized disclosure.  And that is what we tried to do

13   with the provisions of this protective order.  We tried to

14   limit the circumstances under which copies could be made and

15   under which access to the code could be obtained.

16             THE COURT:  It might be helpful, though, Luann,

17   because I recognize that you've made your arguments to me

18   concerning Dr. Williams' reported violations as well as Dr.

19   Meldal's --

20             MS. SIMMONS:  Yes, your Honor.

21             THE COURT:  -- also purported violation, which

22   is significantly different, I think, than Dr. Williams, but

23   there were certain issues that were raised by MobileMedia as

24   to why -- their interpretation, I think it goes to the

25   source code, as to why they don't feel that there has been

1   unauthorized disclosure or violation of the protective

2   order.  So I think addressing those issues and seeing how

3   the two mesh.

4            I will fully recognize that the source code by

5   any company, and Apple is no different in this regard, is

6   extremely sensitive and extremely important and steps are

7   taken to protect it, and the Court recognizes that those

8   steps were attempted to be incorporated in the protective

9   order.

10           So the issue, there seems to be some rub here,

11  and I think part of the interpretation that I've taken from

12  what was submitted by MobileMedia is one Apple -- some

13  comments about permitting MobileMedia and its experts to

14  have access to the source code for over -- more than 60

15  occasions.  But the concept of how much is allowed to be

16  printed, no more than 50 continuous pages, and how the

17  source code reads, and the allowance of Dr. Williams to

18  use Mr. Finch to review certain portions of the source

19  code for him and then print them off.  That seems to be

20  the main rub.

21           MS. SIMMONS:  Agreed, your Honor.  It appears

22  from MobileMedia's submission and from the parties' meet and

23  confer that MobileMedia is interpreting now this provision

24  to mean that as long as someone associated with MMI goes to

25  the source code machines or discs -- fact discovery is

1   closed now, but went to the source code machines and printed

2   the code out, reviewed it in order, you know, quote unquote

3   reviewed it in order to be able to print it, that that

4   satisfied this provision.

5        But that is clearly not what was intended by

6   this provision.  This provision was not set up so that just

7   any person associated with MMI could come and do some

8   extraordinarily high level review based on some general

9   descriptions of what to look for and then print out

10  thousands and thousands of pages of source code to be sent

11  back for the actual review to occur by the expert in paper

12  form.

13       That, in our view, does not meet the requirement

14  that only limited portions of the source code be printed

15  only when reasonably necessary to prepare the reports.

16  That, in our view, is certainly contrary to the letter and

17  spirit of that provision of the protective order.  So we

18  think that that reads that provision essentially out of the

19  protective order, to just allow anyone to come and print it

20  for review elsewhere in the first instance.

21       THE COURT:  Was Mr. Finch under the protective

22  order?  Did he sign off or do what he needed to do, Patrick

23  Finch?

24       MS. SIMMONS:  He was under the protective order,

25  your Honor.

1          THE COURT:  Okay.

2          MS. SIMMONS:  He was not disclosed as the

3  someone that Dr. Williams relied on.  So Dr. Williams in his

4  expert report did not say anything at all about Mr. Finch,

5  much less that he relied on him.  And during his deposition,

6  Dr. Williams similarly said that he did not rely on

7  Mr. Finch.

8          THE COURT:  Okay.  Is it your belief that he

9  relied on Mr. Finch -- well, let me ask you.  First of

10  all, is it your belief that he relied on Mr. Finch, and how

11  do you feel he relied on Mr. Finch that would be

12  inappropriate?

13          MS. SIMMONS:  Well, it's actually a little bit

14  unclear.  I think what seems to have happened, although

15  it seems that MMI is kind of walking both sides of this

16  line.

17          It seems that Dr. Williams gave very high level

18  descriptions of the kinds of code he was looking, for and we

19  asked for some of those descriptions and they were quite

20  high level.  He gave those descriptions to Mr. Finch and

21  asked Mr. Finch to simply do some searching around to find

22  code that met that criteria, print it all out and send it

23  back to New York for Dr. Williams to review.  And if that is

24  what happens, we believe that's a violation of the

25  protective order and perhaps does not qualify as Dr.

1    Williams having relied on in some substantive way in

2    Mr. Finch.

3              But it seems MMI is kind of arguing both sides

4    of that.  He did not rely on Mr. Finch and so Dr. Williams

5    did not need to disclose that, but he did rely on Mr. Finch,

6    and so the review was substantive at the source code

7    machine.

8              THE COURT:  So what your problem is, he may have

9    relied upon Mr. Finch to figure out what source code was

10   relevant to forward on to Dr. Williams to review in the next

11   instance and include in his report?

12             MS. SIMMONS:  Correct.  And as to the issue of

13   continuing to provide access to the code, that was

14   specifically in reliance on MMI's former counsel's

15   representations that this was not happening.

16             THE COURT:  When did present counsel enter the

17   picture, roughly?

18             MS. SIMMONS:  I believe the folks from Proskauer

19   were involved from the beginning but didn't take over as

20   lead counsel until earlier this year.

21             Justin, is that right?

22             MR. DANIELS:  That's right, your Honor.  We took

23   over in litigation in the beginning of March of this year,

24   your Honor.

25             MS. SIMMONS:  The e-mail that we received

1     ensuring us or telling us that this was not happening, that

2     source code was not being printed for review elsewhere in

3     printed form in the first instance came -- not from

4     Proskauer.  It came from Sullivan.

5               MR. SMITH:  Your Honor, this is Rodger Smith.

6               If I might just add to Justin's comments,

7     Proskauer was working in the background and Alan Federbush

8     who appears on the log is also copied on that same e-mail

9     from Sullivan and begins by saying, I've spoken with Alan,

10    or something to that effect.

11              So Proskauer was involved and was consulting

12    with Sullivan and Cromwell at the time, just for clarity.

13              THE COURT:  It starts off, Luann, I have

14    communicated -- and this is an e-mail that was sent on

15    December 1st, 2007.  Luann, I've communicated about this

16    with Alan who has spoken with MMI's experts.  Our experts

17    have informed us that they requested printing of the source

18    code because it was reasonably necessary to prepare an

19    expert report as set forth in Section 11C iv of the

20    protective order.  Okay.

21              MS. SIMMONS:  And, your Honor, our concern here,

22    I believe there was one other point that you wanted me to

23    respond to about the issue of whether there has or has not

24    been any disclosures outside of those under the protective

25    order.  We are not aware -- MMI is correct, we are not aware

1    of any disclosures that have occurred yet, but I guess the

2    provision in the protective order is not conditioned on

3    there actually having been a disclosure, and it seems,

4    again, contrary to the spirit of this provision to have to

5    wait until a disclosure occurs.  And we've got 7,000 pages,

6    give or take, of source code now floating about and the

7    vast majority of those were not even used in the expert

8    reports.

9                THE COURT:  I guess what you are saying is,

10   no harm, no foul doesn't operate.  The whole purpose

11   of the protective order was to prevent that harm from

12   occurring?

13               MS. SIMMONS:  That's correct, your Honor.

14               THE COURT:  All right.  Regarding Dr. Meldal,

15   the concern with him is that he printed photocopies of

16   Apple's source code, but then testified that the routine was

17   that he made and kept those printed for safekeeping and then

18   sent the original printed copies of the code by Fed-Ex to

19   MMI's counsel in New York.

20               All right.  The concern that you had there was

21   what?

22               MS. SIMMONS:  Just additional copies of the code

23   that were made for purposes other than being reasonably

24   necessary to the preparation of the reports.  And in all

25   candor, your Honor, had this been the only issue, I think, I

1   have to imagine we could have dealt with this without having

2   to burden the Court.  It's just that this and the failure to

3   sign the source code log and then the printing of

4   7,000 pages, a lot of which were reviewed in the first

5   instance in print form, it's the combination that starts to

6   make people at Apple start to get very antsy about the

7   protection of their source code.

8            THE COURT:  Let's separate out Dr. Meldal's

9   violation, purported violation, and your comment that you

10  just made, Luann.  If this had been the only violation, what

11  would Apple, or what would you have been requesting or

12  looking for from MMI?

13           MS. SIMMONS:  Had this been the only violation,

14  no other violations at all of the protective order had

15  occurred and this was the only one, we would have simply

16  asked, I think, for the safe copies back from Dr. Meldal.

17  He would have asked that they be returned.

18           THE COURT:  Now, the read that I got, and maybe

19  I'm wrong on this, is that he does not have any copies, that

20  he made -- that he forwarded those printed copies to MMI's

21  counsel in New York.

22           Is that how you are reading it, that he does not

23  have anything now, that it's now all in the hands of MMI's

24  counsel?

25           MS. SIMMONS:  No.  He testified that he kept his

1    safe copy, and at least as of the time that his deposition

2    was taken in April, he still had that safe copy.

3                THE COURT:  And did he explain why to you that

4    he kept the, quote, safe copy?

5                MS. SIMMONS:  He just said that was the routine.

6                THE COURT:  How many pages of source code does

7    he have?  Do you know?

8                MS. SIMMONS:  I do not.  I know that the experts

9    combined printed over 7,000 pages and in their combined

10   expert reports cited to only 888 of those pages.

11               THE COURT:  And Dr. Meldal is an expert for the

12   plaintiff in -- for what?  For what issues?

13               MS. SIMMONS:  He is addressing, I believe it's

14   five patents.  I'm trying to remember if it was five or six

15   patents, I think a couple of which at least have been

16   deferred at this point.  So they split up their three

17   experts amongst the patents, so he addressed both

18   infringement and validity issues for the patents that he was

19   assigned to cover.

20               THE COURT:  In light of the separating -- all

21   right.  And I may have misunderstood what you were trying to

22   express, Luann.  You said that certain patents had been

23   deferred in this case?

24               MS. SIMMONS:  That's correct.  The parties

25   agreed, and when we had a scheduling or status conference

```
 1    before Judge Robinson, I believe in April it was now, we

 2    presented this to the Court and the Court accepted it, that

 3    we would go forward for this phase of the litigation with

 4    ten patents and that four of the remaining 14 patents would

 5    be -- deferred may not be the right word -- temporarily

 6    stayed for the next phase might be a better way to express

 7    it.

 8              MR. DANIELS:  Actually, they were bifurcated

 9    out.

10              MS. SIMMONS:  Right.  Right.  Thank you, Justin.

11              THE COURT:  All right.  And do we know now, and

12    this is maybe a question for Justin -- you don't have to go

13    through a long explanation, Justin -- whether Dr. Meldal is

14    going to be testifying in the first trial in light of this

15    bifurcation process?

16              MR. DANIELS:  Yes, your Honor.  Dr. Meldal will

17    be testifying both on infringement issues -- well, on the

18    source code, yes.  On infringement issues as well as

19    validity, but he will be testifying in the current trial

20    with I respect I believe five of the ten patents, as Luann

21    has stated.

22              THE COURT:  All right.  That's all I wanted to

23    know.  I just wanted to confirm whether he was going to be

24    here at trial or not.

25              Okay.  And concerning Dr. Williams, Luann, I'm
```

1    trying to figure out what you meant by your second bullet

2    point for requested relief.  At Page 3 of your submission,

3    where it says, Dr. Williams be precluded from relying on or

4    testifying about any information he obtained from Mr. Finch,

5    including any information about Apple's source code or the

6    operation of the accused products.

7              MS. SIMMONS:  It's still a little unclear how

8    much information was exchanged between Dr. Williams and

9    Mr. Finch, but to the extent Dr. Williams gained information

10   or knowledge are about how Apple's source code is set up or

11   works or is organized, if he only gained that information

12   through Mr. Finch and did not get that information from

13   reviewing the source code on the actual source code

14   machines, that's the kind of information we're trying to

15   get at from bullet point 2.  We think it would be improper

16   for him to be permitted to testify as to that information

17   when he obtained it, we believe, in violation of the

18   protective order and then also didn't disclose that he was

19   relying on Mr. Finch and his expert report.

20             THE COURT:  All right.  Let me go back a little

21   bit since I want to understand more specifically.

22             What you actually, and you said it in general, I

23   didn't get it down, as to what you would be looking for.

24   Are you basically trying to eliminate Dr. Williams as an

25   expert, then?

```
 1              MS. SIMMONS:  No, absolutely not.  We think that

 2    would be far too extreme --

 3              THE COURT:  All right.

 4              MS. SIMMONS:  -- under these circumstances.

 5              THE COURT:  Specifically --

 6              MS. SIMMONS:  But we do think it would be

 7    inappropriate for him to be permitted to rely on information

 8    about the source code he obtained solely from Mr. Finch.

 9              MR. DANIELS:  Although that would be the effect,

10    your Honor.

11              THE COURT:  Justin, you'll have a chance.

12              MR. DANIELS:  Okay.

13              THE COURT:  Rely upon information about the

14    source code he received?

15              MS. SIMMONS:  From Mr. Finch.

16              THE COURT:  From Finch.  Now, what the heck does

17    that mean?

18              MS. SIMMONS:  Yes.  I can appreciate Justin's

19    comment because the way I said that probably was not as

20    clear as I should have been.

21              We actually are not even seeking at this point,

22    although I think under the protective order we would be

23    entitled to, but we are not seeking to preclude Dr. Williams

24    from testifying about the actual source code he reviewed

25    even though he reviewed it in present form in the first
```

1    instance in violation of the protective order.

2              So to be clear, that's not what we're seeking.

3    We are just seeking that to the extent he has additional

4    knowledge about, for instance, I reviewed this particular

5    file of the source code and I know that that fits into the

6    overall structure of Apple's source code in the following

7    way, it's that latter part of his explanation with

8    information he obtained from Mr. Finch and did not obtain

9    from having reviewed that information on the source code

10   machines himself, that's the information we're getting at

11   from the second bullet point.

12             THE COURT:  All right.  But if he had not

13   reviewed the source code on the source code machines

14   himself, but then subsequently reviewed the source code

15   based upon his instructions to Mr. Finch to run off portions

16   of the source code, or told him, here's what I'm looking for

17   even at a high level, are you saying that he should not --

18   but he reviewed it afterwards, he reviewed the printed

19   copies, are you saying he should not be allowed to testify

20   about the stuff that he actually reviewed?

21             What I'm trying to understand is, are you saying

22   that he had to review it off the source code himself, and if

23   he didn't do it and didn't review it off the source code

24   machine himself, then he's not entitled to -- but he

25   reviewed it based upon a printed copy of the source code,

1   that he's not allowed to rely upon what he gleaned from that

2   printed copy?

3              MS. SIMMONS:  We are not asking for that.  I

4   think we should be allowed to ask for that under the

5   protective order, but that is, in fact, not what we were

6   asking for in light of our efforts to reach a middle ground

7   on this and not have requested such an extreme sanction.

8   That is, in fact, not what we are asking for.

9              We are just asking that to the extent there is

10  any additional knowledge about the overall structure of

11  Apple's code or how it is organized that Dr. Williams

12  obtained from Mr. Finch absent any review of either printed

13  or electronic source code on his own, that's really all

14  we're getting at.

15             THE COURT:  All right.  And part of that is

16  because he never identified Finch as a source of

17  information.

18             MS. SIMMONS:  That's correct.

19             THE COURT:  All right.  That's what I'm trying

20  to understand.  Thank you.

21             MS. SIMMONS:  That's right.  Sorry.  I know that

22  was a little convoluted.

23             THE COURT:  It was, but I wanted to parse it out

24  because, depending upon what I decide to do, I do not -- I'm

25  trying to understand what Apple is requesting, at least at

1    this time.  Okay.

2              MS. SIMMONS:  Thank you, your Honor.

3              THE COURT:  Thank you.

4              All right.  I'm assuming we're going to hear

5    from Justin?

6              MR. SMITH:  It's Rodger.  If I might, I think I

7    can address most of the issues, and there may be a few that

8    I need to defer to Justin on, but if you don't mind, I will

9    proceed.

10             THE COURT:  I wasn't trying to select.  I just

11   work from a mistaken assumption, Rodger.  I'm always willing

12   to listen to what you have to say.

13             MR. SMITH:  Thank you, you Honor.

14             I think your comment about no harm, no foul is

15   apt here because there was no harm and there was no foul.

16   There was no one that provided disclosures that we talked

17   about, and I think as Ms. Simmons recognized.  There's no

18   specific harm identified in the letter or on the call today

19   to Apple.

20             THE COURT:  But I don't think there has to be a

21   harm identified, Rodger.

22             MR. SMITH:  Let me get to the no foul part,

23   then.

24             THE COURT:  Okay.

25             MR. SMITH:  The protective order, and you've

1    probably seen this provision in other cases, adds the

2    language about reasonably necessary, and I've had, over the

3    last couple months had this issue come up in a case with

4    Judge Andrews, and there's some ambiguity there, right, and

5    you have to sort of wonder what that means.  And Apple might

6    have one view you and MobileMedia has a different view.

7              But here you have guideposts.  Through our

8    infinite wisdom at the time, we put in a guidepost.  I don't

9    remember the negotiations.  I don't think we were even

10   involved when it was negotiated, but there is a guideposts,

11   and it says we can't print more than ten percent of any

12   software release or whatever the language is --

13             THE COURT:  Specific.

14             MR. SMITH:  -- and no more than 50 continuous

15   pages.

16             There has been no complaint that we violated

17   either of those provisions, and so I think, your Honor,

18   the protective order itself tells you what is presumptively

19   a reasonable amount of code an expert in this case would

20   need.

21             And it is --

22             THE COURT:  But, Rodger, let me back up because

23   I've got some questions to understand how this language may

24   print up to ten percent of a specific software release so

25   long as it does not print out more than 50 continuous pages.

1    I have no idea what that means or what it could mean, but

2    obviously, counsel and the parties had some understanding as

3    to what that could mean, and I would like to understand

4    MMI's interpretation of that.

5              And when we are talking about ten percent of a

6    specific software release, you know, I sit there, and

7    software during a trial gets plugged in and it's put up on a

8    screen and it's a bunch of letters that I don't quite

9    understand and somebody has to interpret it for me.  But I

10   have no idea what amount of software we're talking about

11   when it's limited to ten percent of a specific software

12   release.

13             MR. SMITH:  I will let Justin jump in, but the

14   fact is -- the fact is, there's no complaint we've exceeded

15   ten percent, so I think we can assume it's somewhere over

16   70,000 pages, or whatever the number is they said we printed

17   times ten.  So, you know, we're well within that.  And, you

18   know, keeping it in context, this is a case that's now down

19   to, I guess, to about ten patents, but there was

20   significantly more early on in the case.  And as you know,

21   because you've dealt with this case before on discovery

22   matters, there are various aspects of the IOS system that

23   are at issue.

24             THE COURT:  Yes.

25             MR. SMITH:  I think the parties recognize that

1    there might be some issues about the scope of what would

2    need to be produced, what MobileMedia would feel would need

3    to be produced, and that Apple might have some objections.

4    So they put down a guidepost for your Honor to look to, is

5    this particular interval when a complaint was made as to how

6    much was printed.

7                 And not having violated that and not having any

8    suggestion that what we did was not reasonably necessary

9    leaves us wondering what we did wrong, what we should have

10   done different other than to ask Apple what they believe is

11   reasonable because we had already agreed between the parties

12   what's reasonable.

13                I will let Justin answer your specific question,

14   if he can.

15                MR. DANIELS:  Yes.  I think if I can is the best

16   I can do.

17                You know, certainly, Apple's source code is

18   millions of lines, so I think that ten percent is not, you

19   know, an unreasonable percentage, but I agree that it's a

20   little bit hard to measure.  7,000 I think in the scheme of

21   Apple's entire source code, even in a version, is pretty

22   small, relatively speaking.

23                And so we're talking millions and millions of

24   lines of code that are available.  And, in addition, you

25   know, even though -- and as you indicated, as you

 1    recognized, there were multiple experts.  Some of the code

 2    they had to print may have overlapped with some other

 3    expert's code, so there were some increasing numbers as a

 4    result of that as well because each expert had their own

 5    view obviously as to what they considered reasonably

 6    necessary.

 7            THE COURT:  But my understanding is there has

 8    been a lot of code printed for these 14 patents, ten of

 9    which are going to go to trial, and the experts totally have

10    only identified something under 900 pages of these -- 900

11    printed pages.

12            So what happened to -- so when I subtract 888

13    from roughly 7,000, and I recognize that may not be a lot of

14    source code in -- by measurement in the sense of lines and

15    millions and millions and millions of parts of source code

16    that Apple has, I'm trying to figure out where the other

17    6,000 pages are and what they're being held on for.

18            MR. DANIELS:  I guess there are sort of two

19    questions in there.  To answer your first one, I can only

20    say that this is a process that the experts engaged in when

21    they prepared their infringement reports.  Obviously, they

22    whittled things down to what they considered they needed

23    ultimately in their expert reports.

24            There was -- you know, there's obviously a

25    process that they go through in terms of identifying code

1    and then preparing the reports.  So I don't know

2    specifically how those ended up, you know, going from 7,000

3    to a little under a thousand or something, whatever that

4    number is, but I'm sure that that is -- that's how it

5    happened.

6              The reason for retaining the code is that there

7    are several open issues still left in this case, and, you

8    know, we just returned from a Markman hearing.  There are

9    many terms, you know, claim issues -- many claim terms that

10   are still at issue.  There are summary judgment motions that

11   are still at issue.  And there was code that was printed

12   because, certainly because claim construction had not been

13   resolved at that point.

14             So there is some wiggle room that was allowed in

15   terms of what the outcomes would be, and so that's one of

16   the reasons why there's probably more code out there that is

17   presently being used because things might adjust.  And there

18   was even discussion about potentially additional expert

19   reports coming in.  So I'm not saying that's going to happen

20   necessarily, but there certainly was discussion before Judge

21   Robinson about that.

22             THE COURT:  So who has copies of the source code

23   now?  Does counsel for MMI have copies of the source code

24   that the experts have and are using, both have and are

25   using?

1          MR. DANIELS:  Yes, your Honor.

2          THE COURT:  And did the experts still have

3    copies of the source code that they used?

4          MR. DANIELS:  I believe -- I believe -- yes, I

5    believe with Dr. Meldal, that's the case, and I have to

6    confirm with the other -- with the other two.

7          THE COURT:  Do they have copies of the source

8    code that they requested but did not use in their reports or

9    deposition?

10          MR. DANIELS:  I believe they still do.  Yes,

11    your Honor.

12          THE COURT:  Do you have them divided up as to

13    who has what?  That is, which expert looked at what parts of

14    the source code?  I'm talking about experts that are being

15    used for trial, not Mr. Finch.

16          MR. DANIELS:  Yes, your Honor.  We know which

17    code was reviewed by each of the experts.

18          THE COURT:  So there's really no reason for the

19    experts to hold onto any code because you've got the code

20    now, and if you were allowed to retain that, you could

21    provide the code to the experts, your individual experts,

22    when they could potentially need to review for trial

23    purposes, for example.

24          MR. DANIELS:  Yes, your Honor.  We would have no

25    problem, you know, having the experts send us, consistent

1    with the protective order.  And what I mean by consistent, I

2    say, you know, the witnesses are to, having them send to us

3    the code that they still have and then we can retain it

4    until, you know, it's needed.

5              THE COURT:  And how are you maintaining the

6    safety of this code?

7              MR. DANIELS:  We have it under lock.  Obviously,

8    it's only in hard copy.

9              THE COURT:  Sure.

10             MR. DANIELS:  It's in counsel's office in a

11   locked file cabinet.

12             THE COURT:  And divided up according to expert

13   A, expert B and expert C, something along those lines?

14             MR. DANIELS:  That's exactly right, your Honor.

15             THE COURT:  And it's divided up according to

16   the source code that each expert requested for their own

17   review?

18             MR. DANIELS:  I am almost certain of that.  I

19   don't know that for a fact, but I'm almost certain that that

20   is correct, your Honor.  I know that it's all retained in

21   one place and that it's organized by report and by -- yes,

22   by report.  And there's also source code that Apple used as

23   well in its reports, which we have hard copies of as well.

24   Apple obviously knows it.  Those are being protected in the

25   same way.

```
 1                THE COURT:  See, this is my feeling when I read

 2     this weekend, because I want you to understand -- this is

 3     off the record.

 4                (Discussion held off the record.)

 5                THE COURT:  On the record.

 6                I didn't look at this as a no harm, no fall

 7     situation.  Whether it was not well defined what was

 8     expected of the parties, particularly the language that the

 9     receiving party shall not print source code, to review

10     blocks of source code elsewhere in the first instance.

11     Frankly, that's exactly what I think Dr. Williams did when

12     he relied upon Mr. Finch to provide him with that.  In other

13     words, he may have given Mr. Finch some instructions.  The

14     high levelness of them versus how detailed they were I'm not

15     going to go into, but that would have required Mr. Finch,

16     who is having some computer technology and programming in

17     his own right as pointed out to me by MMI, review it, get

18     the information, and send them to him.

19                So it wasn't actually Dr. Williams going through

20     the source code in the first instance and then he was

21     actually having somebody else do it for him and then

22     reviewing it elsewhere.

23                So in the literal sense, if I look at that

24     language, that language was violated.  But I'm also

25     recognizing with some hope that the whole purpose of this
```

1    approach -- and the Court recognizes the value of source

2    code and the importance of it for an entity such as Apple --

3    that the intent was just to limit how many fingers got into

4    this pie.  That is, how many people actually had access to

5    the source code that Apple didn't necessarily know about or

6    would understand who was getting what.  And that's what I

7    think was important to them, and I can understand why.  I

8    mean, quite frankly, source code for Apple is the end all,

9    be all.  It's the crown jewel in many respects.  It's how it

10   survives based upon what its company is based on.  So that

11   is a concern that I do have.

12           Now, what is being requested by Apple in the

13   first right, that I had some concerns about how extensive

14   it is.  I do agree with how Luann finally defined to me

15   what she was looking for from Dr. Williams might be an

16   approach.

17           But I would like your comment on that, Rodger.

18   That is, the last part that I discussed with her, about what

19   they were actually asking for about what Dr. Williams should

20   be precluded from doing.

21           MR. SMITH:  Your Honor, I think the problem with

22   that is that we're bringing now into the substantive issues

23   for Judge Robinson to deal with in terms of what it was

24   proper for Dr. Williams to rely on.

25           THE COURT:  Yes.  I think it's more a motion in

1    limine.

2              MR. SMITH:  Yes.  I mean, he provided his expert

3    report.  He gave a deposition.  It sounds to me like they're

4    asking Judge Robinson for relief as to what he can testify

5    to based on how MobileMedia chose to structure its experts

6    and conduct its expert review here.

7              THE COURT:  Well, no, no.  What she's basically

8    saying is, listen, we didn't know -- Dr. Williams said he

9    didn't rely upon Mr. Finch for anything, basically, except

10   give me the source code, get copies for me for me to review.

11   That's basically how it was presented in his deposition.  At

12   least that's what's being related to me.  And he didn't

13   identify them as a source of information -- excuse the pun

14   for the use of the word "source" -- of information.

15             What I think she's saying, and what I understand

16   she's saying is that if he turned to Finch and got

17   information about how Apple structured the source code was,

18   or sought him as a factual source or an expert source in

19   that regard, but was never identified, that could be

20   problematic.

21             MR. SMITH:  Your Honor, I agree, and it would

22   be problematic even if we didn't have this source code

23   dispute.

24             THE COURT:  Yes, that's true.  That's true.

25             MR. SMITH:  I think that sort of discussion

1    later on as to what he's permitted to testify at trial

2    about, they're trying to move forward into some source code

3    dispute, a substantive matter that -- I don't think it's

4    ripe for consideration now.

5           I understand that if they recognize now how

6    draconian their letter sounded, and to my eyes it was a

7    little unclear as to what they were asking for.  I thought

8    they were looking for preclusion as to any source code that

9    Mr. Williams saw as a result of Mr. Finch's review.

10          THE COURT:  Well, that may be what they thought

11   in the first instance and decided to back off.  That's okay.

12   You know, when you write a letter, sometimes you're a little

13   ticked off.

14          Go ahead.

15          MR. SMITH:  Fair enough, your Honor.

16          You know, we beg to differ as to how the -- you

17   know, what the first instance provision says.  We understood

18   it to mean the receiving party.  We had -- Mr. Finch spent

19   hours and hours and hours there, and Mr. Williams, as he

20   testified in his deposition, spent three or four days there

21   himself.

22          And --

23          THE COURT:  But Mr. Finch wasn't going to be the

24   one who is going to be preparing an expert report.  I think

25   that's what Apple's gripe was.  He's a consultant that you

1    hired not for trial, not to testify.  You hired Dr. Williams

2    as well as Dr. Meldal, as well as any somebody else, who was

3    actually going to be testifying.  And I understand their

4    concern in that regard, because it's for what -- and the

5    reliance, frankly, on counsel's representation that they

6    felt it was a reasonable amount being limited for a

7    reasonable purpose.

8             MR. SMITH:  Right, your Honor.  It would be a

9    little bit different, though, if it was only counsel -- say

10   Mr. Federbush went in and reviewed the source code and just

11   printed out large chunks for the experts to look at later,

12   but that's not what happened here.  We had somebody who

13   understood source code more than I did or I think probably

14   more than Mr. Federbush did go in, look at the source code.

15   He had some conversations with Mr. Williams to gain guidance

16   as to what was needed to be produced, printed.  And we think

17   it meets the letter of the provision.  I think it's a little

18   bit of Apple trying to have the provision read differently.

19   I mean, they would have to rewrite the provision and say the

20   testifying expert will not print and may not review later in

21   the first instance.  And that's not what it says.

22            And so we read the provision.  We had a, you

23   know, reasons for having Mr. Finch do the review instead of

24   Dr. Williams, and it's a little late, we think, to have them

25   come back now and say -- well, it's almost a gotcha to come

1  back and say, well, you shouldn't have done it that way.

2  And they knew Mr. Finch was the one reviewing it.  There was

3  no surprise about him.  They knew he was disclosed under the

4  protective order.  And so now to sort of get substantive

5  relief as to what Dr. Williams can testify about, it just

6  does not feel like it flows from what they view as the

7  violation and we don't see as the violation and didn't at

8  the time when we structured our expert review.

9             THE COURT:  All right.  Is there anything else

10  that you wish to add?

11             MR. SMITH:  I don't, your Honor.  Thank you.

12             THE COURT:  My solution is to sit back and

13  say -- before I do that, Luann, did you want make any

14  comments concerning the last argument that was made by

15  Mr. Smith, by Rodger, regarding whether we're going into the

16  domain of Judge Robinson's determination as to what is

17  appropriate for trial?

18             MS. SIMMONS:  I don't think I had anything

19  further to add other than we really did try to tie the

20  relief that we're seeking back to what we see is the

21  violation of the protective order.  And, frankly, even if it

22  is draconian, we do still think that we could -- could have

23  asked for a complete preclusion, but we were trying to be, I

24  don't know, a little bit more reasonable about it.  So we

25  did try to tie this all back to the violations of the

1    protective order.

2              THE COURT:  Well, first of all, the first

3    request was that the court order MMI to return all source

4    code that it printed and copies thereof.  That was not

5    specifically cited in the expert reports.

6              What I'm going to require to do is that the

7    experts provide -- destroy or provide their copies to MMI's

8    counsel, who keeps it under lock and key.  Since there are

9    matters that are still outstanding in this case, including

10   the trial, I'm not going to require that all the source

11   code that had been printed necessarily gets returned, but

12   I do require that it now gets out of the hands of the

13   experts and are kept in counsel's hands and kept under lock

14   and key.

15             I recognize that review for -- of the source

16   code and going through portions of it again, including those

17   portions that Apple may have cross-examined the experts on,

18   or depending upon what the claim construction is, could have

19   an effect on what happens in the future of this case, and

20   I'm not certain what Judge Robinson is necessarily going to

21   allow or what the parties are going to request.  But I think

22   having it kept in a defined group of hands, that I would

23   expect counsel to be fully responsible for, especially if

24   any leaks do occur, and put the onus on counsel rather than

25   on the experts.

1           Secondly, on the request regarding Dr. Williams,

2    even the modified request that's being made, I do think it

3    is an issue more on a motion in limine situation and should

4    be addressed by Judge Robinson at the time either when she

5    addresses such motions or when she addresses such argument,

6    because if it turns out -- to me, there's a source code,

7    potential source code violation here.

8           The receiving party wasn't provided to me as a

9    definition, but I could understand how -- more so how Apple

10   was viewing the receiving party as the person who is

11   actually looking at it in the first instance from the

12   computers that are made available to get the source code

13   from, but there wasn't necessarily going to be somebody else

14   in there, such as either counsel or some other person in

15   there pulling the source code off for the expert to review

16   at someplace else.

17          It's this type of domino effect that is having

18   more hands in the pot for certain portions of the source

19   code and the distribution process that I think causes Apple

20   some angina, understandably so, because of the value that

21   they place on their source code and that I recognize.

22          To sit there and say I think it's a willful or

23   intentional violation, I can't get to that stage.  And so

24   the Williams issue that was brought up today I think more

25   appropriately should be addressed with Judge Robinson.

1    However, in my view, what's being requested, particularly in

2    light of the fact, and Judge Robinson may disagree with me

3    on this, but particularly in light of the fact that there's

4    no indication from Dr. Williams that he used Mr. Finch as

5    a -- he used him as a means to -- for Mr. Finch to transmit

6    information to him, not used him as a means of a source of

7    information, either as an expert or a factual source, or

8    some type of analysis.  That has not been disclosed.

9            If it turns out that he did use Mr. Finch in

10   that regard, then I think that is a different problem for

11   MMI better addressed, though, by Judge Robinson, should

12   information or should this become apparent.  But if I were

13   in Judge Robinson's shoes and this did become apparent or

14   such, I would have some serious concerns about Dr. Williams

15   being able to rely upon such information, that type of

16   information from Mr. Finch when he wasn't identified as a

17   source.

18           Thirdly, the issue was the monetary sanction

19   and Apple's legal fees in bringing this motion.  Before I

20   decide that issue, what are we talking about?  Do we have

21   any idea?

22           MS. SIMMONS:  I'm sorry, your Honor.  I actually

23   don't, but I can provide that in short order.

24           THE COURT:  You can provide it in short order,

25   some basic argument based upon what my conclusion was here

1    today as to why you think you're still entitled to it.  I

2    will give you the right to provide an affidavit along with a

3    two-page letter, two to three-page letter or so in single

4    spaces the arguments, like the arguments that you made here

5    today.  I will then also, within a week after that, submit

6    it.  I will then also allow MMI to respond in kind.  By a

7    week, I'm talking about five working days.  And I will

8    decide whether or not in my mind it's warranted, and counsel

9    can advise, based upon my findings here today, why they feel

10   it's warranted and why you feel it isn't warranted.

11             MS. SIMMONS:  Thank you, your Honor.

12             THE COURT:  All right.  How long do you think

13   it's going to take you to do this, Luann?

14             MS. SIMMONS:  I should be able to provide that

15   within a day.

16             THE COURT:  Within a day, including --

17             MS. SIMMONS:  I believe that's right, although

18   my accounting people might be angry with me, so maybe I will

19   say two days.

20             THE COURT:  No.  I'm not trying to hold you to a

21   horribly shortened time frame, but I also want to make sure

22   that you are giving yourself enough time to make your

23   arguments as to why you're entitled to fees and costs

24   based upon my findings today, too.  So you might want to

25   wait --

```
 1                    MS. SIMMONS:  Why don't we say Monday, the 6th.

 2       Is that acceptable to your Honor?

 3                    THE COURT:  That's fine to me, but did you want

 4       to wait until the transcript is done?

 5                    MS. SIMMONS:  You guys seem to be very fast with

 6       your transcripts.

 7                    THE COURT:  Val said she can get it done today.

 8       Why don't we make it a week from when the transcript is

 9       issued.  And then, Rodger, and your side, and Justin, your

10       side will have a week after their submissions.

11                    Remember, counsel, that anything that you submit

12       under seal I can't run off, I can't get off the website.  We

13       don't have that capability, so make sure you provide -- I

14       just need a courtesy copy.  That's fine for chambers.

15                    MS. SIMMONS:  Okay.

16                    THE COURT:  Okay.  Maximum two to three pages of

17       that type of argument.  I can't imagine it's going to take

18       that long, but you'll have it.

19                    All right.  Thank you.

20                    MS. SIMMONS:  Thank you, your Honor.

21                    MR. DANIELS:  Thank you, your Honor.

22                    THE COURT:  Take care.  Bye-bye now.

23                    (Telephone conference concluded at 10:38 a.m.)

24                              -  -  -

25
```