IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MOBILEMEDIA IDEAS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-258-SLR |
| | ) |
| APPLE INC., | ) |
| | ) |
| Defendant. | ) |

Jack B. Blumenfeld, Esquire, Rodger D. Smith II, Esquire, and Jeremy A. Tigan, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Steven M. Brauer, Esquire, Justin J. Daniels, Esquire, Safraz W. Ishmael, Esquire, Kenneth Rubenstein, Esquire, Anthony C. Coles, Esquire and Alan Federbush, Esquire of Proskauer Rose LLP.

Richard K. Hermann, Esquire, Mary B. Matterer, Esquire and Kenneth L. Dorsney, Esquire of Morris James LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: George A. Riley, Esquire, Luann L. Simmons, Esquire, and David S. Almeling, Esquire of O'Melveny & Myers LLP.

**MEMORANDUM OPINION**

Dated: August 16, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff MobileMedia Ideas LLC ("MMI") filed its patent infringement complaint against Apple Inc. ("Apple") on March 31, 2010, alleging that Apple's iPhone and iPod products infringe the following U.S. Patent Nos.: 6,253,075 ("the '075 patent"), 6,427,078 ("the '078 patent"), RE 39,231 ("the '231 patent"), 5,737,394 ("the '394 patent"), 6,002,390 ("the '390 patent"), 6,070,068 ("the '068 patent"), 6,393,430 ("the '430 patent"), 6,446,080 ("the '080 patent"), 6,549,942 ("the '942 patent"), 6,760,477 ("the '477 patent"), 7,313,647 ("the '647 patent"), 7,349,012 ("the '012 patent"), and 5,915,239 ("the '239 patent"). (D.I. 1) Prior to Apple's answer, on July 16, 2010, MMI amended its complaint to add allegations of infringement of U.S. Patent Nos. 6,441,828 ("the '828 patent"), 6,725,155 ("the '155 patent"), and 5,490,170 ("the '170 patent"). (D.I. 8) Apple answered and asserted affirmative defenses of, *inter alia*, noninfringement, invalidity, unenforceability, failure to state a claim, "waiver, laches and/or estoppel," prosecution history estoppel and lack of standing. (D.I. 10 at ¶¶ 114- 23) Apple also brought counterclaims of noninfringement of each of the sixteen patents-in-suit. (*Id.* at ¶¶ 129-208) Discovery proceeded in the case and has now closed. (D.I. 225) The '390 and '647 patents were subsequently dismissed from suit by joint stipulation. (D.I. 263) On March 2, 2012, Apple filed a motion to dismiss on the ground that MMI lacks standing to sue for infringement of the patents-in-suit. (D.I. 226) That motion is currently pending before the court. On June 21, 2012, Apple filed an unopposed motion for leave to file a supplemental brief in support of its motion. (D.I. 361) On June 29, 2012, MMI filed an unopposed motion for leave to supplement its

own papers. (D.I. 402) For the following reasons, the court grants the motions to supplement the record, and denies the motion to dismiss.

## II. BACKGROUND

### A. Formation of MMI

MMI is a Delaware LLC and has its principal place of business in Chevy Chase, Maryland. (D.I. 8 at ¶ 1) MMI was formed pursuant to a "Formation and Framework Agreement" (the "Formation Agreement") executed by Sony Corporation of America ("Sony USA"),[1] Nokia Corporation ("Nokia"),[2] and MPEG LA, LLC ("MPEG LA")[3]. (*Id.*, ex. C) The Formation Agreement states that MMI was formed by three Delaware corporations: Tagivan, LLC ("Tagivan"), a wholly-owned subsidiary of MPEG LA; Nokia Capital, Inc. ("Nokia Capital"), a wholly owned subsidiary of Nokia; and SCA IPLA Holdings, Inc. ("SCA"), a wholly-owned subsidiary of Sony America. (*Id.* at preamble) MMI was formed "to acquire, develop, administer and manage Intellectual Property rights" contributed to it by Nokia Capital and SCA. (*Id.*)

MMI obtained rights in the patents-in-suit (as well as dozens of other patents and patent applications) in January 2012 from Nokia Capital and SCA pursuant to two Patent Purchase Agreements ("the Purchase Agreements"). (D.I. 228, ex. D; ex. G) Prior to the transfer to MMI, SCA received the patents through assignments from Sony

---

[1] A New York corporation and a subsidiary of Sony Corporation ("Sony"), headquartered in Tokyo, Japan. Sony USA has several principal United States businesses, including Sony Electronics, Inc. ("Sony Electronics"). *See http://www.sony.com/SCA/index.shtml.*

[2] A Finland-based company.

[3] A Delaware LLC.

2

Electronics and Sony Corporation (*id.*, ex. E; ex. F), and Nokia Capital received its

patents from Nokia (*id.*, ex. G). Each respective agreement states that the seller or

transferor "sells, assigns, transfers and conveys [ ] all of [its] right, title and interest in

and to the [assigned] patents and all inventions and discoveries described therein,

including without limitation, all [its] rights [ ] under the Assignment Agreements, and all

[its] rights [ ] to license and collect royalties, including royalties for past infringement,

under such [Assigned] Patents." (*Id.* at ex. E at § 3.1; ex. F at § 2.1;[4] ex. G at § 3.1; ex.

H at § 3.1)

The Purchase Agreements between MMI and SCA and Nokia Capital also

contain an "Assignment of Patent Rights" addendum providing that:

> [Nokia Capital/SCA] sells, assigns, and transfers to [MMI], and its
> successors, assigns, and legal representatives, the **entire right, title and
> interest** in the United States and all foreign countries, in and to the U.S.
> Patents . . . in and to any and all inventions and improvements that are
> disclosed therein; in and to all divisional, continuing, substitute, renewal,
> reissue, and all other patent applications that have been or shall be filed in
> the United States and all foreign countries that are based upon the patents
> . . . ; in and to all original and reissued patents that have been or shall be
> issued in the United States and all foreign countries based upon the patents
> . . . ; and in and to all rights of priority based upon the patents . . . ; agrees
> that [MMI] may apply for and receive a patent or patents for said inventions
> and improvements in its own name . . . . [and] covenants [ ] that no
> assignment, grant, mortgage, license or other agreement affecting the rights
> and property herein conveyed has been made to others by the undersigned,
> and that full right to convey the same as herein expressed is possessed by
> the undersigned.

(D.I. 228, ex. D at MMI-A_00000504 (agreement exhibit B); ex. G at MMI-A_00000464

(agreement exhibit B)) (emphasis added)

---

[4]The Sony Corporation/Sony Electronics contract is entitled "Patent Transfer
Agreement," and replaces reference to the "Seller" with the "Transferor," and the
"Assigned Patents" with the "Transferred Patents."

3

The Purchase Agreements transferring the patents to MMI also include a "limited

license" to SCA and Nokia Capital to practice the patents, as follows:

6.1 The Seller License (as defined below) is a limited license and Purchaser's grant of such license does not include all rights in the Assigned Patents. . . .

6.2 Seller License. Upon assignment of the Assigned Patents to Purchaser, Purchaser hereby grants to Seller and its Subsidiaries, under the Assigned Patents and for the lives thereof, the Seller License set out in the entirety of this Article 6.2: a fully paid up, royalty-free, irrevocable, non-exclusive non-sublicensable, nontransferable right and license ("Seller License") to practice the methods and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit (a) any Seller and/or Subsidiary products or services covered by the Assigned Patents ("Covered Products") and (b) any intermediate products, chips or other components ("Components") for Seller or its Subsidiaries which Components are incorporated into any Seller and/or Subsidiary product and/or service. . . .

(*Id.*, ex. D at §§ 6.1, 6.2; ex. G at §§ 6.1, 6.2) MMI also granted to SCA and Nokia

Capital a release for any liability of infringement for the assigned patents. (*Id.*, ex. D at

§ 6.3; ex. G at § 6.3) MMI was given all rights to "pursue damages, injunctive relief, and

other remedies for past, current and future infringement of the Assigned Patents." (*Id.*,

ex. D at § 3.2; ex. G at § 3.2)

## B. Ownership and Operation of MMI

MMI's equity ownership is divided between Tagivan, with a majority 50.2% share,

and Nokia Capital and SCA, each with 24.9% shares. (*Id.*, ex. C at § 1.02) At the end

of each fiscal year, MMI allocates its net income (as well as net loss) among SCA,

Nokia Capital and Tagivan. (*Id.* at § 6.2) An "Early Dissolution" provision of the

Formation Agreement specifies that if, as of the third anniversary of the effective date of

the Formation Agreement, the MMI Board does not reasonably anticipate that MMI will

4

(within 60 days) reach $5 million in revenue, or "issue[ ] a patent license to at least four

(4) different Persons" not associated with MMI or its owners, Nokia Capital or SCA "may

cause the early dissolution" of MMI after appropriate notice is given.[5] (D.I. 228, ex. C at

§ 4.03) Otherwise, MMI's interests "shall be sold" on January 11, 2020 (via the "Tenth

Anniversary Sale Procedure") unless the involved parties unanimously agree

otherwise.[6] (D.I. 228, ex. C at § 4.04)

The Formation Agreement specifies that MMI shall adopt an operating

agreement which governs its activities. (*Id.* at § 1.01(a)) That agreement, the

"Amended and Restated Limited Liability Company Operating Agreement of

MobileMedia Ideas LLC, A Delaware Limited Liability Company," is also of record

(hereinafter, the "Operating Agreement"). (*Id.*, ex. I) Pursuant to the Operating

Agreement, MMI's "Members" (Nokia Capital, SCA, and Tagivan) are bound

> not to directly or indirectly transfer, sell, gift, exchange, assign, pledge,
> mortgage or otherwise dispose of or encumber any or all of its Interests or
> any legal or beneficial ownership therein [ ] unless such Member shall have
> first received the written approval of all other Members.

(*Id.* at Art. 9, § 9.1; *see also id.* at § 9.2 (any purported transfer without full compliance

is void *ab initio*)) The Operating Agreement also provides that SCA, Tagivan and Nokia

Capital do not have "any interest in specific Company property." (*Id.*, ex. I at § 1.5)

The Operating Agreement further provides that the Board of Representatives of

---

[5]MMI has submitted the Declaration of Lawrence A. Horn, providing that in or after February 2012, "the parties agreed to waive and terminate the dissolution right in Section 4.03 of the [Formation] Agreement" in order to facilitate the extension of a line of credit. (D.I. 441 at ¶¶ 5, 6)

[6]SCA, Nokia Capital and Tagivan have a right of first refusal. (D.I. 228, ex. C at § 4.05)

MMI ("the Board") shall comprise seven (7) individuals: two (2) designated by Nokia; two (2) designated by SCA; and three (3) designated by Tagivan. (*Id.* at § 4.1(2)) The Board is given all powers necessary to carry out the purposes and businesses of MMI, subject to delineated restrictions. (*Id.* at § 4.1(a))

For example, the Board may not, without unanimous approval, "approve any increase in the number or change in the rights and preferences of any authorized Interests" or "approve the purchase or sale of any material asset not in the ordinary course of business." (*Id.* at § 4.1(b)(3)(ix) & (xii)) Unanimous Board approval is also required for MMI to "enter into contingent fee arrangements with law firms or other service providers engaged by or for the purposes of providing services to the Company." (*Id.* at § 4.1(b)(3)(xviii))

Section 4.3 of the Operating Agreement describes the duties of the Board and Officers of MMI. While each Board member has "the same fiduciary duty of loyalty and care as a director or officer of a business corporation organized under the General Corporation Law of the State of Delaware," they are also expressly permitted to serve as a director or member representative of other competing business entities and may, in fact, "take the interests of its employer into account in acting as a Representative under this Agreement." (*Id.* at § 4.3) Put another way, the Board members delegated by Sonia, Nokia and Tagivan may retain loyalties to those companies.

## C. Role of Tagivan

Tagivan's activities are governed by the "Services Agreement By and Among MobileMedia Ideas LLC, Tagivan LLC and MPEG LA, LLC" (hereinafter, the "Services Agreement"). (D.I. 228, ex. J) The Services Agreement contains a schedule of services

6

including, *inter alia*, "[l]icensing services" as well as patent prosecution, royalty

collection, and maintenance of MMI's patent portfolio. (*Id.*, Schedule 2.1) Legal

consulting and support for MMI, as well as other corporate and management services,

are also delineated. (*Id.*) Pursuant to the Services Agreement, Tagivan "shall exercise

its reasonable discretion and take such actions as [it] may reasonably determine are

appropriate or necessary without obtaining prior approval of [MMI] for the provision of

the Services[.]" (*Id.* at § 2.2(a)) The Services Agreement also provides that Tagivan

> shall perform the Services in the capacity of an independent contractor of
> [MMI], and shall, unless otherwise expressly provided herein or authorized
> by [MMI] from time to time, have no authority to act for or represent [MMI] in
> any way or otherwise be deemed an agent of [MMI]. [MMI] shall have no
> authority to act for or represent [Tagivan] in any way or otherwise be deemed
> an agent of [Tagivan]. Nothing contained herein shall be deemed to
> constitute the Parties hereto as members of any partnership, joint venture,
> association, syndicate, trust or other entity; provided, however, that [Tagivan]
> is a limited liability company interest owner of [MMI].

(*Id.* at § 2.2(b))

While MMI has the sole right to collect royalties for the patents (D.I. 228, ex. D at

§ 3.1; ex. G at § 3.1), Tagivan actually collects the royalties (*id.* at ex. J at Schedule 2.1,

MMI-A_00000553), and all of the profits pass through MMI to SCA, Nokia Capital and

Tagivan (*id.*, ex. I at § 6.2). SCA and Nokia Capital also receive profits from the patents

via pre-existing licensing agreements that were not assigned to MMI; the Purchase

Agreements each carved out such pre-existing licenses from the transfer. (*Id.*, ex. D at

§ 3.3; ex. G at § 3.3) Although MMI has "right, title, and interest in and to all causes of

action and enforcement rights, whether currently pending, filed, or otherwise, for the

[a]ssigned [p]atents" and the right to pursue all "remedies for past, current and future

7

infringement;"[7] as well as the responsibility for patent maintenance,[8] MMI has delegated the management of its legal affairs to Tagivan.[9] The Services Agreement generally delineates Tagivan's "Legal" and "Intellectual Property" responsibilities, for example, "[h]andling and resolving claims, disputes or controversies (including litigation, arbitration, settlement or other proceedings or negotiations)," "[l]icensing services" and the "collection and verification of royalties[.]" (D.I. 228, ex. J at Schedule 2.1, MMI-A_00000553-54)

Absent breach or other extenuating circumstances, the Services Agreement may only be terminated by mutual written consent of both MMI and Tagivan. (D.I. 228, ex. J at § 7.2(e)) Moreover, MMI cannot re-assign the patents-in-suit without full Board approval, i.e., the consent of SCA, Nokia Capital and Tagivan. (D.I. 228, ex. I at §§ 4.1(b)(3)(ix) & (xii)) Tagivan, SCA and Nokia Capital effectively have veto power over any such sales by virtue of their Board seats. SCA and Nokia Capital have also retained unrestricted licenses to practice the patented technology without fear of litigation. (D.I. 228, ex. D at §§ 6.1-6.3; ex. G at §§ 6.1-6.3)

## III. STANDARDS

Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000). Under Rule 12(b)(1), the court's jurisdiction

---

[7](D.I. 228, ex. D at § 3.2; ex. G at § 3.2)

[8](D.I. 228, ex. D at § 4.4 & Assignment of Patent Rights (ex. B); ex. G at § 4.4 & Assignment of Patent Rights (ex. B))

[9](D.I. 228, ex. I at §§ 2.1(a), 2.2(b), Schedule 2.1)

may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed. 1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Under a factual attack, however, the court is not "confine[d] to allegations in the . . . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-92 (3d Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group*, 227 F.3d at 69 (quoting *Mortensen*, 549 F.2d at 891).

## IV. DISCUSSION

### A. Standing Requirements

MMI bears the burden of establishing that it has standing to bring an action for patent infringement. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). The Patent Act provides that "[a] patentee" is entitled to bring a civil action for patent infringement. 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors to the patentee." *Id.* at

9

§ 100(d). These sections "have been interpreted to require that a suit for infringement

of patent rights ordinarily be brought by a party holding legal title to the patent." *Propat*

*Intern. Corp. v. RPost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007) (citing *Sicom Sys.*

*Ltd.*, 427 F.3d at 976)); *see also Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367

(Fed. Cir. 2008); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017

(Fed. Cir. 2001).

> [P]laintiffs in patent suits fall into three categories for standing purposes:
> those that can sue in their own name alone; those that can sue as long as
> the patent owner is joined in the suit; and those that cannot even participate
> as a party to an infringement suit. In the first category (i.e., those who can
> sue in their own name alone) are those plaintiffs that hold all legal rights to
> the patent, including assignees and those to whom "all substantial rights to
> the patent" have been transferred. Exclusive licensees who do not receive
> all substantial rights fall into the second category and must join the patent
> owner as co-plaintiff to satisfy prudential concerns (i.e., to avoid the
> possibility that the accused infringer could later be sued by the patentee
> also). Finally, the third category (those who cannot be parties at all) includes
> those who lack exclusionary rights, i.e., those licensees who are authorized
> to make, use, and sell the patented product but who have no right to prevent
> others from also doing so.

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 Fed. Appx. 697 (Fed. Cir. 2008) (citing

*Morrow*, 499 F.3d at 1339) (internal citations and quotations omitted). A party that holds

the exclusionary rights to a patent suffers constitutional injury-in-fact. *See Morrow v.*

*Microsoft Corp.*, 499 F.3d 1332, 1341 (Fed. Cir. 2007). Viewing the test in terms of

such injury, to have constitutional standing, a party's interests in the patents must

"include sufficient exclusionary rights such that [it] suffers an injury in fact from infringing

activities. If [it] holds all substantial rights, it can sue in its name alone. If [it] holds less

than all substantial rights but sufficient exclusionary rights that it suffers injury in fact, it

can sue as a co-party[.]" *Id.*

10

## B. Substantial Rights

A patent is "a bundle of rights which may be divided and assigned or retained in whole or in part." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991). "When a sufficiently large portion of this bundle of rights is held by one individual, we refer to that individual as the owner of the patent, and that individual is permitted to sue for infringement in his own name." *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (hereinafter, "*Alfred E. Mann Foundation*"); *see also Propat*, 473 F.3d at 1189 ("Even if the patentee does not transfer formal legal title, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights to the patent to the transferee. . . [which is then] treated as the patentee and has standing to sue in its own name.") (citations omitted). The court must "look to the agreement between the parties and analyze the respective rights allocated to each party" in order to determine whether substantial rights have been transferred. *Propat*, 473 F.3d at 1189; *see also Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1378 (Fed. Cir. 2000) ("[W]e must ascertain the intention of the parties and examine the substance of what was granted.") (citation omitted).

The Federal Circuit has articulated some of the rights that should be examined for this purpose, as follows.

> [T]ransfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment. We have also examined the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise

11

> and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent.
>
> Frequently, though, the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor, is the most important consideration. Where the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee. It does not, however, preclude such a finding if the licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers. Under the prior decisions of this court, the nature and scope of the licensor's retained right to sue accused infringers is the most important factor in determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent.

*Alfred E. Mann Foundation*, 604 F.3d at 1360-61 (internal citations omitted) (collecting cases).

## C. Analysis

Typically, courts are presented with the situation where an exclusive licensee sues an alleged infringer, and it must be determined whether the licensee has standing. Similar to *Alfred E. Mann Foundation*, the court is presented with the rather unique, converse scenario "in which the patent owner seeks to bring suit, requiring [the court] to determine whether the patent owner transferred away sufficient rights to divest it of any right to sue." 604 F.3d at 1359.

Apple asserts that MMI is a "category 3" plaintiff (without sufficient rights to sue for infringement at all) and, as such, this court should dismiss the suit entirely. Alternatively, Apple argues that MMI is a "category 2" plaintiff (without sufficient rights to sue for infringement without joining others), in which case the court should dismiss the suit with leave to amend to add Sony and Nokia as parties. (D.I. 227 at 15)

12

Notably, while Apple asserts that Tagivan commands all of MMI's litigation and licensing, Apple does not argue that Tagivan (or its parent, MPEG LA) should be joined as plaintiffs. From the court's perspective, Tagivan has more authority vis a vis MMI than do Sony or Nokia. The Services Agreement (from which MMI cannot withdraw) enumerates dozens of responsibilities for which Tagivan has control. As discussed *supra*, Tagivan retains and oversees litigation counsel, handles and resolves all of MMI's legal disputes, identifies prospective licensees and negotiates licenses, and collects all royalties owed to MMI. (D.I. 228, ex. J at Schedule 2.1) There is no indication that MMI has veto power over Tagivan's decisions to bring suit against a potential infringer or to indulge infringement. *See Propat*, 473 F.3d at 1191 (the "right to veto licensing and litigation decisions" considered); *Prima Tek II,* 222 F.3d at 1378-79. The only litigation-related responsibility not delegated solely to Tagivan concerns the ability to enter into contingent fee arrangements with law firms, for which unanimous Board approval is required.[10]  (*Id.*, ex. C at § 4.1(b)(3)(xviii))

While Tagivan was delegated the "responsibility" to bring suit, the "right" to sue lies with MMI. The right to sue is of paramount importance in the "substantial rights" analysis. *See Sicom Sys., Ltd. v. Aligent Techs., Inc.*, 427 F.3d 971, 979 (Fed. Cir. 2005) ("[A]n important substantial right is the exclusive right to sue for patent infringement"); *Vaupel*, 944 F.2d at 875 (Grant of the right to sue is "particularly dispositive" to the substantial rights inquiry in view of the Court's policy to "prevent the

---

[10]As explained by counsel at oral argument, this is consistent with the unanimous Board approval required for the divestiture of assets, as contingency fee litigation essentially divests all of MMI's owners of profit. (D.I. 433 at 17-18)

13

possibility of two suits on the same patent against a single infringer").

Sony, Nokia and Tagivan, undoubtedly aware of the relevant caselaw, structured the instant transactions such that MMI had "the entire right, title and interest" in the patents-in-suit. "A transfer of the 'entire interest' of a patentee in a patent is well known to mean a full assignment of the patent – i.e., transfer of title." *Mars*, 527 F.3d at 1370 (citing *Littlefield v. Perry*, 88 U.S. 205 (1874)) (*mandate recalled and amended by* 557 F.3d 1377 (Fed. Cir. 2009)); *see also* 35 U.S.C. §§ 100(d) & 281 (expressly conferring standing to sue for infringement on owners of patents).

MMI has other "rights" for which the associated enforcement "responsibilities" have been delegated to Tagivan. MMI has the right to receive patent royalties, for example. This is so irrespective of the fact that MMI later allocates its profits to the owners. (D.I. 228, ex. D at § 3.1; ex. G at § 3.1; *id.* at ex. J at § 6.2) The Federal Circuit has not yet been presented with the situation in which 100% of the patent's proceeds flow back to the former title holder, but its jurisprudence indicates that the retention of profits is not dispositive. *See Propat*, 473 F.3d at 1191 ("[T]he fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of [a] patent. . . does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent.").

The Federal Circuit has also indicated that "[t]he right to dispose of an asset is an important incident of ownership, and such a restriction on that right is a strong indicator" that not all substantial rights under the patent have been transferred. *See Propat*, 471 F.3d at 1191 (citing *Sicom*, 427 F.3d at 979) (additional citation omitted). In this case, neither Sony nor Nokia may independently or collectively sell the patents-in-suit;

14

Tagivan's approval (i.e., a unanimous Board) is required.  (D.I. 228, ex. I at §

4.1(b)(3)(ix) & (xii))

Finally, the court does not view the "Early Dissolution" or "Tenth Anniversary Sale

Procedure" provided in the Formation Agreement as dispositive.  The former provision

provided only that the owners "may" have caused the dissolution of MMI.  The latter

provision may be voided (in 2020) by the collective agreement of Sony, Nokia and

Tagivan.  (D.I. 228, ex. C at § 4.04)  Notwithstanding, the potential for a title holder to be

sold or to elect to sell its patents is present in every case, and standing does not hinge

on such possibilities.

In conclusion, while Sony and Nokia have retained (or have been granted back)

certain rights in the patents-in-suit,[11] the court does not deem such rights "substantial"

vis a vis those held by MMI.  There is no indication that either Sony or Nokia, non-

exclusive licensees of MMI holding no legal title to the patents-in-suit, have

constitutional standing to sue.  Tagivan, having never held legal title or any license to

the patents, may not initiate suit in its own name.  Thus, the court's decision does not

subject Apple to duplicative litigation. *See Vaupel*, 944 F.2d at 875 (citing *Crown Die &

Tool Co. v Nye Tool & Machine Works*, 261 U.S. 24 (1923)).

_____

[11]For example, the right to practice the patented technology and to retain pre-existing licenses. *See Abbott Labs.*, 47 F.3d at 1132 (fact that transferor retained the right to sell patented products "to parties with whom [it] had pre-existing contracts and to pre-existing licensees" was among several compelling the conclusion that transferee was a licensee and not an assignee); *see also Sicom*, 427 F.3d at 978 (license to practice the patents is a right to be considered); *see also Asymmetrx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314, 1320 (Fed. Cir. 2009) (same).

15

## V. CONCLUSION

For the aforementioned reasons, the court grants the parties' motions to supplement the record, and denies Apple's motion to dismiss. An appropriate order shall issue.